Napoleon CHISHOLM, Plaintiff,

and

H. C. Rushing, et al.,
Plaintiff-Intervenors,

v.

The UNITED STATES POSTAL
SERVICE, et al., Defendants.

No. C–C–73–148.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Oct. 3, 1980.

Jonathan Wallas and Louis L. LeSesne, Jr., Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P. A., Charlotte, N. C., and Bill Lann Lee, NAACP Legal Defense and Educational Fund, Inc., New York City, for plaintiff.

Stanley A. Mestel and James B. Petrick, U. S. Postal Service, Washington, D. C., and Wayne Alexander, Asst. U. S. Atty., Charlotte, N. C., for defendants.

## MEMORANDUM OPINION

McMILLAN, District Judge.

This action was tried on August 15–17 and 20–22, 1979, upon allegations of the plaintiff, the plaintiff intervenors (hereinafter collectively referred to as "plaintiffs") and the class of employees represented by plaintiffs that the defendants had engaged in policies and practices in violation of Title VII of the Civil Rights Act of 1964, (as amended) 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. § 1981 ("§ 1981") and the Fifth Amendment to the Constitution of the United States and that the plaintiffs and class members had been denied employment opportunities as a result of the racially discriminatory practices of the defendants. Plaintiffs seek injunctive relief including monetary compensation to remedy the claimed discrimination and to provide specific redress for each individual who has suffered as a result of the defendants' alleged discriminatory practices. Based on the evidence, the Court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

A. *Parties*

1. Plaintiffs herein, Napoleon Chisholm, H. C. Rushing, William J. McCombs, C. A. Rickett, Milton J. Yongue, and James F. Lee, are black citizens of the United States residing in Mecklenburg County, North Carolina, who, at all times pertinent, have been employees of the United States Post Office and the United States Postal Service.

2. Plaintiffs have brought this action as a class action under Rule 23, Federal Rules of Civil Procedure. On May 29, 1975 an order was entered certifying this case as a class action consisting of:

All black persons who are employed and who might be employed by the defendants at the Charlotte, Mecklenburg County, North Carolina branch of the United States Postal Service and who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants in ways which deprive or tend to deprive them of employment opportunities and otherwise affect their status as employees or applicants for employment or promotion because of their race or color.

The above class definition was amended on July 17, 1979, and the class was redefined as follows:

. . . all black persons who have been employed by the defendants at the Charlotte, Mecklenburg County, North Carolina facilities of the United States Postal Service (or the United States Post Office) at any time from March 24, 1970 to the date of this Order who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants in ways which deprive them of employment opportunities and otherwise affect their status as employees or

with respect to promotion or pay because of their race or color.

Notice to potential class members was effected prior to trial by having a copy of this Court's July 17, 1979 class action Order posted on all bulletin boards of defendants' Mecklenburg County, North Carolina facilities. The evidence at the trial of this case involved facts relating to a pattern of racial discrimination engaged in by the defendants and certain individual claims of certain of the plaintiffs and class members who testified at the trial. As set forth hereafter, an opportunity will be given to all class members to present their individual claims of discrimination at some later date.

3. The defendant United States Postal Service (hereinafter "USPS") is a quasi-governmental corporation established by Congress and is the successor to the United States Post Office. The business of USPS is mail. This case involves the facilities of USPS located in Mecklenburg County, North Carolina. USPS is an employer within the meaning of Title VII (as amended in 1972).

4. Defendant W.A. Shaw, as of the date this action was filed, was the officer in charge of the Charlotte, Mecklenburg County, North Carolina facilities of USPS. Shaw, and his predecessors and successors, were responsible for the overall operations of the Charlotte branch of the USPS, including the promotion of all personnel and the selection of supervisors and upper level management personnel.

5. Defendant E. T. Klassen, as of the date this action was filed, was the Postmaster General of the United States and the chief executive officer of USPS. Klassen, and his predecessors and successors, were responsible for the overall operations of USPS, including the promotion and other employment procedures and policies of USPS.

6. Defendant Michael R. Greeson, as of the date this action was filed, was the head of the personnel department of the Charlotte branch of USPS and was responsible for the day-to-day personnel decisions of that office, including the decisions involving promotions and the selection of supervisory and upper level management personnel.

B. *Administrative Proceedings*

7. On March 24, 1972, after an inconclusive informal proceeding,[1] plaintiff Chisholm filed a formal administrative complaint of racial discrimination pursuant to the then existing U.S. Civil Service Commission regulations, 5 C.F.R. Part 713. As was true throughout the entire administrative process Chisholm was not represented by counsel. The complaint stated that the "specific action or situation complained of" was:

3. (a) On March 4, 1972, the position of Finance Examiner, level 9 was filled by Mr. Robert L. Wallace and on March 13, 1972, the position of Budget Assistant, level 8 was filled by Mr. L. B. Holland; I was denied an equal opportunity to be considered for the above positions.

(b) That such denial of equal opportunity for black employees in relation to promotion in the U. S. Postal Service, Charlotte, N.C. is a continuing discriminatory practice.

In his formal complaint, Chisholm gave as "the date of the alleged act of discrimination," "[s]pecifically: March 4, 1972, and March 13, 1972" and "[g]enerally: 1960 through present time." The following were set forth in the letter of complaint as Chisholm's reasons that there had been discrimination against blacks as a class as well as against Chisholm individually:

7. In being denied the equal opportunity to be considered for the aforementioned positions, I was informed by the Personnel Office that I did not meet the specialized experience required, in that, at least one year of specialized experience must have been at a level of difficulty comparable to not more than

---

1. Before filing his administrative complaint, Chisholm wrote a letter to the Postmaster in Charlotte and requested "one minute of his time for each year (Chisholm) had been a postal employee" to discuss "the very bad situation in the Charlotte Post Office." Chisholm received a reply that no such meeting would be allowed.

3 levels and 2 levels below the position to be filled, 9 and 8 respectfully [sic]. Therefore, since I am a level 5 carrier I was denied the opportunity to compete for the positions. However, in subsequent advertisements with the same stipulation as above Mr. C. C. Claud and Mr. Leonard W. Kerr, both level 5 and both white employees were granted an opportunity to compete for level 8 positions on March 10, 1972, at 10:30 a. m. and 11:00 a. m., respectfully [sic]. On March 17, 1972, Mr. Jack R. Polk, a white employee, level 4 was granted an opportunity to compete for a level 8 position advertised with the same stipulation. Therefore, I contend that the aforementioned stipulation is a manipulated tool of management whereby discrimination in general is practiced by management against the black employees and in this case specifically against me. In that I firmly believe that I am the more qualified employee.

In regards 3-b above: because of the lack of the accessibility to record examination the below contentions are not based on specific statistics, however they are in my opinion, statistically inferred based on 12 years of competent observation—stated within a 95% to 99% competence level.

(a) That less than 1% of the total supervisory staff, level 7 and above is black.

(b) That the total number of black supervisors appointed since 1960 is less than ½ of 1% of the total number of white supervisors appointed since 1960.

(c) That the total number of times that a black supervisor has chaired a position on the Promotion Advisory Board is less than ¼ of 1% of the total number of times that it has convened.

(d) That the white employee has been consistently "detailed" to the open positions and allowed to work in the position on an average of 1 year before it goes up for bid, thus giving the "detailed" employee a definite advantage over any other applicant.

(e) That the "detailed" employee gets the position regardless of the qualification of any applicant competing against him.

(f) That less than ¼ of 1% if any, black employees, are "detailed" to supervisory and other staff positions.

As a result, it is through the "detailed process" which is unadvertised, and the convening of a biased Promotion Advisory Board that willful and consistent discriminatory practices in promotions against the black employee, has and is prevailing in the Charlotte, N. C. Postal Service.

This Court has previously found that, "[i]t is undisputed that . . . in his formal complaint, the plaintiff raised broad class-wide issues of discrimination." Memorandum Opinion filed May 29, 1975.

8. As required by U. S. Civil Service Commission regulations, an investigation of Chisholm's complaint was conducted by an investigator employed by USPS. While the USPS investigation focused only on the specific denial of two promotions, raised by Chisholm, the administrative record contains various minority census reports and other statistical compilations which show that few blacks had obtained higher level USPS jobs. On the basis of a review of the investigator's report and considering only the denial of Mr. Chisholm's applications for promotion, the regional USPS office of Equal Employment Compliance issued on August 28, 1972, a proposed decision that the "allegation of discrimination due to your race is not supported; therefore, we propose to dispose of your complaint of discrimination as not being supported". Chisholm was informed that he could request an administrative hearing if dissatisfied with the proposed decision, and he did so. A hearing was held September 21, 1972 at which time evidence of class-wide discrimination was presented as well as evidence concerning the specific promotions which Chisholm claimed he had been denied.

9. In his subsequent decision, the hearing examiner considered only the question

"[has] the complainant been improperly denied consideration for promotion?". The examiner found "that the complainant was improperly denied consideration for the position of Finance Examiner, but that he was not improperly denied consideration for the position of Budget Assistant." He concluded that, "[T]he preponderance of the evidence supports the allegation of discrimination because of race". The hearing examiner recommended the following relief:

Since the evidence shows an inconsistency in the application of the qualifications standards by the Personnel Office of the Charlotte Post Office, it is recommended that for at least one year, all determinations of eligibility and/or ineligibility of candidates for positions in the Charlotte Post Office be audited by the Regional Office before the lists of eligibles are referred to the selecting official.

It is also recommended that the complainant be given priority consideration for promotion to the first available position for which he applies in which he meets the minimum qualifications.

10. On December 29, 1972, the national office of USPS Equal Employment Compliance accepted the examiner's proposed findings, recommended decisions and recommended action in a short letter of final decision. The letter also did not address Chisholm's allegations of class-wide discrimination. Chisholm was given the option of appealing to the Board of Appeals and Review of the U. S. Civil Service Commission or filing a civil action pursuant to Title VII; he chose the former.

Chisholm's January 14, 1973, letter of appeal stated: After careful consideration of the various factors leading to his decision, I have concluded that I cannot and will not accept his decision. Therefore, on behalf of all of the minority employees in the Charlotte, N. C. Post Office and myself I am appealing to you for equitable relief from the practices of discrimination against the minority employees by management in the Charlotte, N. C. Post Office.

Among his reasons for appeal were: *First*, "the decision leaves intack [sic] an unjustified Promotion Appeals Board which has only one black supervisor on it; and no female members." *Second*, "[t]he decision makes no effort to correct the discrimination practices of management via use of the 'detail' process".

The appeal went on:

Note: that in the Hearing management made no effort to defend their method of "detailed" promotions whereas it was pointed out by me and testimony given as to just how this is done. (1) the opening to which they can detail an employee is not made known to the entire work force, therefore they hand pick a "buddy," detail him to the position and allow him to work it for a considerable length of time, "normally 6 months to a year and a half," then, they place the position up for bid as if it just came open. Added to that is the fact that they load the Promotion Advisory Board with two people who usually are instrumental in detailing their "buddy" employee. As a result their "buddy" gets the promotion. Now place yourself on that Promotion Board as the third member and you are reviewing an applicant thats [sic] been working the position in question for at least a year, and it has been prior assured that there is no reported discrepancy in his work performance. How would you vote?

I am therefore requesting that you direct the Charlotte Post Office to make known to all employees of any and all positions to which an employee can be "detailed" prior to the filling of the position. And that the Charlotte Post Office allow any and all employees ample time to express their interest and qualification for the position prior to filling the "detailed" position. Your attention is directed to the fact that when an employee is detailed to a higher level position he is paid accordingly and it's ultimately the same affect as a promotion.

11. Thereafter on May 29, 1973, the final agency decision with respect to Mr. Chisholm's complaint was affirmed except for reimposing the required one year audit-

ing period (which had been eliminated by the national office of USPS). The decision expressly stated that class-wide discrimination would not be addressed.

This Court has previously found and it is undisputed that "[d]espite the clear language in Chisholm's formal complaint, claiming pervasive racial discrimination . . . the administrative agency chose to 'interpret' Chisholm's complaint as raising the limited claim of discrimination in the Finance Examiner and Budget Assistant jobs" only. As "the decision of the Board [was] final and there [was] no further right of administrative appeal", this lawsuit was filed on June 27, 1973.

C. *Judicial Proceedings*

12. Following the institution of this action, motions to amend the complaint (to add a Fifth Amendment claim) and to intervene were filed and allowed. Defendants' motions to dismiss were denied. On May 29, 1975, this Court entered a Memorandum Opinion and a separate Order allowing, *inter alia*, the case to proceed as a class action (and as a trial *de novo*) and allowing an interlocutory appeal. Leave to appeal was granted by the United States Court of Appeals for the Fourth Circuit. After full briefing and intervening appellate decisions, the defendants' appeal was voluntarily dismissed on August 3, 1977.

13. Thereafter, the parties conducted extensive discovery with respect to the class and individual claims. Trial was held August 15–17 and 20–22, 1979. At the close of trial, the Court directed the parties to meet and attempt to settle the case. Settlement efforts proved fruitless and, on June 23, 1980, this Court entered a Memorandum of Decision setting forth, in general terms, its findings with respect to certain issues raised in the case. The Court having now reviewed the entire record, more detailed and complete findings are hereafter set forth.

D. *General Organization of USPS in Mecklenburg County*

14. The Charlotte Post Office is the USPS installation in the Charlotte, Meck-

lenburg County, North Carolina metropolitan area, and consists of about a dozen or more stations within the city limits of Charlotte (the number of stations varied over time), including the large relatively new General Mail Facility, and two or more branches outside the city limits. The Charlotte Post Office is the only federal employer of appreciable size in the Charlotte area and serves the largest metropolitan area in North Carolina. In May 1972, shortly after the filing of Chisholm's administrative complaint, about 1400 plus persons (including rural carriers) were employed by the Charlotte Post Office. In addition to the Charlotte Post Office, the USPS maintains several other facilities in Mecklenburg County including offices in Pineville, Matthews and Davidson.

15. The Charlotte Post Office and the territory it serves, including Mecklenburg County, are within the Charlotte Sectional Center, which consists of a three-county-wide corridor of the western part of the State of North Carolina from Virginia to Chester, South Carolina. The Charlotte Sectional Center is comprised of two first-class post offices, the Charlotte Post Office and the Hickory Post Office, and approximately 202 associate offices. The Charlotte Sectional Center is itself one of six sectional centers in the Charlotte District or Carolinas District, which covers North and South Carolina.

16. The same management officials are in charge of the operation of both the Charlotte Post Office and the larger Charlotte Sectional Center. Thus, the Charlotte Sectional Center Manager or Postmaster has overall responsibility for the operation of the Charlotte Post Office (and the other post offices) in Mecklenburg County, North Carolina.

17. Within the Charlotte Post Office (and Charlotte Sectional Center) there are four main organizational divisions, Mail Processing, Customer Services, Finance (or Support) and Employment and Labor Relations which perform the following major functions:

(a) Mail processing division's function is mail distribution, mail processing, and dispatch activities, and plant maintenance throughout the Charlotte Post Office;

(b) Customer Services division's function is all operational and customer services activities, including dispatch, delivery and collection; retailing, window services and related activities, such as vehicle maintenance and operations, throughout the Charlotte Post Office;

(c) Finance (or Support) division's function is providing finance, budget administration, data systems information, accounting and costing, auditing and administrative services; and

(d) Employee and Labor Relations division's function is administration of personnel policies and practices.

There is substantial movement by employees from one functional area to another by means of transfer, promotion and temporary assignment. Employees by working in various functional areas are provided experiences which may be helpful when promotional decisions are made.

18. Mail processing is an operational division, and employees are assigned to it in work locations throughout the Charlotte Post Office, notably the General Mail Facility, which has three tours (or shifts), covering 24 hours, the parcel post annex, and airport mail facility. Customer Services is also an operational division with work locations throughout the Charlotte Post Office. The Finance and Employee Relations offices essentially provide support services and have far fewer employees; both offices are located in the General Mail Facility.

19. Within functional divisions, managers and supervisors administer operational and personnel policies and practices in tours or sections of larger facilities, such as the General Mail Facility, parcel post annex and airport mail facility and in the smaller branches and stations. Line supervisors at larger facilities or superintendents of station operations at branches or stations initiate personnel recommendations or requests, which then pass on to managers and functional Sectional Center Directors, and the Director, Employment and Labor Relations and the Postmaster for final approval.

E. *Personnel Organization*

20. Employees are normally hired into various functional craft positions of clerk, city carrier, vehicle operator, vehicle maintenance, mail handler and rural mail carrier, each of which positions has a separate seniority roster and collective bargaining agreement. There are collective bargaining agreements with unions representing rural letter carriers, mail handlers, letter carriers, and a group including clerks, motor vehicle employees, maintenance employees and special delivery messengers.

21. Craft lower level vacancies are filled by a bidding system principally based on craft seniority pursuant to collective bargaining agreements. Craft jobs are normally filled by the "senior qualified" employee. At times material to this lawsuit, craft employees have been designated by Postal Field Service (PFS) and subsequently by the Postal Service (PS) pay levels.[2] Each job is assigned a pay level. Clerks are generally level 5 and 6 employees; carriers are generally at level 5; and journeyman mail handlers are normally level 4. Each level has a number of pay steps through which employees advance by length of service. The higher the level and step the higher the pay, although pay at the upper steps of a lower level generally overlaps pay at the lower step of a higher level.

22. In 1973, seniority lists were maintained at the Charlotte Post Office (including part-time employees) in the following categories and with the following racial breakdown:

---

2. On March 5, 1973, initial level supervisory positions which had previously been designated levels 7, 8 and 9 were redesignated Postal Management Schedule, or PMS, levels 15, 16 and 17.

| Category | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| Supervisory | 96 | 9 | 105 |
| Carrier | 341 | 85 | 426 |
| Rural Carrier | 22 | 0 | 22 |
| Clerk | 535 | 207 | 742 |
| Special Del. Messenger | 12 | 0 | 12 |
| Mail Handler | 33 | 70 | 103 |
| Postal Assistant | 7 | 0 | 7 |
| Motor Vehicle Service Vehicle Op. | 13 | 23 | 36 |
| Vehicle Maintenance Service Supervisory | 6 | 0 | 6 |
| Vehicle Maintenance | 17 | 2 | 19 |
| Building & Maintenance Service Supervisory | 4 | 2 | 6 |
| Building & Maintenance Service | 22 | 29 | 51 |

23. Higher level positions start with level 7 and above and include initial level supervisory positions which have line responsibility for supervising craft employees, and nonsupervisory technical positions such as personnel, accounting, EEO specialist and nurse positions. The bulk of higher level positions are supervisory employees.

24. Supervisory vacancies are usually filled by regular craft employees of the Charlotte Post Office who apply through competitive procedures, which until 1976 included a written examination such as the general initial level supervisory OS 100 examination for certain designated positions. Initial level Supervisory positions were generally designated PS level 7, 8, or 9, until March 1973, when initial level supervisory positions were redesignated Postal Management Schedule, or PMS, levels 15, 16, and 17, with no immediate change in the level of pay.

25. Management positions are defined as those in which the incumbent normally supervises supervisors instead of craft employees. Until 1973, management level supervisory positions were designated PS 10 and above. After 1973, management level supervisory positions were designated Postal Executive Schedule, or PES, level 18 and above. PES management vacancies are circulated throughout the region of which the Charlotte Post Office is a part and sometimes even nationwide. They may also be filled in a non-competitive process by certain employees who have been excessed from other areas.

26. Generally speaking, promotion to supervisory and management jobs is an "in-house" process. USPS in Charlotte utilizes an internal labor market for upper level jobs. New supervisors are rarely hired directly into the USPS, although certain training programs have been initiated from time-to-time to obtain supervisors from outside the system. Promotions are progressive in nature. One normally must first be an initial level supervisor before obtaining higher level supervisory jobs. For example, the Charlotte Postmaster at the time of trial, O. B. Sloan, started his postal career in a craft job. Similarly, most of the other individuals who obtained higher level posi-

tions (levels 7 and above) began their careers as clerks, carriers, or mailhandlers.

F. *Workforce Statistics*

27. USPS has maintained periodic records demonstrating the racial composition of its workforce by job level. The racial breakdown for various periods during the years 1962–1973 are as follows:

(a) EMPLOYEES BY LEVEL AND RACE, 1962

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 2 | 0 | 2 |
| 2 | 0 | 13 | 0 | 13 |
| 3 | 62 | 34 | 0 | 96 |
| 4 | 589 | 94 | 1 | 684 |
| 5 | 39 | 6 | 0 | 45 |
| 6 | 11 | 1 | 0 | 12 |
| 7 | 40 | 1 | 0 | 41 |
| 8 | 16 | 0 | 0 | 16 |
| 9 | 14 | 0 | 0 | 14 |
| 10 | 6 | 0 | 0 | 6 |
| 11 | 1 | 0 | 0 | 1 |
| 12 | 2 | 0 | 0 | 2 |
| 13 | 1 | 0 | 0 | 1 |
| 14 | 1 | 0 | 0 | 1 |
| 15 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 701 | 150 | 1 | 852 |
| Subtotal 7-15 | 82 | 1 | 0 | 83 |
| TOTAL | 783 | 151 | 1 | 935 |

Source: Survey of Federal Civilian Employment of Selected Minority Groups as of 6-22-62, excluding 9 white rural carriers.

(b) EMPLOYERS BY LEVEL AND RACE, 1968

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 2 | 0 | 10 | 0 | 10 |
| 3 | 0 | 19 | 0 | 19 |
| 4 | 32 | 74 | 0 | 106 |
| 5 | 813 | 206 | 1 | 1020 |
| 6 | 103 | 14 | 0 | 117 |
| 7 | 20 | 1 | 0 | 21 |
| 8 | 40 | 1 | 0 | 41 |
| 9 | 10 | 2 | 0 | 12 |
| 10 | 17 | 0 | 0 | 17 |
| 11 | 9 | 0 | 0 | 9 |
| 12 | 3 | 0 | 0 | 3 |
| 13 | 2 | 0 | 0 | 2 |
| 14 | 2 | 1 | 0 | 3 |
| 15 | 1 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 948 | 323 | 1 | 1272 |
| Subtotal 7-17 | 105 | 5 | 0 | 110 |
| TOTAL | 1053 | 328 | 1 | 1382 |

Source: Field Report on EEO Program for Progress, dated 8-29-68, excluding rural carriers.

(c)          EMPLOYEES BY LEVEL AND RACE, 1969

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 25 | 0 | 25 |
| 2 | 0 | 5 | 0 | 5 |
| 3 | 0 | 18 | 0 | 18 |
| 4 | 28 | 76 | 0 | 104 |
| 5 | 824 | 222 | 1 | 1047 |
| 6 | 125 | 15 | 0 | 140 |
| 7 | 15 | 1 | 0 | 16 |
| 8 | 43 | 1 | 0 | 44 |
| 9 | 10 | 2 | 0 | 12 |
| 10 | 17 | 0 | 0 | 17 |
| 11 | 9 | 0 | 0 | 9 |
| 12 | 3 | 0 | 0 | 3 |
| 13 | 3 | 0 | 0 | 3 |
| 14 | 2 | 1 | 0 | 3 |
| 15 | 1 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 977 | 361 | 1 | 1339 |
| Subtotal 7-17 | 104 | 5 | 0 | 109 |
| TOTAL | 1081 | 366 | 1 | 1448 |

Source:   Field Report on EEO Program for Progress, dated 7-7-69, excluding rural carriers.

(d)          EMPLOYEES BY LEVEL AND RACE, 1970

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 2 | 1 | 4 | 0 | 5 |
| 3 | 1 | 17 | 0 | 18 |
| 4 | 32 | 78 | 1 | 111 |
| 5 | 757 | 244 | 2 | 1003 |
| 6 | 142 | 20 | 0 | 162 |
| 7 | 13 | 1 | 0 | 14 |
| 8 | 47 | 2 | 0 | 49 |
| 9 | 12 | 2 | 0 | 14 |
| 10 | 19 | 0 | 0 | 19 |
| 11 | 9 | 0 | 0 | 9 |
| 12 | 3 | 0 | 0 | 3 |
| 13 | 3 | 0 | 0 | 3 |
| 14 | 2 | 0 | 0 | 2 |
| 15 | 1 | 1 | 0 | 2 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 933 | 363 | 3 | 1299 |
| Subtotal 7-17 | 110 | 6 | 0 | 116 |
| TOTAL | 1043 | 369 | 3 | 1415 |

Source:   Field Report on EEO Program for Progress, dated 4-14-70, Excluding rural carriers.

(e) EMPLOYEES BY LEVEL AND RACE, 1971

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 2 | 1 | 4 | 0 | 5 |
| 3 | 1 | 15 | 0 | 16 |
| 4 | 33 | 84 | 0 | 117 |
| 5 | 741 | 244 | 1 | 986 |
| 6 | 154 | 33 | 0 | 187 |
| 7 | 11 | 4 | 0 | 15 |
| 8 | 42 | 4 | 0 | 46 |
| 9 | 14 | 2 | 0 | 16 |
| 10 | 17 | 0 | 0 | 17 |
| 11 | 9 | 0 | 0 | 9 |
| 12 | 4 | 0 | 0 | 4 |
| 13 | 3 | 0 | 0 | 3 |
| 14 | 2 | 0 | 0 | 2 |
| 15 | 1 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 930 | 380 | 1 | 1311 |
| Subtotal 7-17 | 104 | 10 | 0 | 114 |
| TOTAL | 1034 | 390 | 1 | 1425 |

Source: Field Report on EEO program for Progress, dated 6-4-71, excluding rural carriers.

(f) EMPLOYEES BY LEVEL AND RACE, 1972

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 2 | 1 | 4 | 0 | 5 |
| 3 | 1 | 17 | 0 | 18 |
| 4 | 37 | 89 | 0 | 126 |
| 5 | 727 | 270 | 1 | 998 |
| 6 | 156 | 39 | 0 | 195 |
| 7 | 12 | 4 | 0 | 16 |
| 8 | 46 | 4 | 0 | 50 |
| 9 | 16 | 1 | 0 | 17 |
| 10 | 17 | 0 | 0 | 17 |
| 11 | 11 | 1 | 0 | 12 |
| 12 | 4 | 0 | 0 | 4 |
| 13 | 3 | 0 | 0 | 3 |
| 14 | 3 | 0 | 0 | 3 |
| 15 | 1 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 1 | 0 | 0 | 1 |
| Subtotal 1-6 | 922 | 419 | 1 | 1342 |
| Subtotal 7-17 | 114 | 10 | 0 | 124 |
| TOTAL | 1036 | 429 | 1 | 1466 |

Source: EEO Program for Progress Report, dated 5-10-72, excluding rural carriers.

(g)          EMPLOYEES BY LEVEL AND RACE, 1973

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 1 | 0 | 1 | 0 | 1 |
| 2 | 2 | 2 | 0 | 4 |
| 3 | 2 | 15 | 0 | 17 |
| 4 | 76 | 32 | 0 | 108 |
| 5 | 67 | 92 | 0 | 159 |
| 6 | 780 | 257 | 0 | 1037 |
| 7 | 16 | 4 | 0 | 20 |
| 8 | 48 | 7 | 0 | 55 |
| 9 | 21 | 1 | 0 | 22 |
| 10 | 15 | 0 | 0 | 15 |
| 11 | 11 | 1 | 0 | 12 |
| 12 | 5 | 0 | 0 | 5 |
| 13 | 1 | 0 | 0 | 5 |
| 14 | 3 | 0 | 0 | 3 |
| 15 | 3 | 0 | 0 | 3 |
| 16 | 0 | 0 | 0 | 0 |
| 17 | 0 | 0 | 0 | 0 |
| Subtotal 1-6 | 927 | 399 | 0 | 1326 |
| Subtotal 7-17 | 123 | 13 | 0 | 136 |
| TOTAL | 1050 | 412 | 0 | 1462 |

Source:    Exhibit 3 to Defendants' Answers To Plaintiffs' First Interrogatories, Seniority Lists from July 1973, excluding rural carriers and P.L. 121 appointments.

(h)    The percentage of blacks in the workforce has remained relatively constant, with a 30% black work force, during the 1970's.

28.    As of 1975, the breakdown of USPS supervisors in the Charlotte Post Office was as follows:

SUPERVISORY EMP10YEES BY
LEVEL AND RACE, 1975

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 13 | 2 | 1 | 0 | 3 |
| 14 | 6 | 1 | 0 | 7 |
| 15 | 36 | 9 | 1 | 46 |
| 16 | 7 | 2 | 0 | 9 |
| 17 | 6 | 1 | 0 | 7 |
| 18 | 15 | 0 | 0 | 15 |
| 19 | 3 | 1 | 0 | 4 |
| 20 | 6 | 0 | 0 | 6 |
| 21 | 3 | 0 | 0 | 3 |
| 22 | 1 | 1 | 0 | 2 |
| 23 | 2 | 0 | 0 | 2 |
| 24 | 2 | 0 | 0 | 2 |
| 27 | 1 | 0 | 0 | 1 |
| TOTAL | 90 | 16 | 1 | 107 |

Source:    Admin. File, John A. Pettice, Complaint of October 18, 1974.

G. *Procedures For Selection of Initial Level Supervisors and Upper Level Employees*

29. USPS has used various methods to select employees for upper level (generally level 7 and above) positions. A number of jobs level 7 and above including, for example, most higher level jobs in Finance and Personnel have been filled without requiring passage of any written tests. Such upper level jobs are, at least in theory, filled by the "best qualified" employee as more fully discussed below. However, while the passage of the pertinent written tests is not required for such jobs, test scores generally are provided to the selecting authority and in some cases, passage of the initial level supervisor exam (discussed in detail below) could be utilized as a substitute for required job experience. Other upper level jobs (referred to herein as "initial level supervisory positions") have at various times been filled only by those persons who scored as required on the then existing written supervisory exams.

30. The highest level supervisory and management jobs, generally those above level 15 on the present scale, do not have any additional written test requirements. Of course, since initial level supervisors have usually passed the pertinent tests, failure to get by the testing requirement precludes one from both initial level and higher positions.

31. As a practical matter, few if any individuals have been promoted to any upper level jobs without making a satisfactory test score. This fact is true with respect to jobs where a successful test result is not required but may be used to substitute for experience or otherwise as an added credential. For example, white employees L. B. Holland, E. L. Robinson, James F. Brawley, Richard C. Warfel and Charles Morgan received passing scores on the pertinent supervisor exams and were later promoted to upper level jobs where such test success was not a formal requirement.

H. *Use of the Initial Level Supervisory Examinations*

32. Until October 1976, a USPS employee was required to take a written examination in order to be eligible to apply for and be considered for initial level supervisory positions. The examination used to establish registers or lists of employees eligible to fill most initial level supervisory positions was the "postal operations" or "postal branch" 100 examination for initial level supervisory positions in all crafts.

33. The initial level supervisory 100 examination was described as an examination consisting of technical and managerial abilities, multiple-choice questions in the areas of Customer Service, Mail Processing, and collection and delivery of mail.

34. In 1974, the following positions were covered by the initial level supervisory 100 examination:

Asst. Supt., Window Services (A)
Asst. Supt., Window Services (B)
Asst. to Supt., Scheme Examinations
Asst. to Supt., Mail Office Window Svcs.
Clerk-in-Charge, Transfer Office
Foreman Airmail Transfer Office
Foreman, Bulk Mails
Foreman, Collections
Foreman, Collections & Delivery
Foreman, Delivery
Foreman, Inter. Airmail Record Units
Foreman, Mails
Foreman of Mails, Carrier Station
Foreman, Parcel Post, Delivery and Collection
Foreman, Platform Operations
Foreman, Registry
Foreman, Scheme Examinations
Foreman, Special Delivery and Collections
Foreman, Special Delivery and Mails
Foreman, Special Delivery Services
Foreman, Station Operations
Foreman, Undeliverable Mail
Foreman, Window Services
Information Research Officer
Manager, Detached Mails Unit (A)
Manager, Station or Branch Ops. (A)

Manager, Station or Branch Ops. (AA)

Route Examiner

Station, Br. Foreman, Window and Bx. Svcs.

Superintendent of Mails

Superintendent, Registry (A)

Superintendent, Transfer Office (A)

Superintendent, Window Services (A)

Superintendent, Window Services (B)

Supervisor, Detached Mail Unit

Supervisor, Route Examiners

Supervisor, Scheme Examiners (A)

Supervisor, Scheme Examiners (B)

Supervisor, Schemes and Routing

Tour Foreman, Mails

Tour Foreman, Transfer Office

Tour Foreman, Truck Terminal.

Transportation Supervisor

Superintendent, Postal Opns.

Administrative Assistant (A)

Assistant Manager Office Staff, Operations

Foreman, Office Services

Foreman, Office Staff, Operations

Office Manager, Postmaster's Office

Office Staff Supervisor

Superintendent Office Services (A)

Superintendent Office Services (B)

Superintendent Postmaster's Office Staff

Supervisor Administrative Services

Supervisor Office Services (A)

35. Separate examinations were used to establish separate registers to fill initial level supervisory positions in the maintenance (custodial) branch or area, building maintenance service branch and motor vehicle branch (operations and maintenance). As set forth above, promotions to certain higher level positions in support, specialist or technical areas did not formally require passing any initial level supervisory examination. Such positions included Safety Management; Personnel; Personnel Management; Post Office Accounting; Nonprofessional Clerical, Technical, Administrative and Supervisory Accounting; Budget and Accounting; Financial Management; Professional Accountant and Accountant.

36. The initial level 100 supervisory examinations were prepared by the national testing center of USPS and its predecessor organizations. The examinations were requested and administered by a local post office such as the Charlotte Post Office periodically in order to reopen or replace existing registers of eligible employees.

37. Since 1968, several versions of the 100 initial level supervisory examination have been administered and used to establish registers of eligible employees at the Charlotte Post Office:

a. The 1968 100 initial level supervisory examination was administered in late 1968 and the register of eligible employees became effective in February 1969.

b. The 1970 100 examination was administered on September 16, 1970, and October 17, 1970. The existing register based on 1968 examination was cancelled effective February 8, 1971, and a new register based on the 1970 examination became effective February 18, 1971.

c. A reopened 100 examination was administered November 24, 1973, December 1, 1973, and January 26, 1974, in order to reopen the register to permit newer employees an opportunity to become eligible on the existing supervisory register based on the original 1970 examination. A register based on the 1970 reopened examination was in effect from January 24, 1974, until September 1974.

d. The 100 examination was administered in March and April 1974, in order to establish a new supervisory register, which went into effect September 13, 1974. The register based on the 1974 100 examination remained in effect until October 1976.

e. The supervisory register based on the 1974 examination was replaced in October 1976, by a register which was not

based on an examination but was developed without examination and by a rating of employees by their supervisors in categories A, B and C.

38. The initial level supervisory 100 register of eligible employees was used for at least the following purposes:

a. Only employees on the initial level supervisory register were eligible to be detailed to initial level supervisory positions in order to gain experience and learn supervisory skills.

b. Only employees on the initial level supervisory register were entitled to be considered for and selected to initial level supervisory positions.

c. An employee's eligibility on the initial level supervisory register was used by Charlotte Post Office Management as a criteria for detailing and selecting to non-initial level supervisory upper level positions.

d. Employees on the initial level supervisory register were in fact often selected for non-initial level supervisory positions such as group leader, seven PSDS Technician positions and jobs in Finance, Personnel and other functions where test passage was not an absolute prerequisite.

e. Successful completion of the test would allow one applying for a job for which the test was not required to use test results as a substitute for otherwise required (at least in theory) experience.

f. Since one's test scores were often provided to the Promotion Advisory Board which was considering the candidates for a given upper level vacancy, such Boards could use this additional information as each Board deemed appropriate.

39. For all the above reasons, passage of the supervisory exam was considered to be (and was) a definite plus for any employee. Successful test completion gave an employee the chance to obtain specific jobs and, in addition, the opportunity to obtain different and important work experiences.

I. *The 1968 and 1970 Examinations*

40. A Charlotte Post Office employee had to meet the following participation requirements in order to be able to take the 1968 or 1970 initial level supervisory examination:

a. Employment at the Charlotte Post Office;

b. Career status, *i. e.*, full-time register or part-time flexible, at level PS–4 or higher (except part-time flexible rural carriers);

c. At least 4 years of career service in the clerk, letter carrier, mail handler, rural carrier or special delivery messenger crafts (except that non-post office branch employees such as motor vehicle or maintenance (custodial) employees were required to have at least 5 years of service in the above crafts);

d. In addition, PS–4 employees were required to have first passed the clerk-carrier examination.

41. A Charlotte Post Office employee who took the 1968 or 1970 examination was put on the initial level supervisory register by attaining a cutoff score of 70%, *i. e.*, a percentile score indicating that an employee scored better than 70% of the test takers on a nationwide basis. No evidence has been offered to justify this cutoff score.

42. While information is unavailable concerning the numbers of employees who applied to take the 1968 examination, the following information is available concerning Charlotte Post Office applicants who passed the examination:

a. The names of 61 white employees and 5 black employees were placed on the 1968 Initial Level Supervisory Examination register in February 1969.

b. In April 1970, the 1968 examination supervisory register was then composed of 51 white employees and 4 black employees.

c. From 1968 to June, 1969, some 21 persons, all white, were promoted to Levels 7 and 8. See Findings 78(e) and (f).

43. The following were the results of the 1970 examination:

|  | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| Applicants | 187 | 55 | 2 | 244* |
| Eligible | 83 | 10 | 0 | 93 |
| Passing Rate | 44.4% | 18.2% | – | 38.1% |

*Does not include J. L. Fowler, M. W. McCarter and J. C. Garver, races unknown.

44. The different passing rate for white and black employees on the 1970 examination was statistically significant based on a chi-square analysis, and the result could not have occurred by chance more than one time in a thousand. It is probable almost to the point of certainty that something other than the ability the test is supposed to measure is responsible for the racially differential results. Under the rule of thumb developed by federal agencies, known as "the four-fifths rule", the results on the 1970 examination constitute a serious discrepancy and had adverse impact on black employees.

45. USPS did not present any evidence that the 1970 examination was valid. No study, professional or otherwise, was advanced to justify the use of the 70% cutoff score selected for the 1970 exam.

46. Based on a nationwide study (as opposed to Charlotte-only data) of the results of the 1968 exam, which found overall adverse impact nationwide, it is highly probable that there was adverse impact on the black employees of USPS at the Charlotte Post Office with respect to the 1968 examination. USPS presented no evidence that the 1968 exam was valid, and no study, professional or otherwise, was presented to justify the 70% cutoff score selected for the 1968 test.

47. The standing of an employee who passed the 1968 or 1970 examination on the initial level supervisory register was determined by a rank order based on the employee's examination score and a service credit calculated by adding .5 point for each full year of postal service (including certain military service) not to exceed 27 years.

48. The average (mean) service credit for black employees who passed the 1970 examination was 5.15 and the average (mean) service audit for whites was 6.01. While the use of such service credits might have compounded the adverse impact of the use of the test scores to some extent, the difference between the two means is not statistically significant and the addition of service points to the test scores did not affect the adverse impact of the tests on blacks. USPS offered no study or theory justifying the use of service credits.

49. The supervisory register based on the 1968 examination was in effect from February 1969 through January 1974 for purposes of selection for detailing or promotion to initial level supervisory and other upper level positions.

50. From July 1965 until 1972, only available employees within the top 15 percent of the 1968 and 1970 examination initial level supervisory register at the time of the filling of an initial level supervisory position were within the "zone of consideration" and could be considered for promotion by a Promotion Advisory Board. To the extent practicable, employees detailed to initial level supervisory positions were required to be selected from those within the zone of consideration at the time of filling such detail.

51. In April 1970, 51 white employees and 4 black employees were on the initial level supervisory register based on the 1968 examination, and 9 white employees and no black employees were within the zone of consideration for initial level supervisory positions. In 1971, 84 white employees and 10 black employees were on the initial level supervisory register based on the 1970 ex-

amination, and 14 white employees and one black employee were within the zone of consideration for initial level supervisory positions.

52. The effect of the use of the zone of consideration on the adverse impact of the 1968 and 1970 examinations is that there is even less likelihood that any black employees would be detailed, selected for promotion or gain the other benefits available to those who were successful on the test, in light of blacks' significantly lower scores. No study was presented by USPS to justify the use of the zone of consideration.

53. From July 1972, to June 1973, the zone of consideration was modified, and available employees on the 1970 examination initial level supervisory register were considered regardless of their score, but employees had to be considered in the order their names appeared on the register. The effect of this change, from zone of consideration to rank order consideration, on the adverse impact of the 1968 and 1970 examinations was virtually none because black employees were concentrated at the lower end of the ranking. No study was presented by USPS to justify considering employees in the order their names appeared on the register.

54. The 1970 supervisory register was amended July 10, 1973, to include employees with scores 55% and above. The amended register was composed of 110 white employees and 9 black employees. This change, however, did not alleviate the adverse impact of the 1970 examination on black em-

ployees. No study was presented justifying the 55% cutoff since used after July 1973.

J. *The 1970 Reopened Examination (Administered in 1973 and 1974)*

55. In order to take the 1970 reopened PS 100 initial level supervisory examination, a Charlotte Post Office employee had to meet the following participation requirements:

a. Employment at the Charlotte Post Office;

b. Career status, *i. e.,* full-time regular or part-time flexible, at level PS–4 or higher (except part-time flexible rural carriers);

c. At least 3 years of career service in the clerk, letter carrier, mail handler, rural carrier, special delivery messenger crafts (except that non-post office branch employees such as motor vehicle or maintenance (custodial) employees were required to have at least 5 years of service in the above crafts);

d. In addition, PS–4 employees were required to have first passed the clerk-carrier examination.

56. An employee who took the reopened 1970 examination was put on the initial level supervisory register by attaining a cutoff score of 55%, *i. e.,* a percentile score indicating that an employee scored better than 55% of the test takers on a nationwide basis.

57. The following were the results of the 1970 reopened examination:

| | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| Applicants | 152 | 94 | 1 | 247* |
| Eligible | 92 | 14 | 1 | 107 |
| Passing Rate | 60.5% | 14.9% | – | 43.3% |

*Does not include L.H. Blakeney and T. H. Shonts, races unknown.

58. The different passing rates for white and black employees on the reopened 1970 examination was statistically significant based on a chi-square analysis, and the result could not have occurred by chance

more than one time in a thousand. It is probable almost to the point of certainty that something other than the ability the test is supposed to measure is responsibility for the racially differential result. Under

the four-fifths rule, the results of the re-opened 1970 examination constitute serious adverse impact on black employees. USPS did not present any evidence that the re-opened 1970 examination was valid. No study was presented justifying the use of the 55% cutoff used with respect to the reopened 1970 examination.

59. The standing of an employee on the reopened 1970 examination initial level supervisory register was determined by a rank order based on the employee's examination score and a service credit calculated by adding .5 point for each full year of postal service (including certain military service) not to exceed 27 years.

60. The average service credit for black employees who passed the reopened 1970 examination was 4.29 and the average service credit for whites was 6.27. While this difference may compound the adverse impact of the examination to some extent, the difference between the two means is not statistically significant. The addition of service points to test scores did not affect the adverse impact of the examination on black employees. USPS has provided no study or evidence to justify the use of service credits.

61. The supervisory register based on the original 1970 examination was replaced by a register based on the reopened 1970 examination on January 24, 1974, which remained in effect until September 16, 1974, for purposes of selection for detailing or promotion to initial level supervisory and other upper level positions.

### K. *The 1974 Examination*

62. In order to apply to take the 1974 initial level supervisory examination, a Charlotte Post Office employee, at any level, had to have at least one year of service in USPS by March 30, 1974, the date of the examination.

63. A Charlotte Post Office employee who took the 1974 examination was put on the initial level supervisory register by attaining a cutoff score set by the local post office, which in the case of the Charlotte Post Office was 60 percent, *i. e.*, a percentile score indicating that an employee scored better than 60 percent of the test takers on a nationwide basis.

64. The following were the results of the 1974 examination:

|  | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| Applicants | 188 | 67 | 1 | 256* |
| Eligible | 109 | 17 | 1 | 127 |
| Passing Rate | 58.0% | 25.3% | – | 49.6% |

*Does not include R. H. Wilson, race unknown.

65. The different passing rate for white and black employees on the 1974 examination was statistically significant based on a chi-square analysis, and the result could not have occurred by chance more than one time in a thousand. It is probable almost to the point of certainty that something other than the ability the test is supposed to measure is responsible for the racially differential results. Under the four-fifths rule, the results on the 1974 examination constitute serious adverse impact on black employees.

66. USPS did not present any evidence that the 1974 examination was valid. No study or other evidence was presented justifying the use of the 60% cutoff score on the 1974 examination.

67. Service credits were not used to supplement the scores of Charlotte Post Office employees who passed the 1974 initial level supervisory examination in order to determine the standing of an employee on the register. The supervisory register based on the 1974 examination was in effect from

September 13, 1974, through October 1976, for purposes of detailing and promotions.

L. *Supervisory Selection Procedures Beginning October 1976*

68. The existing initial level supervisory register for all crafts based on the 1974 initial level supervisory examination register was cancelled October 1976, and replaced by a register with the names of employees who had a minimum of 1½ years postal service, met minimum qualifications for the position, and completed a postal training course entitled "Introduction to Postal Service Course."

69. Employees who were placed on the examination register for initial level supervisory positions were then rated A, B or C by their immediate supervisor and next higher level manager[3] on PS Form 439, and employees rated A were considered for promotion.

70. The general supervisory candidate list by category and race as of April 1977, was composed of the following employees:

| Category | White Employees | Black Employees | Total Employees |
|----------|-----------------|-----------------|-----------------|
| A | 36 | 8 | 44 |
| B | 16 | 11 | 27 |
| C | 3 | 3 | 6 |
| Totals | 55 | 22 | 78* |

*Includes one employee, race unknown.

70a. Beginning March, 1978, a new system for the selection of supervisors, the Profile Assessment System For Supervisors (P.A.S.S.) was implemented. P.A.S.S. involves an employee rating his own supervisory potential, a similar rating by the employee's supervisor, the use of a computer to delineate the differences between the ratings of employee and supervisor and an allegedly racially neutral and otherwise qualified panel to resolve such differences. Although "no one fails P.A.S.S." (the rating catagories list supervisory potential as "excellent", "good" or "some") as a practical matter those employees rated excellent get details and promotions. As of the date of trial, P.A.S.S. had not been in effect long enough to see what, if any, discriminatory results were produced by its design.

M. *Promotion Practices*

71. As discussed above, promotions with respect to non-supervisory jobs controlled by the various collective bargaining agreements (i. e. craft jobs) are filled on a "senior qualified" basis. That is, the promotion goes to the employee with the most continuous service in the particular craft who desires the promotion as long as said employee has the minimum job qualifications for the pertinent specific vacancy.

72. Promotions for upper level supervisory and management positions have been during times pertinent to this case, at least in theory, filled on a "best qualified basis". The normal procedure is for the particular vacancy to be advertised to incumbent employees either by placing notices on appropriate bulletin boards or through USPS publications. Interested employees indicate in writing if they desire to be considered for the pertinent vacancy. A list of employees who express interest in the promotion is compiled.

Sometimes, certain individuals are eliminated from this initial list because they do not have requisite "specialized experience"

3. Supervisors ranking employees either A, B, or C did so largely based on their own discretionary evaluations and without any clear guidelines from USPS.

(that is experience in USPS jobs within a certain level of the job level of the vacant position or equivalent education) or "generalized experience" (USPS job experience, non-USPS job experience or education which would provide, again at least in theory, knowledge of the particular job in question). The task of determining whether the particular eligibility requirements (or whether minimum qualifications are met) for a given higher level position, whether supervisory or non-supervisory, is generally made by a personnel specialist from the Employment and Labor Relations division of USPS using PS Form 2497, entitled "Qualification Analysis Worksheet". The personnel specialist will review the employee's application for the position and his official personnel folder on file with the personnel office, including all written examination scores, such as entry level clerk-carrier, initial level supervisory examination and any Federal Service Entrance Examination (FSEE) scores.

The generalized experience and specialized experience requirements for each position are set forth in a U.S. Civil Service Commission publication, the X–118B Handbook. The normal requirement is that generalized experience and specialized experience be obtained at a given "level of experience", that is, experience in a job within no more than two or three levels below the position being filled. The level of experience requirement may be met by permanent assignment or detail. Level of experience may be waived by substitution of education or prior business experience may be substituted although no written standards exist. Education is permitted as substitution for specialized experience with the personnel specialist using his judgment as to when education may be substituted.

After names are eliminated because particular individuals fail to meet the requisite experience levels, the remaining applicants for the promotion are given an opportunity to appear before a Promotion Advisory Board to be orally interviewed. The Promotion Advisory Board normally consists of three individuals. The usual course is for the Board to meet and then to provide three names to the Charlotte Postmaster for the selection of an individual to fill the pertinent vacancy. During certain periods, the Promotion Advisory Board has provided the names of suggested individuals to the Postmaster in the order that the Board rate their qualifications. At other times, the Board has simply presented three (or more) names in alphabetical order to the Postmaster without any indication as to which of the individuals was rated the most qualified of the three.

Promotion Advisory Boards are chosen by the Postmaster and are composed of higher level supervisors, i. e., a supervisor from the work unit and a supervisor at least one or two levels above the position being filled, and as a practical matter include the unit head of the vacant job.

As of trial, the Promotion Advisory Board completed a PS Form 1796, entitled "Qualification Rating," by taking qualifications from the X–118B and listing elements for the job, and then determined in its discretion which qualifications were most important for the position and whether particular applicants have demonstrated low, satisfactory or superior potential, although there are no written guidelines for determining potential. There are no written guidelines to be used by Promotion Advisory Boards, and Board members sometimes used their own personal knowledge of an applicant in his rating. The Promotion Advisory Board completes a PS Form 442, entitled "Report on Interview for Supervisory Position," as to how it arrived at its rating.

After receiving the Promotion Advisory Board's recommendation, the Postmaster selects one candidate on the list, although in the case of supervisory positions, he may consider other candidates on the supervisory register (prior to June 29, 1972, only other candidates within the zone of consideration).

73. The promotion process described above, although generally the theoretical model, may also include additional steps and reviews, for example:

(a) As discussed above, written tests have been utilized at various times to prepare rosters of employees eligible for promotion and detail (the temporary filling of a job vacancy). Employees have been required to attain a required score (which has changed from time-to-time) to reach the "zone of consideration" for the various jobs for which tests have been utilized.

(b) The Promotion Advisory Boards consider (or fail to consider) a wide range of matters. An employee's past work history, the details he has received, his discipline record, his supervisory evaluations and the impression created by an oral interview are all utilized, from time-to-time and in varying and unknown degrees, to rate candidates for promotion.

(c) Notwithstanding the rules pertaining to eligibility for consideration, the USPS has from time to time decided to interview persons who are ineligible under established criteria. There have been no set criteria to determine when the practice will be followed. Should a person be designated for selection who is rated ineligible, the applicant can be granted a waiver of the eligibility requirements. There is no evidence which would show what, if any, standards are used to determine whether an employee is entitled to a waiver. They have apparently been applied arbitrarily. For example, in 1974 Napoleon Chisholm and a white employee named Joiner were allowed to compete for a Level 21 position as Manager of Finance, notwithstanding the USPS position that each lacked the specialized experience requirement. However, when the USPS decided not to fill that position and instead split the position into two level 20 jobs, Chisholm was not allowed to compete.

74. USPS attempted at trial to justify a number of its promotion decisions on the grounds that the white selected for a position had been employed for a longer period of time or had more experience in a given functional area than had the unsuccessful black candidate. These upper level positions, however, are ostensibly based on overall qualifications and not simply seniority, and being employed for a longer period of time with the Postal Service does not qualify one for higher level positions. The Promotion Advisory Boards were designed to and did consider a whole range of factors, including the applicant's presentation, his dress, articulation, his application, his supervisor's recommendation and the interview itself, his job experience, his background, his personnel file, his sick leave balance and the various categories set forth in the Report on Interview For Supervisory Position (which included at times "stability and social adjustment", "vitality" and "mental qualities", among others). Moreover, as discussed below, one of plaintiffs' primary claims has been that whites were hand picked for promotions and received extensive training through the detailing process which made the Promotion Board's decision simply a rubber stamping of previous favorable treatment. The fact that seniority *per se* did not control promotions and details is made clear by the fact that less senior whites were sometimes promoted over qualified blacks.

For example, John Pettice (black) was passed over in favor of Richard Askew, a white with less time with the USPS and less supervisory experience. William McCombs (black) was denied a position in 1974 or 1975 in favor of a white with less time with USPS. Herman Rushing (black) was denied a detail to Civil Service examiner; the white detailed to the position had less time with USPS and less time as a member of the Civil Service Board. David Willis (white) was provided a Foreman of Mails job in preference to the more senior and qualified Roy Dixon, Jr. The Postmaster testified that seniority was not the deciding factor in promotions and the testimony of individuals who served on Promotion Advisory Boards (such as Richardson) made it clear that a whole range of matters was considered by such Boards. If whites received promotions because of special training (details) denied blacks, the blacks are entitled to be put in their "rightful place" to remedy the discrimination.

75. It should be noted that certain promotions during the period 1970–1979 have not been advertised and filled by means of the normal promotion process. Once an employee reaches a given job level, he cannot be demoted except for cause. Higher level employees from outside Charlotte have been assigned to USPS upper level jobs in Charlotte and have been "excessed" into Charlotte supervisory jobs. When such "excessing" occurs, the promotion process discussed above is completely bypassed and no vacancy is advertised. Many of the "excessed" white employees who were slotted into vacancies in Charlotte filled jobs with respect to which blacks denied a chance to compete were more qualified. For example, Chisholm trained Homer Benson (white) when Benson was excessed; Clarence Morgan trained a white named Howard, and a black named Hunt trained an excessed white named Fisher.

76. While the above described promotion system appears neutral on its face, the Court finds that the system has been manipulated and utilized to the detriment of blacks in many ways, including all of the following particulars:

(a) As detailed above, the written tests which have been utilized directly both for initial level supervisory jobs and for other details and other matters have discriminated against blacks. Passage of the tests has been an absolute prerequisite for one to be eligible to seek certain upper level supervisory jobs including the normal initial level supervisory positions as well as for details. The rosters which have been prepared from those who score sufficiently high on the exams, were utilized both before and after the effective date of Title VII. The percentage of blacks who did not successfully pass certain tests and obtain positions on the pertinent eligibility list is statistically significant. The defendants have failed to show that the tests are job related within the meaning of the pertinent employee selection guidelines. Moreover, the cutoff scores utilized with respect to the tests have been arbitrarily arrived at and have discriminated against blacks in a statistically significant way. Blacks were denied promotions and details because they were unable to obtain positions on the pertinent eligibility lists, and blacks were discouraged from taking the test and seeking jobs because highly educated and qualified blacks were unable to pass the tests. (See, e. g., Edward High).

(b) The "specialized experience" and "generalized experience" requirements set forth in the pertinent USPS administration guidelines have been ignored or waived on occasion, to the detriment of blacks and in favor of whites, when USPS officials desired to promote a specific individual. Compare e. g., the refusal to provide credit for Chisholm's education with respect to the Budget Assistant and Finance Examiner jobs in 1972 and the waivers of experience for whites Claud, Polk and Prather for their work at a dairy and in the military. See also the complete waiver of experience requirements for Chisholm and Joiner with respect to the PMS–21 level Manager of Finance job in 1974. The current Postmaster admitted that he could obtain waivers to promote otherwise ineligible employees. The decision as to whether a given factor should be allowed as a substitute for experience was left to the unbridled discretion of personnel assistants who would often act based on personal knowledge of the particular individual seeking the waiver. Where such action was taken (e. g., Prather), whites benefited.

(c) Promotion Advisory Boards have been discriminatorily selected. Traditionally, and especially before 1973, few blacks were allowed to serve on Promotion Advisory Boards, and there have been virtually no instances when blacks have formed a majority of the members of such boards. USPS attempts to appoint to Promotion Advisory Boards employees who, at the time they serve on the Board, are at a job level at least two levels higher than the level of the job vacancy to be filled. Since blacks have traditionally been denied higher level jobs, few Charlotte blacks have been eligible to serve on Promotion Advisory Boards. Indeed, until 1970, no black employees were eligible to sit on a Promotion

Advisory Board for higher level positions and from 1970–1973, only one black supervisor, Zoel Hargrave, was deemed eligible to sit on boards. USPS has offered no business justification for this rule. Promotion Advisory Boards have also tended to include those upper level employees who had previously detailed and supervised an employee seeking the job on a permanent basis to the very job. Since the detailed employee has already been favored by one or more of such Board members, the process is not a fair one. It does appear that after the initiation of this case, USPS made additional efforts to assign blacks to Promotion Advisory Boards. However, the vote of one black on the Board was not enough to lead to the promotion of blacks, even where a majority of the Board considered the black candidate superior. See, e. g., James Richardson's (a black) testimony concerning Herman Rushing's qualifications for the Customer Service Representative job in 1974.

(d) The deliberations and decisions of Promotion Advisory Boards have been standardless and inconsistent. No written criteria are available to govern the decisions made by Promotion Advisory Boards. Various trial witnesses who sat on Promotion Advisory Boards indicated that their deliberations and decisions were affected by different criteria. The very forms utilized by USPS in the oral interview process require Board members to rate applicants, after a short questioning period, on such subjective categories as "Stability and Social Adjustment," "Vitality," and "Mental Qualities." Each Board member is free to give whatever weight he desires to each category and no meaningful review of Board deliberations is made, or is possible. Roy Dixon in 1978 was denied a position as foreman of mails. He approached supervisors at two different levels to determine why he had not received the promotion, in order to improve himself prior to the next promotion. One management representative likened the process to a football game where any team could win on a given Sunday. The other management representative's explanation of the process was that "you've got

to be liked." In 1973, the U.S. Civil Service Commission reviewed the EEO policy at USPS and stated:

There has been no fixed procedure for interviewing candidates by the advisory board. Interviews were not always performed, yet in some cases even ineligible candidates have been interviewed. Further, there has not been a fully standardized format for promotion certificates. The supervisor's appraisal is given major weight in the ranking process. While this is not necessarily bad of itself, the appraisal is sent to the board without any line official review of the rating. The possibility of deliberate, as well as unintended, bias is too apparent.

The method of rating and ranking has been inadequate and highly questionable in terms of avoiding actual discrimination. Members of the Promotion Advisory Board simply vote for their choices on a first, second, third, and fourth place basis. These votes are then translated into total point scores. In practice, however, only the first place votes are used in ranking candidates. This popularity contest is substituted for consensus ranking on the basis of the essential job element skills.

The newly assigned Chief of Employment and Labor Relations has eliminated the popularity vote system.

*Action Items*

Further action should be taken to:

—Establish a fixed set of requirements designating when interviews will and will not be conducted in the promotion process. Eliminate interviewing of unqualified candidates, but assure full explanation to the unqualified candidates and counseling on preparation needed to qualify.

—Implement a system of line review of supervisor's appraisal to minimize bias.

—Reduce the weight given to supervisory performance ratings in determining eligibility for initial level supervisory positions to the point that the performance ratings do not, in effect, have veto power over all other factors.

Despite the above recommendations, Promotion Advisory Board procedures were not improved after 1973. Postmaster Sloan admitted that no written guidelines were developed and that sometimes he would consider the recommendations of persons who had not interviewed the candidates when making his selection. It is clear that Board members (such as Richardson) could and did utilize the impressions they made concerning individuals in non-work social settings to influence their decisions. Since the Boards were largely white, those (whites) who had social acquaintances making the decision were more favorably treated.

On at least one occasion, one white member of a Promotion Advisory Board (Gearin) attempted to limit the number of blacks promoted to several (from seven to nine) available Accounting Technician vacancies (level 6) because he felt too many blacks in the job would be disruptive. Class members William Holman and James Lee were denied Accounting Technicians jobs because of this discrimination.

(e) On occasions when blacks would receive a higher rating from a Promotion Advisory Board on the subjective scale used by USPS (e. g., Herman Rushing's 1974 attempt to obtain a customer service job), the job would nonetheless be given to a white. Indeed, blacks have traditionally (e. g., Rowe Motley, Rushing) been denied supervisory positions where contact with the public was part of the job.

(f) White employees have been groomed for certain vacancies by the process of temporarily assigning (or "detailing") to a vacancy. On numerous occasions, whites have been detailed to a job position for a number of months prior to the time the position is formally advertised to be filled. These details have been the prerogative of the existing already largely white supervisory and management complement of USPS, and such details, and especially the lengthy ones, have traditionally gone to the favored whites. The record is replete with examples of whites who have been detailed for months at a time and then have been promoted to the job which they were filling temporarily. Some whites who were so favored are Robert L. Wallace, L. B. Holland, Eric Rogers, Bill Brown, Robert Thompson, Richard Warfel, Gertha Richards, Charles Morgan, Richard Askew, Hugh Livingston and many more. Such excessive details served as training grounds for the favored whites. Excessive details went to white clerks and carriers both before and after the initiation of this case. The situation did improve in 1978 when the maximum length of details was set at less than sixty (60) days. The detailed whites would then serve on a temporary basis (with corresponding higher pay and opportunity to gain experience) for an extended period of time. When the vacancy would then be advertised to be filled on a permanent basis, the detailed employee would have an overwhelming advantage and would customarily be given the vacancy on a permanent basis. The fact that the individuals who detailed a given white buddy would often sit on the Promotion Advisory Board when the vacancy was finally posted tended to make what had been planned come to pass. The excessive detailing served no legitimate business purpose. As of November 1973, the Finance function was in terrible shape; the sum of $1,000,000 had been misplaced by various persons in the Finance office (many of whom had benefited from details).

(g) The Postmaster has been given absolute discretion to choose among the three or more names provided to him by the Promotion Advisory Board. This discretion when combined with the rest of the system, as the statistics will clearly show, has been exercised to the detriment of blacks.

(h) The Postal Service has on occasion simply deviated from its procedure, without explanation, where it appeared that a black might be a successful candidate. For example, Tom McGill was the second place candidate for a position as Accounting Assistant in 1973. The successful white applicant was promoted again

within a very short period of time. Prior to that time, the USPS practice had been to promote the second place candidate without readvertising the position. In this case, the competition was reopened, denying McGill the automatic consideration he should have received. When James Little was favorably rated by his immediate supervisor as having promotion potential, white supervisors above his immediate supervisor modified his evaluation in contravention of USPS procedures. In 1970 Herman Rushing applied for a position as Customer Services Representative. After he submitted his application, USPS withdrew the advertisement and awarded the job to an excessed white employee. This procedure had never before been followed.

77. The result of the discriminatory promotion practices engaged in by USPS has been to deny to blacks jobs for which they were well qualified. Indeed, while blacks constitute about 30 per cent of the employees at the USPS, more blacks (46) than whites, (21) had obtained four-year college degrees as of 1974. The system whereby favored whites were groomed to fill vacancies through the detailing process not only gave those whites additional income while they served on the details and the higher level jobs but discouraged blacks from even applying for jobs for which they were qualified. Some blacks who were not successful with respect to the written test (such as Rowe Motley, Robert Childs, Bruce Chan-

dler and Edward High) left the Post Office. Others who were rebuffed when they sought details and promotions (such as William Holman and Peggy Talbert) stopped seeking promotions since their efforts and the efforts of other qualified blacks had proved futile. The promotion practices outlined above created roadblocks to blacks to obtain better jobs. The few supervisory jobs given to blacks before the initiation of this proceeding were largely the least desirable ones. Blacks were discouraged from taking the pertinent tests and from applying for jobs because of the discriminatory practices of the defendants.

78. The discriminatory use of lengthy details had especially widespread and pervasive effects. Once a white received initial training through detailing he had a permanent advantage over a black denied the same benefit. Since discriminatory details provided before March 24, 1972 (the effective date of Title VII with respect to the government) provided advantages to whites after that date, the discriminatory process perpetuated itself. Blacks were never given a chance to catch up or to reach their rightful place. This effect was compounded by the fact discriminatory details continued after March 24, 1972. Indeed, as of July 1973, one month after this case was filed, at least the following whites were employed in a detailed or acting capacity, many in the choicest jobs available at the Charlotte Post Office:

| Name of White | Level of Detailed Position |
|---|---|
| J. J. Pollard | 22 |
| L. B. Holland | 21 |
| H. G. Porter | 18 |
| E. L. Robinson | 16 |
| C. W. Baker | 16 |
| J. H. Corriher | 21 |
| R. L. Harrison | 15 |
| C. C. Helms | 13 |
| B. R. Austin | 19 |
| R. L. Wallace | 17 |
| R. C. Warfel | 18 |
| J. G. Brawley | 15 |
| G. H. Richards | 15 |
| W. L. Kent | 14 |
| D. B. Breedan | 20 |
| S. A. Boyd | 17 |

| Name of White | Level of Detailed Position |
|---|---|
| D. F. Chesser | 20 |
| W. R. Jamison | 17 |
| W. E. Boone | 15 |
| W. G. Brown | 15 |
| J. M. Sechrest | 18 |
| E. G. Osborne | 15 |
| H. M. McCarter | 18 |
| R. V. Suddereth | 16 |
| W. W. Beaver | 16 |
| R. J. Ledford | 15 |
| M. H. Grass | 18 |
| J. W. Neill | 16 |
| J. C. Booth | 18 |
| E. R. Rogers | 18 |
| K. M. Hancock | 15 |
| R. A. Helms | 9 |

As of the same date (July 1973), six blacks had upper level details. However, of these six, Chisholm had just received his detail on June 30, 1973 and only after filing this case, and James F. Lee had accepted a detail to settle an EEO complaint. Also, two blacks (Ellis and McCombs) were detailed to the virtually all-black University Park station, while the remaining two blacks, Hargraves and Richardson, were detailed at levels 20 and 15 respectively.

79. The relevant statistics, both before and after the effective date of Title VII demonstrate that jobs level 7 and above have not been provided to blacks on a nondiscriminatory basis. For the periods prior to 1972, the pertinent available statistics show promotions as follows:

(a) EMPLOYEES PROMOTED TO HIGHER LEVEL POSITIONS BY LEVEL AND RACE, 1964

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 6 | 3 | 0 | 4 |
| 7 | 9 | 0 | 9 |
| 8 | 5 | 0 | 5 |
| 9 | 1 | 0 | 1 |
| 10 & above | 0 | 0 | 0 |
| TOTAL | 18 | 0 | 18 |

Source: Admin. File, Oren McCullough, Complaint of March 21, 1966.

(b) EMPLOYEES PROMOTED TO HIGHER LEVEL POSITIONS BY LEVEL AND RACE, JULY 1965 – JUNE 1966

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 8 | 2 | 10 |
| 8 | 4 | 0 | 4 |
| 9 | 4 | 0 | 4 |
| 10 | 1 | 0 | 1 |

(b)　　　　　EMPLOYEES PROMOTED TO HIGHER LEVEL
　　　　　　POSITIONS BY LEVEL AND RACE, JULY
　　　　　　1965 — JUNE 1966

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 11 | 0 | 0 | 0 |
| 12 | 0 | 0 | 0 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 17 | 2 | 19 |

Source:　Admininistrative Complaint File of Mr. Hazel
　　　　　E. Ellis, "Promotions Since July 1, 1965."

(c)　　　　　EMPLOYEES PROMOTED TO HIGHER LEVEL
　　　　　　PROMOTIONS BY LEVEL AND RACE, 1968

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 6 | 0 | 6 |
| 8 | 7 | 0 | 7 |
| 9 | 2 | 0 | 2 |
| 10 | 4 | 0 | 4 |
| 11 | 3 | 0 | 3 |
| 12 | 1 | 0 | 1 |
| 13 & above | 3 | 0 | 3 |
| TOTAL | 26 | 0 | 26 |

Source:　Quarterly Reports on Postmaster's Program for Pro-
　　　　　gress, dated April 1968 and July 30, 1968, and Field
　　　　　Reports on EEO Program for Progress for 7-27-68 -
　　　　　8-23-68, dated 8-29-68, for 8-24-68 - 9-20-68, dated
　　　　　9-25-68, for 10-1-68  - 12-30-68, dated 1-13-69.

(d)　　　　　EMPLOYEES PROMOTED TO HIGHER LEVEL
　　　　　　POSITIONS BY LEVEL AND RACE, JAN.
　　　　　　1969 — JUNE 1969

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 2 | 0 | 2 |
| 8 | 6 | 0 | 6 |
| 9 | 2 | 0 | 2 |
| 10 | 2 | 0 | 2 |
| 11 | 1 | 0 | 1 |
| 12 | 1 | 0 | 1 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 14 | 0 | 14 |

Source:　FIELD REPORTS ON EEO PROGRAM FOR PROGRESS
　　　　　for 1-1-69 - 3-31-69, dated 4-10-69, and
　　　　　for 4-1-69 - 6-30-69, dated 7-7-69.

(e)

**EMPLOYEES PROMOTED TO HIGHER LEVEL
POSITIONS BY LEVEL AND RACE, 1970***

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 9 | 0 | 9 |
| 8 | 10 | 2 | 12 |
| 9 | 6 | 0 | 6 |
| 10 | 7 | 0 | 7 |
| 11 | 1 | 0 | 1 |
| 12 | 2 | 0 | 2 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 35 | 2 | 37 |

Source:  FIELD REPORTS ON EEO PROGRAM FOR PROGRESS
for 1-10-70 - 4-3-70, dated 4-14-70 and for
5-31-70 - 11-30-70, dated 12-4-70.

*Does not include 4-3-70 - 5-30-70 and 12-1-70 - 12-31-70.

(f)

**EMPLOYEES PROMOTED TO HIGHER LEVEL
POSITIONS BY LEVEL AND RACE, 1971***

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 2 | 0 | 2 |
| 8 | 4 | 0 | 4 |
| 9 | 2 | 0 | 2 |
| 10 | 1 | 0 | 1 |
| 11 | 3 | 1 | 4 |
| 12 | 0 | 0 | 0 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 12 | 1 | 13 |

Source:  FIELD REPORTS ON EEO PROGRAM FOR PROGRESS
for 12-1-70 - 5-31-71, dated 6-4-71, and
for 5-31-71 - 11-30-71.

*Includes 12-1-70 - 12-31-70, does not include 12-1-71 - 12-31-71.

---

80. The statistics and other evidence of discrimination before 1972 demonstrates that USPS had a well-deserved reputation as the "graveyard" of black talent in the area. A number of highly educated, motivated and qualified blacks (i. e., Motley, High and Childs) left USPS when their attempts to obtain promotion were denied. When Motley attempted to obtain a supervisory job in Customer Relations in about June 1968 he was told "you're a good carrier but you're colored and Charlotte is not ready for colored to have this job." He immediately resigned and left the Post Office. Robert Childs attempted to get a Customer Services Representative job with USPS sometime before he left the Post Office in 1967. He was not allowed to appear before the pertinent Promotion Advisory Board but was "interviewed" in the hall of a USPS building. Childs took special training courses provided by USPS and obtained a B.S. in accounting but never was given a promotion or detail. He is now Chief Executive Officer of Greensboro National Bank. Edward High, who had a B.S. in accounting from Columbia University plus an advanced degree in education, be-

came a carrier with USPS about 1955. He later applied for an Accounting Clerk job, was refused the job, and was told "Ed, you don't want that position anyway because you would be the only Negro in there . . . you wouldn't feel comfortable." High took the written supervisory examination and failed it; not long thereafter he passed a test given by the National Association of Securities Dealers required before one is allowed to handle securities. At the time of trial, High was the principal budget officer of the Utility Department of the City of Charlotte where he was chiefly responsible for a multimillion dollar budget.

81. Both before and after 1972, a large percentage of blacks had at least some post high school education. Blacks until about 1961 were allowed to belong only to the mostly black union, the National Alliance of Postal Employees. Prior to 1961, blacks were not allowed to join the other USPS unions. Blacks were denied not only promotions prior to 1972, but also higher level details. Blacks were not allowed to carry rural delivery routes, and blacks were generally denied the aid on their carrier routes which was given to similarly situated whites. The few blacks who eventually obtained supervisory jobs did so normally only after filing and pursuing administrative complaints of discrimination. See e. g., Zoel Hargraves and Hazel Ellis. The first two black USPS supervisors in Charlotte, Hargraves and George Moore, were passed over for promotion to PS level 8 supervisory positions by white employees, including white employees who advanced from PS level 4 craft position to PS level 8 supervisory positions in two years. (EEO Investigation File of McCullough). Hargraves was promoted after prevailing on an administrative charge of racial discrimination in 1966.

82. The promotion procedures and relevant statistics changed little after the effective date of Title VII. A summary of promotions with USPS from 1972–1977 to jobs level 7 and above (taken from a summary of weekly personnel reports) demonstrates that the historical discrimination against blacks about which Chisholm com-

plained in his administrative hearing continued. While the statistics set forth herein include employees who were unilaterally reassigned to jobs in Charlotte and who filled jobs in Charlotte by transferring from another USPS office and without having to compete for the vacancy and also include several jobs which involved re-ranking of job level, the figures are nonetheless striking and compelling. Even if the reassignments, unilateral transfers and re-rankings are not considered, the statistics buttress the testimony and other evidence of racial discrimination.

83. In 1972, the statistics show promotions to jobs level 7 and above as follows:

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 7 | 0 | 11 |
| 8 | 2 | 18 |
| 9 | 0 | 4 |
| 10 | 0 | 1 |
| 11 | 0 | 2 |
| 12 | 0 | 2 |
| 13 | 0 | 1 |
| 14 | 0 | 1 |
| 15 | 0 | 1 |
| | 2 | 41 |

Of the two blacks so promoted in 1972, one (James Toatley) was promoted to the EEO Counselor position, a one-of-kind newly created fulltime position.

84. In 1973, the upper level promotions were:

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 9 | 0 | 2 |
| 12 | 0 | 1 |
| 13 | 0 | 3 |
| 14 | 0 | 1 |
| 15 | 1 | 13 |
| 16 | 1 | 5 |

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 18 | 0 | 7 |
| 19 | 1 | 1 |
| 20 | 0 | 2 |
| 21 | 0 | 2 |
| 22 | 1 | 1 |
|  | 4 | 38 |

Of the four blacks promoted in 1973, one (Toatley) became EEO Specialist (level 19), a job which replaced the EEO Counselor position. Another black (George W. Johnson, Jr.) was transferred from outside Charlotte to a level 22 position.

85. In 1973, both the U.S. Civil Service Commission and the USPS Contract Compliance Examiners conducted reviews of equal employment opportunity at the Charlotte USPS. The 1973 Civil Service Commission report specifically criticized practices of the Charlotte Post Office in the assignment of higher level details, supervisory appraisals for higher level promotions, and promotion board consideration of applicants for higher level positions as possibly discriminatory. The EEO audit, dated July 23, 1973, prepared by USPS Compliance Examiners criticized detailing and promotion practices as discriminatory. Both reports concluded that the Charlotte Post Office's enforcement of equal employment opportunity was ineffective.

86. The promotion statistics for the years 1974–1977 reflect the following:

(a) 1974

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 7 | 0 | 1 |
| 9 | 0 | 1 |
| 11 | 0 | 2 |
| 13 | 0 | 1 |
| 14 | 1 | 4 |
| 15 | 5 | 13 |

(a) 1974

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 16 | 0 | 2 |
| 17 | 0 | 5 |
| 18 | 1 | 6 |
| 19 | 0 | 2 |
| 20 | 0 | 5 |
| 21 | 0 | 4 |
| 22 | 0 | 1 |
| 27 | 0 | 1 |
|  | 7 | 49* |

*Also one Spanish surnamed American at Level 17

(b) 1975

| Level | Blacks Promotion | Whites Promotion |
|---|---|---|
| 8 | 0 | 2 |
| 9 | 0 | 1 |
| 11 | 1 | 1 |
| 15 | 0 | 8 |
| 16 | 0 | 3 |
| 17 | 0 | 4 |
| 18 | 1 | 2 |
| 19 | 1 | 1 |
| 23 | 0 | 1 |
|  | 3 | 23 |

(c) 1976

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 8 | 1 | 0 |
| 9 | 0 | 2 |
| 15 | 0 | 4 |
| 16 | 0 | 1 |
| 18 | 0 | 4 |
|  | 1 | 11 |

(d)

### 1977

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 8 | 0 | 1 |
| 9 | 1 | 0 |
| 14 | 0 | 1 |
| 15 | 0 | 1 |
| 16 | 0 | 1 |
| 20 | 1 | 0 |
|  | 2 | 4 |

Of the blacks promoted in 1976 and 1977, one, Chauncey E. Jones, Jr., received two promotions to an Electronic Technician position (levels 8 and 9), a specialized job outside the normal USPS promotion ladder.

87. From 1978 to August 11, 1979 (immediately before trial), an analysis of promotions (not counting any reassignments, transfers and re-rankings) shows the following:

| Level | Blacks Promoted | Whites Promoted |
|---|---|---|
| 11 | 0 | 1 |
| 12 | 1 | 0 |
| 14 | 1 | 0 |
| 15 | 2 | 2 |
| 16 | 2 | 2 |
| 17 | 0 | 3 |
| 18 | 1 | 4 |
| 19 | 0 | 1 |
| 20 | 0 | 2 |
| 21 | 0 | 1 |
|  | 7 | 16 |

87a. Defendants assert that the pertinent labor pool for initial level supervisory jobs (levels 7 and above) is the work force at levels 6 and below and that the pertinent labor pool for the upper level supervisory jobs are those persons in the initial level supervisory jobs. Defendants do not quarrel with the proposition that the appropriate pool for advancement at USPS is the "in house" work force.

That initial level supervisory jobs must come from the craft jobs is clear. Employees at levels 6 and below can only advance by obtaining the higher level positions. Thus, the parties are in basic agreement that initial level supervisory jobs should come from employees at levels 6 and below. That labor pool as of 1972 consisted of 419 black employees at levels 6 and below and 922 whites at such levels (See Paragraph 27(f) *supra*) or a pool of 31% blacks. This pool is thus relevant to promotions made in 1972 and thereafter.

Indeed, the most pertinent statistics in Title VII cases are those showing relevant data prior to and at the time a lawsuit is commenced. Here, this data demonstrates discrimination with respect to promotions in 1970 and 1971 as well as in 1972 up to the time of suit and thereafter. The promotion data for 1970 and 1971 is set forth in Paragraph 79, *supra*. In 1970, only two of 21 promotions to jobs levels 7 to 9 went to blacks out of a workforce pool (even accepting defendants' definition of a proper pool) of about 30% black. In 1971 (to December) there were no blacks hired for 8 jobs in levels 7 to 9. While two blacks were promoted in December 1971, it is not clear how many whites were promoted that month.

From January 1, 1972 until June 30, 1973 (the date the complaint was filed in this case) the promotion statistics derived by refining PX 5 and eliminating from consideration Ernest A. Perry (2–19–72), Robert L. Caddell (2–19–72), Charles G. Horne (12–23–72) and Howell R. Kennedy (12–21–72), all of whom were reassigned without change in level, but including John J. Armstrong (2–19–72), R. V. Suddereth (2–19–72), Eric Rogers (2–19–72), O. B. Sloan (1–6–73), John Dale Terry (1–6–73) and Walter Burgoyne (6–9–73), all of whom were either promoted or first assigned to vacancies in Charlotte (See PX 86, the SF–7 forms) are as follows:

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 7 | 10 | 0 |
| 8 | 15 | 2 |
| 9 | 5 | 0 |
| 10 | 1 | 0 |
| 11 | 2 | 0 |

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 12 | 2 | 0 |
| 13 | 3 | 0 |
| 14 | 0 | 0 |
| 15 | 2 | 0 |
| 16 | 1 | 0 |
| 17 | 0 | 0 |
| 18 | 1 | 0 |
| 19 | 0 | 1 |
| 20 | 0 | 0 |
| 21 | 1 | 0 |

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 7 | 2 | 0 |
| 8 | 3 | 0 |
| 11 | 4 | 1 |
| 12 | 1 | 0 |
| 13 | 2 | 0 |
| 14 | 4 | 1 |
| 15 | 22 | 6 |
| 16 | 8 | 1 |
| 17 | 7 | 0 |
| 18 | 10 | 2 |
| 19 | 3 | 1 |
| 20 | 7 | 0 |
| 21 | 2 | 0 |
| 22 | 1 | 0 |
| 23 | 1 | 0 |
| 27 | 1 | 0 |

The one black promoted to level 19 in 1973 was James Toatley (EEO Specialist) who also received one of the level 8 promotions in 1972.

Thus of 27 initial level promotions between January 1, 1972 and June 30, 1973, (levels 7 and 8) only 2 or 7% went to blacks. Of the promotions above level 8, only 1 of 19 or 5% went to blacks, and this promotion involved the newly created and specialized EEO specialist job.

The figures are not materially different if defendants' definition of promotions (see DX 36) is used. Defendants' trial exhibit, DX 36, lists promotions, as defined by defendants, from March 24, 1972 to the eve of trial. A review of these figures demonstrates that blacks were not promoted to jobs levels 7 and above anywhere near the proportion of black representation in the labor pool.

From March 24, 1972 to June 30, 1973, defendants' statistics show the following promotions:

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 7 | 6 | 0 |
| 8 | 10 | 2 |
| 9 | 4 | 0 |
| 11 | 1 | 0 |
| 12 | 2 | 0 |
| 16 | 1 | 0 |
| 18 | 1 | 0 |
| 19 | 0 | 1 |

Of the twenty-two persons promoted to jobs levels 7 to 9, only 2 or 9% were black. The one level 19 promotion was the EEO specialist job filled by James Toatley (black).

The situation improved only slightly thereafter. From June 30, 1973 to December 31, 1975, the promotion statistics (again taken from GX 36) show the following:

Thus, of 46 promotions level 15 and below, only eight, or about 17% went to blacks. The fact that USPS began making improvements in the percentage of blacks promoted (especially after defendants' appeal was dismissed) is relevant with respect to the relief appropriate herein; however, the statistics (as well as the individual cases) demonstrate significant pervasive post-act discrimination.

Defendants contend that the pool for upper level supervisors contains those persons previously promoted to lower level supervisory positions and that since there were few blacks in this pool the statistics for upper level jobs do not demonstrate discrimination. The evidence is abundant and is set forth in these findings, that blacks were victims of discrimination both prior to and after March 24, 1972 with respect to promotions, details, tests and discipline and that the alleged neutral standards for the selection of supervisors were manipulated to the detriment of blacks.

The pool which defendants seek to use for upper level jobs was a product of racial discrimination in the Post Office, discrimination which had long been prohibited by Executive Order and regulations. Such discrimination took place both before *and* after the effective date of Title VII. As shown above, discrimination in the selection of lower level supervisors was evident from the beginning of 1972 to the date the complaint was filed and thereafter. Defend-

ants have offered no evidence to indicate that the practice of selecting upper level supervisors from this pool was required by business necessity. The detailing process and the management trainee program were available to assist blacks in obtaining their rightful place. Blacks could have been provided details and training to make up for past discrimination and blacks could have been moved directly to second level supervisory jobs.

The defendants took no such actions but continued to discriminate after March 24, 1972. The fact that whites received a disproportionate share of initial level supervisory promotions after the effective date of Title VII constituted additional reason for defendants to abandon their limited pool for the selection of upper level jobs. Since blacks were denied promotions because of their race both before and after the effective date of Title VII, they are entitled to "make whole" relief.

88. The evidence indicates that promotions to jobs which absolutely require an appropriate cutoff score on the OS/100 supervisory examinations show that such initial level supervisory jobs were filled for the years 1972 (after March 24, 1972), 1973, 1974 and 1978 (there were no promotions in jobs requiring passage of the exams in 1975–1977) as follows:

| Year | Blacks Promoted | Whites Promoted |
|------|-----------------|-----------------|
| 1972 (after 3/24/72) | 0 | 1 |
| 1973 | 1 | 8 |
| 1974 | 4 | 5 |
| 1978 | 3 | 3 |
|  | 8 | 17 |

These statistics demonstrate an improvement with respect to the filling of such jobs beginning in 1974. However, of course, the adverse impact of the test on blacks had many other deleterious effects on the employment opportunities of blacks.

88a. While improvements were made in the promotion practices in the months immediately prior to trial, the job has not yet been completed. Blacks are still limited by the many years of discrimination and the standardless practices actually used by USPS in its promotions. The statistics and other evidence of discrimination is not negated by the fact that whites on an average have more seniority than blacks with USPS. Best qualified jobs are not filled by seniority. To the extent whites have superior in-house training than blacks it is the result of discrimination in details. Once an employee has been a clerk or carrier for a number of years, he acquires thereafter little additional job knowledge which might be transferable to a supervisory job. The USPS pay scales are designed such that the wages of craft employees top out after numerous years. Blacks earn less than whites even when seniority and education are factored into the equation, and the reason for much of the difference is the racial discrimination evident in this record.

N. *The Detailing Process*

89. As discussed above, the procedure used by USPS to fill temporary vacancies is a process known as "detailing" or "204–B details". Details are utilized both for craft positions and supervisory positions. Simply stated, a detail is a temporary assignment of an employee to duties other than his designated position. A detail to a higher level position entitles an employee to receive pay at the higher level, and to gain specialized and general experience for promotion to higher level positions. Details for higher level positions are made by the immediate supervisor from among eligible, qualified and available employees in the work unit. However, details to initial level supervisory positions during certain periods were made from employees on the initial level supervisory register in the work unit. During pertinent periods, there were no written guidelines for the selection of employees for higher level details nor are there any review procedures. Details are made by supervisors who have great discretion in deciding which employee will receive a detail and the duration any such assignment will last. The Charlotte Postmaster

in the late 1960's and early 1970's (Carpenter) simply went along with the details made by his staff despite the fact few top details were given to blacks. The next Postmaster (Sloan) did not change this practice, and detailing decisions after 1973 remained the job of the mostly white upper levels employees.

90. James Toatley, the EEO Counselor in Charlotte, testified in his deposition (taken November 12, 1974) that blacks had traditionally been denied upper level details because of their race. Toatley's review of available records led him to the conclusion that "few, if any, black clerks or carriers (were) detailed to higher level jobs before 1972." The evidence supports Toatley's analysis and discrimination.

91. The assignment of higher level details at the Charlotte Post Office was criticized [4] by the U.S. Civil Service Commission in 1973 as follows:

2. *204B Details*

Tour Superintendents are permitted to assign any qualified individual to a higher level position on 204B detail. Such details are large in number and many are excessively lengthy. There is no policy of rotation; therefore, it is *possible* that one individual on a tour could be assigned to a higher level position on a regular basis by virtue of favoritism or discrimination. In addition, the fact that many lengthy details are followed by promotion of the individual into the position gives the *impression* of preselection.

"*Action Items*

—Monitor the assignment of employees on 204B details to insure that discriminatory patterns do not develop.

—Shorten the length of details, promoting into the vacancy at the earliest practical date."

(1973 CSC Report, Appendix A, p. 2)

92. Despite these recommendations, extensive details were accorded whites after 1973.[5] It was not until 1978 that the maximum length of details (less than 60 days) was established.

93. Since details have been the prerogative of upper level supervisors and managers, the abuse of the detailing process has virtually without exception been used to the benefit of whites rather than blacks. White supervisors and managers have tended to detail their white "buddies" to upper level supervisory and managerial jobs thereby grooming such buddies for the permanent vacancies. This discriminatory process has had a snowballing effect since once an employee is detailed and promoted he is in a superior position for additional and even higher details and promotions.

94. The record is replete with examples of discriminatory abuse of the detailing process. While details are designed to enable USPS to fill temporary vacancies for a short period of time, they have been used to allow white employees to gain extensive experience in a particular job prior to the time the job is advertised for permanent promotions. The "detailed" employee has a great advantage in any competition for the job he has held for such an extensive period. Examples of abuse in the detailing process are set forth in the findings concerning individual claimants. Some examples of the discriminatory use of details are:

(a) The detail of Robert Wallace to the Finance Examiner job and L. B. Holland to Budget Assistant.

(b) The Accounting Technician position in 1971 which James Lee sought and was denied, notwithstanding Lee's having a college degree.

(c) The Postal Systems Examiner position which Tom McGill sought in 1974.

(d) The Postal Services Auditor position which Milton Yongue had sought and which Yongue had previously requested a detail to.

(e) The Accounting Assistant position which Yongue applied for.

---

4. It is interesting to note that when his deposition was taken in 1978, Postmaster Sloan was not familiar with this study.

5. Much of the evidence concerning discrimination in details is discussed above in the portion of these findings concerning promotion. Such evidence will not be repeated but is pertinent to discrimination in detailing *per se*.

(f) The Postal Systems Examiner position given to Gertha Richards after a detail of approximately 6 months, another position which Yongue sought.

(g) Denying John Pettice a detail to General Foreman until an EEO investigator determined that the denial constituted racial discrimination; then placing Pettice in the position for 90 days; and finally summarily removing Pettice from the detail with no explanation and replacing him with a white for an extended period prior to awarding the job permanently to the white.

(h) The Safety Officer and Driver Instructor positions which William Holman sought.

(i) The Civil Service Examiner detail denied to Herman Rushing when even the incumbent had recommended Rushing for the detail.

(j) The details given Richard Askew despite the fact Askew was suspended for making a racially derogatory statement.

95. Equally significant is the experience of those few blacks who were able to secure details into higher level positions. In those cases, the details were of no benefit to the black employees and whites who had not been detailed would be placed into the position when it was permanently filled. Some examples are:

(a) Roy Dixon's being detailed for 22 months as supervisor over the mailhandlers, only to have the permanent position go to a white employee who had never performed that function.

(b) William McCombs being detailed as Assistant Station Manager, while the permanent position went to a white who had not been detailed.

(c) Peggy Talbert being detailed as officer-in-charge of the Stanfield Post Office and receiving a commendation for the way in which she had performed her job, only to have the permanent position go to a white instead.

(d) Tom McGill being denied permanent positions as Accounting Assistant in 1974 and Postal Services Examiner in 1973 after having been detailed in each position for about 6 months.

96. The available reliable statistics indicate that upper level details have been unfairly provided to blacks. The really important details are those which have provided extensive experience to whites without giving blacks a chance even to show their mettle. Since the cold statistics lump together short details with longer ones, the effect of the discrimination was even greater than that reflected by the figures alone. The pertinent statistics are as follows:

(a)      EMPLOYEES DETAILED TO HIGHER LEVEL POSITIONS BY LEVEL AND RACE, JULY 1965 – JUNE 1966

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 7 | 176 | 20 | 196 |
| 8 | 46 | 7 | 53 |
| 9 | 77 | 1 | 78 |
| 10 | 35 | 0 | 35 |
| 11 | 0 | 0 | 0 |
| 12 | 0 | 0 | 0 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 334 | 28 | 362 |

Source: Administrative Complaint File of Mr. Hazel E. Ellis, "Higher Level Details"

(b)     EMPLOYEES DETAILED TO HIGHER LEVEL
         POSITIONS BY LEVEL AND RACE, 1968*

| Grade Level | White Employees | Black Employees | Total Employees |
|---|---|---|---|
| 8 | 131 | 23 | 154 |
| 9 | 87 | 9 | 96 |
| 10 | 79 | 5 | 84 |
| 11 | 9 | 0 | 9 |
| 12 | 2 | 0 | 2 |
| 13 & above | 0 | 0 | 0 |
| TOTAL | 308 | 37 | 345 |

*Data incomplete at level 7.

Source:     Quarterly Reports on Postmaster's Program for Pro-
            gress dated April 1, 1968 (supplemented by work-
            sheets) and July 30, 1968, and Field Reports on
            EEO Program for Progress for 7-27-68 - 8-23-68,
            dated 8-29-68, for 8-24-68 - 9-20-68, dated 9-25-68
            for 10-1-68 - 12-30-68, dated 1-13-69.

(c)     EMPLOYEES DETAILED TO HIGHER LEVEL
         POSITIONS BY LEVEL AND RACE,
              JAN. 1969 - JUNE 1969

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 7 | 46 | 24 | 1 | 71 |
| 8 | 81 | 9 | 0 | 90 |
| 9 | 27 | 3 | 0 | 30 |
| 10 | 36 | 1 | 0 | 37 |
| 11 | 4 | 0 | 0 | 4 |
| 12 | 1 | 0 | 0 | 1 |
| 13 & above | 0 | 0 | 0 | 0 |
| TOTAL | 195 | 37 | 1 | 233 |

Source:  Field Reports on EEO Program for Progress for 1-1-69,
         dated 4-10-69, and for 4-1-69 - 6-30-69, dated 7-7-69.

(d)     EMPLOYEES DETAILED TO HIGHER LEVEL
         POSITIONS BY LEVEL AND RACE, 1970*

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 7 | 15 | 5 | 1 | 21 |
| 8 | 66 | 16 | 2 | 84 |
| 9 | 19 | 2 | 0 | 21 |
| 10 | 26 | 0 | 0 | 26 |
| 11 | 5 | 1 | 0 | 6 |
| 12 | 2 | 0 | 0 | 2 |
| 13 & above | 0 | 0 | 0 | 0 |
| TOTAL | 133 | 24 | 3 | 160 |

Source:  Field Reports on EEO Program for Progress for 1-10-70 -
         4-3-70, dated 4-14-70 and for 5-31-70 - 11-30-70, dated
         12-4-70.

*Does not include 4-3-70 - 5-30-70 and 12-1-70 - 12-31-70.

(e)
EMPLOYEES DETAILED TO HIGHER LEVEL
POSITIONS BY LEVEL AND RACE, 1971*

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 7 | 22 | 8 | 0 | 30 |
| 8 | 89 | 22 | 1 | 112 |
| 9 | 44 | 2 | 0 | 46 |
| 10 | 18 | 0 | 0 | 18 |
| 11 | 14 | 0 | 0 | 14 |
| 12 | 2 | 0 | 0 | 2 |
| 13 & above | 2 | 0 | 0 | 2 |
| TOTAL | 191 | 32 | 1 | 224 |

Source:   Field Reports on EEO Program for progress for 12-1-70 –
          5-31-71, dated 6-4-71, and for 5-31-71 – 11-30-71.

*Does not include 12-1-71 – 12-31-71.

(f)
EMPLOYEES DETAILED TO HIGHER LEVEL
POSITIONS BY LEVEL AND RACE, 1972*

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 7 | 30 | 8 | 0 | 38 |
| 8 | 90 | 28 | 1 | 119 |
| 9 | 50 | 3 | 1 | 54 |
| 10 | 17 | 1 | 0 | 18 |
| 11 | 20 | 0 | 1 | 21 |
| 12 | 1 | 0 | 0 | 1 |
| 13 & above | 2 | 0 | 0 | 2 |
| TOTAL | 210 | 40 | 3 | 253 |

Source:   EEO Program for Progress Reports for 1-1-72 – 5-8-72,
          dated 5-10-72, and for 5-30-72 – 11-30-72, dated
          12-8-72.

*Does not include 5-9-72 – 5-29-72, and 12-1-72 – 12-31-72.

(g)
EMPLOYEES DETAILED TO HIGHER LEVEL
POSITIONS BY LEVEL AND RACE,
DEC. 1972 – MAR. 1973

| Grade Level | White Employees | Black Employees | Other Employees | Total Employees |
|---|---|---|---|---|
| 7 | 11 | 6 | 1 | 18 |
| 8 | 45 | 14 | 1 | 60 |
| 9 | 18 | 2 | 0 | 20 |
| 10 | 6 | 0 | 0 | 6 |
| 11 | 5 | 0 | 0 | 5 |
| 12 | 1 | 0 | 0 | 1 |
| 13 | 0 | 0 | 0 | 0 |
| TOTAL | 86 | 22 | 2 | 110 |

Source:   EEO Program for Progress Report for 12-1-72 – 3-31-73,
          dated 4-27-73.

97. The above statistics indicate that details to the best jobs were the province of whites and that blacks received less than their fair share of this training. Of course, as set forth above, it was the lengthy details given whites which had the greatest discriminatory effect.

98. The reliable detailing statistics maintained by USPS beginning in April 1973 and thereafter show some improvement in the defendants' practices. However, since all upper level details were lumped together on the forms used by USPS, it is impossible to know if the best details were still disproportionately given to whites. What is clear is that there were numerous examples of discriminatory individual abuse with respect to details after 1973.

99. It was not normally necessary for an employee to specifically request a detail. Employees by taking the pertinent supervisory examinations or by applying for jobs (e. g., Chisholm's application for a finance job in 1968 or 1969) let it be known that they desired promotion. Despite such expressions of interest, blacks were denied details. Moreover, blacks that went a step further and specifically sought details (e. g., Al Hart, William Holman, Roy Dixon, Jr.) were generally not successful in their efforts.

O. *Discipline*

100. USPS has established a series of various disciplinary steps of progressive severity to be used with its employees. The process begins with an oral counselling and proceeds through written warnings, suspension and discharge. The various steps within the disciplinary system are set out in the collective bargaining agreements with craft employees. Those contractual provisions do not include, however, any criteria as to how that discipline is to be administered. It is instead left to the individual judgment of a particular supervisor, without the benefit of any written guidelines.

Discipline is significant, not only because of the immediate repercussions against an employee who is disciplined, including loss of wages if suspended or discharged, but also because a record of discipline can adversely affect an individual's prospects for promotion. For example, Postmaster Sloan testified that he disregarded the first choice of a Promotions Advisory Board in filling a position as Accounting Assistant in 1974 because the first choice had a severe absenteeism problem.

The absence of any objective criteria guiding the administration of discipline leaves open the possibility that racial bias, either consciously or unconsciously, will enter into decisions to discipline. Further, the lack of any objective criteria renders it impossible for higher management officials to review disciplinary actions for possible discrimination, because there are no yardsticks with which to compare a decision to determine whether it has been rendered fairly without any racial factors.

Coupled with this lack of objective criteria, the statistical evidence at trial, compiled from the defendant's own reports and charts, showed a grossly disproportionate rate of discipline against black employees. Although blacks comprised only about 30 per cent of the work force, the ratio of blacks discharged to whites discharged was more than 2 to 1. Well over half of the suspensions between 1973 and 1978 were taken against blacks.

101. The figures, showing the number of involuntary separations and suspensions for the periods for which figures are available at trial, come from forms kept by USPS and acknowledged to be accurate by defendant Greeson. They are:

| Period | Involuntary Separations | | Suspensions | |
|--------|-------|-------|-------|-------|
| | Black | White | Black | White |
| 1-4/70 | 3 | 1 | | |
| 5-11/70 | 9 | 1 | | |
| 12/70 - 5/71 | 3 | 0 | | |
| 5-11/71 | 1 | 1 | | |
| 1-5/72 | 5 | 2 | | |
| 5-11/72 | 3 | 0 | | |
| 12/72 - 3/73 | 14 | 1 | | |
| 4-9/73 | 8 | 3 | 7 | 4 |
| 10/73 - 3/74 | 1 | 3 | 0 | 0 |
| 4-9/74 | 3 | 2 | 3 | 6 |
| 10/74 - 4/75 | 2 | 3 | 10 | 5 |
| 4-10/75 | 3 | 0 | 2 | 2 |
| 10/75 - 4/76 | 2 | 1 | 21 | 13 |
| 4-9/76 | 4 | 7 | 4 | 9 |
| 10/76 - 3/77 | 3 | 1 | 9 | 4 |
| 4-9/77 | 3 | 0 | 8 | 8 |
| 10/77 - 4/78 | 6 | 4 | 10 | 4 |
| 4-9/78 | 3 | 4 | 9 | 6 |
| TOTAL | 76 69% | 34 31% | 83 57.6% | 61 42.8% |

102. A more detailed analysis for the years 1975 and 1976 was done in connection with an EEO investigation of a complaint filed by Norman Mitchell. Those figures showed an equally disproportionate rate of discipline being taken against black employees.

| | White | Black |
|---|---|---|
| .Letters of Warning | 120 | 280 |
| Restricted Sick Leave | 18 | 27 |
| Suspensions | 31 | 63 |
| Removals | 12 | 10 |
| Absenteeism Letters | 9 | 27 |
| Deferment of Step Increase | 4 | 6 |
| Reminder Letter | 4 | 15 |
| Reduction in Grade Level | 1 | – |
| Letters to Report to Manager of Personnel | 3 | – |
| Settlement Agreements | 1 | 3 |
| Counselings | – | 1 |

103. The above figures were buttressed at trial by testimony pointing out specific instances of discipline taken against black employees where white employees guilty of infractions of equal or worse magnitude escaped discipline. Wade Mosley, who is black, was notified that he was being discharged for poor attendance. It was only after he filed an EEO complaint and a grievance and pointed out several instances of white employees with worse attendance records that the discharge proceedings were discontinued.

A black employee named Aletha Brooks was suspended for missing work while she was attending a session at a local mental health facility. Her attendance at the mental health center was part of an agreement with USPS to attempt to resolve a problem which had caused her to have difficulties with absenteeism. Several whites with similar situations had faced no such discipline for absences caused by attendance at various mental health facilities.

In 1976 the USPS sought to discharge a black employee named Maurice Todd for absenteeism. When Todd's representative pointed out to management the case of a white employee with a worse record, the USPS response was simply to assert that the white worked in a different area under a different supervisor. That factor, of course, is one of the problems with the unfettered discretion allowed to supervisors, in that different supervisors can treat employees guilty of the same infraction in different fashions.

In late 1975 or early 1976 USPS sought to suspend and then to discharge Tom McGill for absenteeism. McGill filed a grievance and the discharge and suspension were reduced to a warning after McGill pointed out to management the situations of two whites with comparable records who had not been similarly treated.

104. The above evidence indicates that blacks have been unfairly disciplined. Even where blacks have ultimately prevailed (or had the severity of discipline reduced) in the disciplinary process they have been forced to undergo the stress and uncertainty created by the accusations. Many others have been suspended or terminated, perhaps unjustly, or have been denied promotional or detail opportunities because of their discipline record. USPS has offered no evidence to suggest the figures above are inaccurate or to explain why blacks have received a disproportionate share of adverse discipline.

P. *Management Training*

105. From time to time USPS has selected employees or applicants for employ-

ment to participate in various management training programs utilized by the service. Such programs enable an employee to by-pass the normal progression through the ranks from a craft job to a supervisory job. Prior to 1978, USPS in Charlotte never hired a black management trainee; despite the fact there were a number of blacks with four year college degrees who could have been considered for such a management training program. (One black trainee, Carlton Robinson was sent to Charlotte in 1975.) Four whites were hired as management trainees in Charlotte when the program began.

Plaintiff Chisholm sought to be appointed to a management trainee position. A test was required as a prerequisite to being appointed to such a job. Chisholm took the test but was not told what he scored. Local management officials did tell him that he had failed. Chisholm communicated with the Civil Service examination officials at Post Office headquarters and learned that there were no pass-fail scores. This misrepresentation by local management was an effort on the part of USPS officials to keep from having to place a black in a management trainee position. It is clear that USPS did not use the management trainee route to help eliminate the pervasive effects of long-time discrimination.

### Q. *Dealings with Intransigent Blacks*

106. USPS had, for a number of years prior to the effective date of Title VII (1972), an administrative process for dealing with complaints of racial discrimination. That procedure is also, of course, utilized as part of the enforcement process of Title VII since 1972. There was substantial evidence at trial of incidents in which black employees had filed charges of discrimination and had been found to be the victims of discrimination. In most of these cases, the findings of discrimination were made by employees of USPS.

107. Notwithstanding the clear message that USPS should have received from these determinations of discrimination, no meaningful changes in the agency's way of doing

business were effected. Instead of seeking ways to eliminate the pervasive discrimination proved at trial, the agency's approach was simply to try to dispose of these complaints on an individual basis without giving any meaningful relief. One of the inevitable results of this approach was to discourage others from utilizing the administrative complaint process because of the demonstrable lack of results, even where discrimination had been found.

Some examples are:

(a) A determination in 1975 that Al Hart had been discriminated against in the assignment of details to varied work areas. Although USPS agreed to assign Hart to areas other than that with which he was already familiar, he went three years without receiving such a detail.

(b) A determination that John Pettice had been discriminatorily denied detailing to General Foreman. Following that finding, he was given a 90-day detail and was then summarily removed, without explanation. A white was then detailed into the same position, until it was permanently filled. The white who followed Pettice was given the permanent position.

(c) A determination that Herman Rushing had been discriminatorily denied a detail as Civil Service Examiner. Notwithstanding that determination, the only relief tendered to Rushing was that he receive equal treatment in the future, an entitlement he already possessed· under Title VII without the necessity of filing charges.

In several other instances, while charges were pending, before any determination had been reached, USPS reached understandings with the complainants which resulted in the discontinuation of the proceedings. For example, USPS agreed not to discharge Wade Mosley if he agreed to dismiss his EEO complaint. James Lee was offered a detail to Assistant Safety Officer which resulted in his dismissing his pending EEO complaint.

Management consistently viewed the EEO process as an adversarial one. Most employees were required to represent them-

selves in a process filled with procedural pitfalls and against the superior forces management could bring to bear.

While there is nothing inherently wrong with informal resolutions, the evidence at trial demonstrated that those proceedings did nothing to modify the agency's personnel practices or to get at the root causes of discrimination, and the approach of USPS was simply to dispose of the individual cases without any view towards remedying past discrimination or eliminating its recurrence.

The long road which a complainant faced in the administrative process together with the fact that USPS did not always live up to its settlement bargains tended to discourage blacks from using the process. Indeed, after the filing of this action, many black employees depended on the results of litigation to improve their lot.

R. *Rural Carriers*

108. Rural carrier positions were a special category of carrier jobs which were the privileged domain of whites. The record indicates that rural carrier positions have consistently been given to whites. (In July 1979, several weeks before trial, the first black rural carrier was appointed.) In order to become a rural carrier, one has always been required to first be a substitute rural carrier. Until 1975 substitute rural carrier positions were not subject to regular competition. Instead, the incumbent (white) rural carriers would designate any person they wanted—and the designees did not need to be regular post office employees—to be substitute carriers. The persons designated as substitutes tended to be friends of the rural carriers, and since the rural carriers were all white, this "buddy system" virtually ensured that the rural carrier work force would remain all white.

The practice was modified slightly in 1975, in that USPS began requiring a test prior to one's being assigned as a substitute rural carrier. Incumbents in other USPS positions were still discouraged from getting assignments as rural carriers because they were still required to first go into the substitute classification, a move which might involve trading a full-time position for a part-time position (one day a week). This limitation had the effect of continuing to deny incumbent blacks the opportunity to move into a classification which had traditionally been denied them. At least one black, Wade Mosely, suffered from this discrimination.

S. *Individual Claims.*

109. The Court heard the testimony of a number of individual USPS employees concerning their experiences in connection with the employment practices of USPS. This testimony forcefully illustrated the impact of the discriminatory and standardless practices which the statistical evidence reflects. In addition to giving life to the cold statistics, however, those individuals' testimony and other evidence relating to the specifics of their claims furnish a factual basis for a determination of certain of their individual claims of racial discrimination. The Court's factual determinations have been made in view of all of the evidence in this case, much of which is detailed above, and upon the Court's determination of the credibility of witnesses, where necessary. The findings below concerning the individual allegations of racial discrimination do not always repeat or refer to the general discriminatory practices which bear on the findings with respect to individuals. The whole record, however, has been considered by the Court.

110. *Napoleon Chisholm*—Napoleon Chisholm was first employed by USPS Office in 1957. He served in the military from 1958 to 1960 and returned to the Post Office in 1960. Chisholm attended Hampton Institute for approximately two years, from 1952 to 1954, and then attended N.C.A.& T. University in Greensboro, N.C. for about one year. In the mid-1960's, he enrolled at the University of North Carolina at Charlotte, taking night classes, and in 1972, he received the Bachelor of Arts degree in Business Administration with an accounting minor. Chisholm was employed as a Letter Carrier until 1974, when he was promoted to Postal Systems Examiner.

In 1968, Chisholm took the supervisory exam, but was unsuccessful. He took the exam again in 1970 and was successful.

In about 1968 or 1969, Chisholm applied for a position as Postal Systems Auditor (now known as Finance Examiner). He was given an interview, but was not selected. The job went instead to a white employee named Sims. Chisholm was never told why he was not selected.

In late 1971 or early 1972, Chisholm applied for two jobs, Finance Examiner, level 9, and Budget Assistant, level 8. It was Chisholm's failure to obtain either of these positions that led to his filing of the EEO complaint which, along with his claims of class-type discrimination, forms the jurisdictional basis for this case.

The Finance Examiner's job was awarded to Robert Wallace, a white who had been detailed into that position for about fifteen months, prior to getting the job. The Budget Assistant job went to Laurel B. Holland, who is also white. Holland had been detailed in that job approximately a year prior to being awarded the job. Chisholm was not detailed to any jobs prior to 1972 even though his prior application for the Postal System Examiner job and his efforts on the supervisory examinations demonstrated his interest in a promotion detail.

Chisholm was denied the opportunity to compete for the Finance Examiner and Budget Assistant positions. The alleged grounds for denying Chisholm the opportunity to compete for the jobs was that he lacked the requisite specialized experience. USPS regulations allowed the substitution of educational experience for specialized experience. USPS refused to recognize Chisholm's educational experience. This denial formed the basis for part of Chisholm's administrative complaint, and the Civil Service Commission determined that the Postal Service's refusal to recognize Chisholm's educational experience for Finance Examiner was discriminatory. The discrimination found in the administrative process is not challenged by USPS. The Court has previously granted partial summary judg-

ment with respect to that issue, such that the only question, with respect to the Finance Examiner's job, is whether USPS has met its burden of showing that Chisholm would not have received the position in any event. USPS has presented no evidence which would indicate that Chisholm would not have been promoted to the Finance Examiner job if he had been fairly treated, and the Court finds that Chisholm was a victim of racial discrimination and is entitled to relief. The record is clear that the interview before a Promotion Advisory Board is an essential and important part of the process. Chisholm has demonstrated his capacity to handle finance positions and he certainly could have attempted to convince a Promotion Board that he could handle the job. The members of the pertinent Promotion Advisory Board did not testify at trial; it is clear, however, that one's performance on the interview is a major factor in some Board decisions. Of course, if the Board had refused to promote Chisholm because of discrimination in details which favored whites, such a decision would be improper.

Further, several white employees, specifically, Claud, Kerr, Prather and Polk, were allowed to compete for various jobs prior to 1972 without complying with the specialized experience requirement. In each case, a USPS personnel assistant used his discretion to effect a waiver. In each case, these whites received an opportunity to interview. Prather got the job of Methods and Standards Analyst even though he never took the required exam for that job. USPS has offered no credible evidence which supports the disparate treatment of black and white employees with respect to the waiver of specialized experience requirements, and the Court finds that Chisholm was discriminated against because of his race in being denied a position as Budget Assistant as well.

The discrimination against Chisholm with respect to the Finance Examiner and Budget Assistant positions went beyond the defendants' failures to substitute education for experience. Chisholm had been denied details that would have given him an oppor-

tunity to show his skills. Wallace and Holland had each been detailed to the jobs for extensive periods and then were selected by Promotion Advisory Boards containing members who had been involved in the detailing process.

Following the exhaustion of his administrative remedies, Chisholm filed this lawsuit on June 27, 1973. Prior to that time, he had never been detailed to a higher level position from his level 5 letter carrier job. Three days after the lawsuit was filed, USPS detailed Chisholm to an Accounting Assistant position, level 14, in the Finance Office. Chisholm continued in that detail until December 1973. This detail represents an example of the Postal Service's practice of attempting to quiet the complaints of individual black employees while failing to take any steps to remedy the underlying pervasive discrimination.

In 1973, Chisholm applied for a position as Manager of Finance. This application was Chisholm's attempt to use the remedy he was provided in the administrative process to receive the next job for which he applied and was qualified. Chisholm was initially rated as ineligible, ostensibly because he was not at a sufficiently high level position and lacked the requisite specialized experience. The person eventually designated to receive the job, a white named Joiner, was also rated as ineligible for the same reason. USPS in conformity with its policy that a waiver for experience could be granted when the management deemed it appropriate simply waived the level requirements for both Chisholm and Joiner, and each was allowed an interview with the Promotion Board. Joiner was selected for the position, after being evaluated as best qualified by the Promotion Board. Chisholm was rated as third best qualified. Despite the previous administrative ruling and the determination Chisholm was qualified, this level 21 job was not offered to Chisholm. The Court concludes USPS was obligated as a result of the administrative decision to offer the Manager of Finance job to Chisholm and that he would have accepted such an offer.

Joiner never actually filled the level 21 position. He had asked for time to complete an educational program in Florida before moving to Charlotte, and later refused the job offer. Instead of offering Chisholm the job, USPS abolished the level 21 Finance Manager position and created two level 20 jobs. Joiner meanwhile took a similar level 21 position in Florida. Chisholm was never offered the opportunity to become Finance Manager either before or after Joiner declined.

The two level 20 positions—Manager, Accounting and Reporting Systems and Manager, Budget and Cost Analysis—were subsequently advertised. Chisholm applied for both positions. After having been allowed a waiver of the experience requirement for the level 21 position and being permitted to apply, Chisholm was suddenly and inexplicably ineligible for a waiver for a lower ranked job! The white employee given the Manager, Accounting and Reporting Systems job had previously been detailed to a series of higher level positions between 1966 and 1973. Chisholm, of course, had received no such details.

In December 1974, Chisholm was promoted to Postal Systems Examiner. He applied for the job when it was posted and was awarded the job without having to go through the interviewing process. He has subsequently been detailed as Officer in Charge of the Post Office in Kings Mountain, N.C., from October 1977 to April of 1978, and as Officer in Charge at the Post Office in Matthews, N.C., from May 1978 to September or October of 1978.

In late 1970 or early 1971, Chisholm was unfairly disciplined for going home to lunch. Chisholm was given a letter of warning for that infraction. Whites regularly did the same thing and were not disciplined. Chisholm filed an EEO complaint over the matter, and the complaint was resolved by an agreement that the letter of warning would be withdrawn. Sometime prior to that time, Chisholm had been disciplined for tardiness after he had requested a schedule adjustment because of his attending school at night. As a result of the

USPS refusal to adjust his schedule, Chisholm was late on several occasions and was suspended for tardiness. USPS had regularly adjusted whites' schedules in order to allow them to further their education.

The Court finds that Chisholm has been a victim of racial discrimination in being denied details and promotion and being disciplined. Chisholm is entitled to back pay for details denied prior to 1972, for the denial of promotion to Finance Examiner in 1972, for denial of the Manager of Finance job in 1974, and for denial of the two level 20 jobs discussed above in 1974. The master will provide Chisholm monetary compensation, which assumes he was offered and accepted the highest level jobs which he sought. Chisholm shall also receive front pay until he is promoted to a job level 21 or above in Charlotte.

111. *Herman Rushing*—Herman Rushing was employed by USPS in 1955 as a Temporary Clerk and became a regular clerk in 1958. He applied for a number of promotions but received none until 1973.

In about 1961 or 1962 Rushing sought a position as dispatch expediter, a newly created position. Prior to the creation of this job Rushing and a white employee (Roy Helms) had been performing the dispatch expediter duties as part of their regular duties as clerks. Both Rushing and Helms took the test for the position. Rushing was successful on the test; Helms was not. The job did not go to Rushing; it went to another white who had never done the work.

In about 1970 Rushing applied for a position as Customer Service Representative. The job had been advertised, and the only prerequisite for consideration was to submit a written application. Rushing turned in his application. After he applied, the personnel office decided to simply place an excessed white employee in the position without going through the competition process. This procedure—advertising a job and then assigning it to an unassigned, excessed supervisor—had never before happened in Rushing's knowledge.

In 1971 Rushing sought a detail to a position as Civil Service Examiner. The examiner's position is a full-time one responsible for administering tests and applications for federal employment. For some time prior, Rushing had served as a member of the Civil Service Board; this was a part-time additional duty which involved assisting the examiner as needed. The assigned examiner was being detailed to another position for several months requiring a detail for the examiner position. The incumbent examiner recommended Rushing for the detail. This recommendation was overruled by higher management, and a white employee (Richard Suddreth) was instead assigned to the detail. Rushing filed an administrative EEO complaint, and the U.S. Civil Service Commission determined that the reasons given by the Postal Service for overruling the examiner's recommendation and for denying Rushing the detail were pretextual and that Rushing's race accounted for his being denied the detail.

Rushing was afforded no relief as a result of this determination. The Postmaster simply stated that "[s]hould the occasion arise that the need to detail someone to the position of Examiner-in-Charge, Mr. Rushing will be given equal consideration for the detail." This relief is, of course, no more than what Rushing was entitled to under Title VII even without filing a complaint. The Examiner position was a level 7 job; Rushing was at that time in a level 5 position. Consequently, Rushing is entitled to an award of back pay for this discrimination.

The white (Suddreth) who received the detail was at level 5, just as was Rushing. Rushing at the time had more overall seniority with USPS and more seniority and experience on the Civil Service Board. At the time of trial, Mr. Suddreth had advanced to a level 17 position, as Foreman of Mails and Assistant Station Manager.

Following the filing of Rushing's EEO complaint, he was never again used by management as a member of the Civil Service Board. Prior to his filing of the EEO complaint, he would sometimes be used as often as two or three times per week. Management never advanced any reason, either at

the time of the occurrence or at trial, to explain this action detrimental to Rushing, and the Court finds the exclusion of Rushing from the Board was reprisal for Rushing's filing the EEO charge.

Rushing also sought details to other positions, specifically, Superintendent of Office Services (1975) and Postal Systems Examiner (1977). In each case, he made written application, but he received no response other than an acknowledgement of receipt of the applications.

In 1974 Rushing applied for a position as Customer Services Representative (trainee), a level 13 job. The job went instead to a white named Livingston. James Richardson, a black management representative of the Postal Service, testified for the defendants at the trial. He was the only member of the Promotion Advisory Board for that vacancy who testified. Richardson felt that Rushing was a better candidate than Livingston. Further, an evaluation of the records, prepared following the interviews of the Board, showed that Beard, a white member of the Board, rated Rushing and Livingston equally on a number of factors. In the one category where his evaluation of the two candidates diverged, Rushing was rated higher by Beard than Livingston. Beard's comment, with regard to Rushing, was: "Mr. Rushing has the experience and background necessary to be a [Customer Services Representative]." Beard's comments, with regard to Livingston, was: "This man has a lot of potential." Notwithstanding that 2 of the 3 members of the Board felt that Rushing was better qualified, the white was instead recommended. O.B. Sloan, the Postmaster, made the final decision by simply selecting the person recommended by the Board, without reviewing the folder containing the members' evaluations, without making any independent judgment of the applicants' qualifications, and without making any inquiry to determine the validity of the Board's process. USPS has offered no evidence which shows any factor other than race which explains this decision. The Court finds that Rushing was denied the Customer Services Representative job because of his race.

Rushing is entitled to back pay and injunctive relief to put him in his rightful place. The Court believes it is appropriate to compare Rushing with Richard Suddreth and to provide back pay to Rushing based on the promotions Suddreth received. Rushing is also entitled to be compensated for details lost as a result of discrimination. Finally, Rushing should receive front pay and a promotion to job level 17 or above in Charlotte.

112. *Alfred A. Hart Jr.*—Alfred A. Hart Jr. was employed by the Post Office in 1965 as a temporary clerk and became a permanent clerk, level 5, in 1966. In 1968 he became one of the first Letter Sorting Machine (LSM) operators, level 6, in Charlotte.

Hart took the supervisory test on several occasions. When he first took the exam in 1970, he failed. He passed the exam the next two times that he took it, in 1973 and 1974. Hart was never detailed to a supervisory position prior to passing the test. Having been unsuccessful in 1970 on a test which has been shown to be racially discriminatory, Hart is presumed to be shown to be a victim of discrimination. The Court is unable to determine at this point what promotions if any, Hart would have received had the Postal Service not made the racially discriminatory tests a precondition to promotion to supervisor. That issue will be left to determination in the Stage II proceedings, as set forth below.

Following his successful completion of the supervisory exam, Hart was placed on the supervisory roster but was never detailed into any supervisory positions, nor did he receive any promotions.

After he successfully passed the supervisor test a second time, Hart was again placed on a roster, and was given a "B" rating. Three other persons, all white, in Hart's unit were also placed on the roster. Hart did begin receiving details following this test, but he was not detailed on an equal basis with his white colleagues. Hart's details were limited to the LSM operations where he was already working. The whites received details in other areas,

enabling them to broaden their experience and knowledge and therefore enhancing their chances of promotion. The amount of details in number and time given to Hart was significantly less than that given to the whites.

The discrimination in details accorded Hart led him to file an administrative complaint of discrimination. The investigator assigned to the case carefully examined management's explanations for assigning Hart to fewer and less desirable details and found them lacking. He determined that the Post Office's commitment "that minorities . . . will be used in details and assignments on an equal basis . . . was not implemented with regards to [Hart]."

Following this determination of racial discrimination, an agreement was made by Hart and the Postal Service in 1975 that he would be given an equal opportunity to act as Foreman of Mails and in other operations and that he would be detailed to operations other than the LSM. Notwithstanding this explicit agreement, Hart was still not detailed to any operations other than LSM until 1978. One of the white employees who received preferential treatment in terms of details for over four years was promoted to foreman in 1978. Hart applied for this Foreman of Mails job. Throughout this period of time, both before filing his EEO complaint and after the putative resolution, Hart actively sought details from his supervisors and other management persons.

In 1974 Hart applied for a position as Customer Services Representative. The job went to a white employee named Hugh Livingston. Hart also sought a position as Foreman of Mails in 1978 which was given to David Willis, a white who had been employed with the Postal Service significantly less time than had Hart.

The Postal Service has tendered no evidence to rebut Hart's prima facie case of racial discrimination or to demonstrate that Hart's inability to obtain details and promotions was because of any non-racial factor. The Court finds that Hart was denied details because of his race and is presumptively entitled to monetary and other relief to make him whole. The master should determine the back pay, front pay and promotions in Charlotte which Hart was denied because of his race and should put him in his rightful place.

113. *William J. McCombs*—William J. McCombs has been employed by the Postal Service since 1956. Prior to that time he had attended Johnson C. Smith University for 3½ years. He began his postal career with the railroad post office. In about 1959 he became a regular employee at the Charlotte Post Office.

From 1956 to 1978 McCombs was a clerk, level 5. He was promoted in 1978 to Finance Clerk, level 6.

McCombs took the supervisory exam each time that it was given, beginning in 1968 until 1976, when USPS ceased using the test results. He was unsuccessful each time that he took the test. Beginning in 1977, McCombs was placed on the supervisory roster when the Postal Service in 1976 began using a roster not based on an examination.

At some time prior to 1974, McCombs was detailed for about a year as Assistant Station Manager at University Park Station. During that period McCombs performed the job well and received commendation letters from the Postmaster. When the position was advertised to be permanently filled, McCombs sought to apply but was told that he would not be allowed to compete because he was not on the supervisory roster. The job instead went to a white who had not been detailed to the position and whose experience was, like McCombs', working as a clerk.

As a victim of the Postal Service's racially discriminatory tests, McCombs has been discriminated against because of his race. He will be entitled to demonstrate during the Stage II proceedings what positions he would have applied for had he not been prevented from doing so because of the discriminatory written exams.

During about 1974 or 1975 McCombs also applied for a position as a Customer Services Representative, level 13. Placement on

the supervisory roster and successful passage of the supervisor exam were not required in order to compete for this position. McCombs went through the interview process, but a white who was less senior than McCombs was chosen. McCombs had never been given a detail into this position.

During 1975, McCombs was detailed to a position as Window Services Technician; however, there was no permanent position for Window Services Technician authorized at the University Park Station where McCombs worked. McCombs filed an EEO complaint because of the lack of such a position. The complaint was resolved by an agreement to pay McCombs at level 6 while he was detailed into that position. Sometime thereafter, the Postal Service determined that no permanent position would be authorized, and McCombs reverted to a level 5 pay grade again, although he continued to perform the duties of the Window Services Technicians.

University Park Station is in a predominantly black neighborhood and the Postal Service employees at the station have been virtually all black. Other small stations comparable to the University Park Station were assigned a level 6 Window Services Technician. In 1978 the permanent position was ultimately authorized and McCombs was awarded the position. The Postal Service has offered no evidence other than race to explain why the University Park Station was denied this position, and its subsequent authorization of the position demonstrates that some factor other than legitimate considerations were at work.

The Court finds that McCombs was discriminated against because of his race in being denied opportunities and promotions as a result of the discriminatory operation of the supervisory examinations. The Court also finds that McCombs was discriminated against in the denial of the Assistant Station Manager job in June 1974. McCombs is entitled to injunctive and monetary relief for denial of promotions and

money lost as a result of USPS's failure to authorize the Window Services Technician job. He is also entitled to front pay and promotion to a job level 15 or above in Charlotte.

114. *William Holman*—William Holman was employed by the Postal Service in February 1962 as a carrier. He remained a carrier through the time of trial. Holman is a college graduate, having received a bachelor's degree from Johnson C. Smith University in economics in 1964. Since 1964 Holman has been licensed as an accountant by the State of North Carolina and does accounting work on a part-time basis.

Holman applied for a number of promotions with the Postal Service and took the tests necessary for him to advance into supervisory positions.

He first applied to take the supervisor exam in 1965 but was told by management that he would not be allowed to take it because he had not been continuously employed for three years. He did take the exam in 1968 and 1970.[6] On both occasions he was successful and was placed on the supervisory roster.

Notwithstanding his successful completion of the exams Holman received only very short supervisory details. Holman was allowed, during a two month period, on 3 or 4 occasions, to work as Assistant Station Manager, but that work was very sporadic and did not involve any sustained training. Further, Holman was still paid at his usual carrier's rate of pay.

When a new supervisory examination was given in 1974, Holman decided not to apply for it since his passing it in the past had proved to be futile and in view of his inability to receive a promotion or even a supervisory detail. Holman's discouragement was justified, in view of his treatment over the preceding several years, and in view of USPS treatment of other qualified blacks who were discriminatorily denied promotion.

---

**6.** Holman testified that he had taken the examinations in 1967 and 1971, but the PX 71 and PX 82 indicate that the exams were in fact given in 1968 and 1970, and these are apparently the tests that Holman referred to.

Holman also applied for several other jobs. In about 1972 he applied for a job as Safety Officer. The job went instead to a white (Clyde Baker) who had been detailed into the position for a period of 9 to 12 months. Holman was not even allowed to interview for the position.

Holman also applied for a job as Driver Instructor Examiner. That position involved training and familiarizing tractor-trailer operators with their work. Prior to working for USPS, Holman had had more than 12 years experience driving tractor-trailers. The driving instructor job was a level 6 or level 7 one. The job went to a white (George Jordan) who had been detailed into the position for approximately 12 months.

In about 1975 Holman applied for a job as Accounting Technician. There were from 7 to 9 positions open at the time. Two blacks were chosen for the vacancies, but Holman was not one of them. Holman was qualified for the position. At least one member of the pertinent Promotion Advisory Board desired that the number of blacks promoted be limited because he thought blacks would be too disruptive.

Holman was qualified for each of the positions he applied for and was also qualified for supervisory details and promotion. The defendants have offered no evidence to demonstrate that Holman was not promoted or detailed for any reason other than race. Although there was evidence that the whites chosen for the safety officer and driver instructor examiner jobs were employed by the Postal Service earlier than Holman, there is no evidence that this seniority (in one case, only 10 months) was a factor in the decision to promote the whites over Holman. Moreover, Holman's driving and safety records were excellent.

Holman was discriminated against in being denied details to higher level positions and in being denied promotions to the jobs of Safety Officer, Driver Examiner and Accounting Technician. Indeed, his background and performance qualified him for even higher level jobs in finance or elsewhere in USPS. Holman should be awarded appropriate "make whole" relief for the details and jobs he was denied and should be allowed to demonstrate before the master other jobs for which he was qualified in Charlotte.

115. *James M. Little*—James M. Little was employed by the Postal Service in about 1965. In late 1976 or early 1977 he participated in a training program and was placed on the supervisory roster. Under the Postal Service's procedure, Little's immediate supervisor (John Pettice, a black) was to evaluate his potential for promotion and rate him as either A, B, or C. Pettice gave Little an A rating, meaning that Little was immediately ready for promotion. The B rating would indicate that he was not ready for promotion for at least 6 months and was not to be evaluated for at least 6 more months. The C rating meant that an employee would not be ready for promotion before at least 12 months and that he would not be evaluated for at least 12 more months.

Several days after Little was evaluated by Pettice, he was given a new evaluation by Dean Chesser (white), his tour superintendent. Chesser gave Little a C rating. Chesser's action represented a deviation from USPS procedure, which was to have management make comments on the first-level supervisor's evaluation, rather than writing a new evaluation. Further, Little was not present at the time that Chesser's evaluation was performed, also a deviation from USPS procedures. Chesser did not directly supervise Little.

Less than 12 months later, again contrary to USPS procedures, Little was again evaluated, this time by his current first line supervisor, a white, and assigned a rating of C. These evaluations were again done without Little's knowledge. One of the purposes of the evaluation procedure is to appraise an employee of how management views his strengths and weaknesses and promotion potential, and the entire program was being subverted by management's handling of Little's situation. This practice had the result of making Little ineligible for promotion without advising

him of what alleged deficiencies USPS management had identified as grounds for giving him a C rating.

When Little made an effort to secure copies of these evaluations for the first time, he was given a runaround, both by his supervisors and by management in the personnel department. It was only after writing to the Postmaster General in Washington that Little was able to get a copy of the evaluations, notwithstanding that he was clearly entitled to review the evaluation without all the roadblocks USPS imposed.

The Postal Service has offered no explanation or rationale to explain this unusual treatment of Little's efforts to be promoted other than his race. The Court finds that Little was denied the opportunity to be promoted because of his race. Little shall have an opportunity before the master to demonstrate what promotions and details in Charlotte he was denied as a result of his race and to receive appropriate relief.

116. *John A. Pettice*—John A. Pettice was employed by the Post Office in 1961. He has completed approximately three years of full time college study in liberal arts and data processing.

Pettice worked first as a substitute clerk and then as a regular clerk until July 1970, when he was promoted to Special Delivery Clerk in Charge. In December 1971 he was promoted to Foreman of Mails, which is an initial level supervisor position. It was at that time classified as level 7, but has been re-classified as PMS level 15.

In September 1974, a white employee (W.W. Burton) with less qualifications, education and experience was being regularly assigned to a detail as General Foreman, a position which is the next highest level of supervisor over the Foreman of Mails. Pettice filed an administrative complaint alleging discrimination based on race. The complaint was investigated, and the investigator, a USPS employee, determined that Pettice was better qualified in terms of supervisory experience and academic background than the white who was assigned the detail.

There was never any formal resolution or relief granted to Pettice arising out of this determination. The Postmaster did allow Pettice to be detailed for a period of 90 days to the General Foreman position. Pettice performed satisfactorily during this period; however, at the end of 90 days he was summarily removed from the detail without explanation.

Following his removal from the detail, a white employee, Richard Askew, was then detailed to the position of General Foreman for a number of months. While Pettice was detailed to the position, and later, during the first months of Askew's detail, the position had no permanent occupant. After Askew had been in the detail for a number of months, the permanent position itself was formally abolished, but Askew continued to fill the position on a detail basis, from March 1975 to February 1978.

While Askew was still on the detail, the position was re-advertised to be filled on a permanent basis. Pettice applied for the job, but it was awarded to Askew. Askew had been employed by the Post Office for approximately three years less than Pettice had. Askew had also been suspended for racially derogatory remarks. Pettice had also been a supervisor longer than Askew. Furthermore, at the time that Askew was promoted he had experience in supervising only two of approximately 11 different operations that the General Foreman is responsible for, while Pettice had experience in all of these areas. Although Pettice felt he was better qualified than Askew, he refrained from filing an administrative claim of discrimination arising out of Askew's promotion because of his sensitivity to his relationship as a management employee to higher level management employees.

The Postal Service has presented no evidence to explain any reason other than race as to why Askew was promoted to the position of General Foreman. The Court finds that Pettice was discriminated against with respect to details and promotions. He is entitled to appropriate monetary compensation and promotion to a job level 18 or above in Charlotte.

117. *James Lee*—James Lee first worked permanently for USPS in October 1960 as a mail handler. For several years prior he had worked part-time during the Christmas rush. In April 1961 he became a clerk, level 5. He received a BS degree in economics in 1962. During the early 1950's he had taken a number of accounting courses at North Carolina A&T University.

From 1961 to 1970 Lee was never detailed into any higher level supervisory positions. He had twice taken the written examinations for initial level supervisory jobs, but failed the tests on both occasions.

In about 1971 Lee applied for a level 7 job as Accounting Technician. An applicant was not required to be on the supervisory promotion roster in order to compete. Lee was interviewed, but he did not receive the job. The job went instead to a white (Painter) who had been detailed into the position for a number of months prior to the job being filled. Lee had never been given a detail into this position. The members of the Promotion Board were all white.

In 1972 Lee applied for a position as Senior Postal Source Data Technician, level 7. Lee was interviewed for this position, but the job went instead to a white employee (Charles Morgan). Lee had been promoted in 1969 to Postal Source Data Technician, (PSDS), the job immediately below the Senior Postal Source Data Technician one. Lee had been performing the PSDS Technician job since 1968, when he was detailed into that position, with no change in his rate of pay. When the PSDS Technician positions were permanently advertised in 1969, Lee applied for only 4 out of 15 vacancies. He did not receive a permanent position at that time, but did receive one several months later when several more vacancies occurred.

Charles Morgan, who received the Senior PSDS Technician job in 1972, had been permanently assigned to the PSDS Technician position earlier than Lee but actually had less experience in the position, when Lee's time in a detail is counted. Charles Morgan had been detailed for almost a year in the Senior PSDS technician job before being awarded it permanently in 1972. Two of the members of the Promotion Advisory Board which selected Morgan in 1972 as the permanent Senior PSDS Technician had detailed him to the job.

Following being denied the Senior PSDS Technician position, Lee filed an EEO complaint, alleging that he had been discriminated against. While the complaint was pending, management offered him a detail into the position of Assistant Safety Officer. Lee accepted it and withdrew his EEO complaint. This occasion was the first time that Lee had been offered a higher level detail.

The Court concludes that Lee was denied details and promotion to the Senior Postal Source Data Technician job because of his race. The defendants have offered no credible evidence to rebut Lee's prima facie showing. Lee is entitled to appropriate monetary and injunctive relief and to be promoted to a job at the level of the Senior PSDS Technician job or higher in Charlotte.

118. *Norman A. Mitchell*—Norman Mitchell is employed by the USPS as a mail handler. In 1976 he became involved in a discussion with his supervisor which led to his being suspended for 15 days. Following an investigation, the suspension was removed. In numerous incidents white employees engaged in comparable or more extreme conduct than did Mitchell and were not suspended or otherwise disciplined. Mitchell was discriminated against because of his race in the administration of discipline. Since Mitchell lost no wages, he is not entitled to any monetary relief with respect to this claim. USPS will be directed however not to subject Mitchell to unfair discipline in the future.

119. *Roy Dixon, Jr.*—Roy Dixon, Jr. was first employed by the Postal Service in 1969 as a part-time mail handler and in 1970 became a full-time mail handler. In 1973 he obtained a BA degree in political science.

Dixon has been permanently assigned as a mail handler, level 4, since 1970. Mail handlers are the employees who first handle mail that comes into the General Mail Facility in Charlotte.

Dixon took the supervisory promotion examination in 1972. He was unsuccessful and hence was disqualified from competition for promotion to supervisor until the Postal Service discontinued use of the exams in 1976. When USPS implemented a new supervisory roster not based on test results, Dixon was detailed to a supervisory position over mail handlers, and he continued in that position until December 1978. Dixon continuously sought from his superiors details into other areas which would involve supervision over clerk's functions, in order to broaden his experience and enhance his promotability. The operations to which he sought detail included mail sorting and processing. The work done by mail handlers is less specialized and requires less knowledge than some clerk work. Dixon never received the varied details he sought, and his experience was limited to supervising mail handlers, which is the position he had performed himself.

In December 1978 the job to which Dixon had been detailed was advertised to be filled permanently. The permanent position is entitled Foreman of Mails. There were three jobs as Foreman of Mails advertised, including the position supervising the mail handlers. The job to which Dixon had been detailed was filled by a white, David Willis, who had never supervised mail handlers before and who had been employed by the Postal Service for significantly less time than had Dixon. When Dixon was before the Promotion Board, one of the issues and concerns that was raised by management representatives was Dixon's lack of experience supervising non-mail handling operations. He had, of course, sought details to such other jobs.

Following Willis' promotion, Dixon talked with both the Postmaster and with the Director of Mail Processing to determine why Willis was chosen over him and to determine what he could do in order to be ready for the next promotion. Neither was able to give any specific answer. The Director of Mail Processing told Dixon that "you have to be liked." Dixon asked the Postmaster to explain why he had not received the Foreman of Mails position. In his testimony, Dixon described his inquiry and Mr. Sloan's response as follows:

Well, after I didn't get the job, I was sort of upset. I just wanted to know what were my weaknesses, what would I have to do in order to make supervisor, what did I do wrong. I asked Mr. Sloan. Then he made a statement that it's just like two pro football teams playing football. On any given Sunday any team could win. I personally felt that wasn't sufficient. I was not there to play football. I was there to support my family and make a livelihood.

It was only after Dixon was denied the promotion to Foreman of Mails in December 1978 that he was given a detail to a supervisory position supervising employees other than mail handlers. Dixon received a detail supervising clerks for which he was commended for his good performance.

Dixon is entitled to appropriate backpay and other relief. He should be given backpay for any jobs he was denied as a result of failing the supervisory exams. He also should receive monetary relief for any details lost and for any earnings lost as a result of discrimination against him in the Foreman of Mails job. Finally, Dixon is entitled to front pay and to be promoted to a job level 15 or higher in Charlotte.

120. *Tom Lee McGill*—Tom Lee McGill began working for USPS in 1965. He retired in 1977 on a disability. He has attended a number of schools and colleges and has an educational background in business and accounting. McGill has also completed Postal Services courses for the Customer Services Representative and the Postal Systems Examiner positions. McGill began working as a mail handler and later became a clerk.

In 1971 McGill applied for a position as an Accounting Technician, level 6. He simultaneously applied for the job of Accounting Clerk, level 5. The two jobs were awarded at the same time. McGill received the level 5 job and a white received the level 6 position. The white (John Pressley) who received the level 6 position had no

college level training in preparation for the job.

After McGill had been working in the Accounting Clerk position for several months, he asked the local Postmaster to have the job upgraded to level 6, because the job involved the same duties as were being performed by the Accounting Technician. The Postmaster declined. McGill then wrote to the Postmaster General at the Postal Service headquarters, and the position was upgraded to level 6 about 2 months later.

In 1972 McGill sought promotion to a position as Postal Systems Examiner, the same position sought by plaintiff Chisholm. It was a level 9 job. Because McGill was only in a level 6 position, he could not compete for the position without a waiver from management. Although such waivers could be granted, management refused to give McGill one. The position went instead to a white named Robert Wallace. Following Wallace's being awarded the job, McGill was detailed to the Finance Examiner job satisfactorily for two weeks per month for six months.

In 1973 McGill sought a position as Accounting Assistant, level 14. McGill had been detailed in that position for two weeks per month for the year preceding the job's being filled. While performing the detail McGill received a letter of commendation from the Director of Finance for the way in which he performed the job. The white applicant, Richard Warfel, had never performed work similar to that done by the Accounting Assistant, but Warfel received the promotion.

Following Warfel's selection, McGill talked with one of the members of the promotion board (Toatley) who advised McGill that he had been ranked second and would probably end up with the job if Warfel was promoted again. Warfel only stayed in the position about two months before being promoted to another position. The practice in the Postal Service at that time was not to readvertise a job where the successful applicant stayed in a position for only a brief period, such as was true for

Warfel here. Instead, the position would ordinarily be given to the candidate who placed second on the list. When the position was readvertised, it again went to a white employee who had competed for the first vacancy filled by Warfel. McGill did not apply for the position again because he felt it would be futile in view of the Postal Service's decision to readvertise the position.

In 1973 McGill applied for a position as Postal Systems Examiner, level 15. He had been detailed in that position for about six months. The job went to a white employee, Gertha Richards, who was at that time a level 5 clerk. McGill had, while he was detailed to that position, trained Richards in the job's duties.

In 1974 another vacancy for Postal Systems Examiner occurred. McGill again applied. The job went to a white, Charles Morgan, who had been detailed in the position about one month prior to being awarded the job. Following the award of the first vacancy to Richards, McGill continued to be detailed to the Examiner's position periodically and received a letter of commendation from the Acting Director of Finance for his work in that job.

McGill was also a victim of the Postal Service's discriminatory disciplinary practices. In late 1975 or early 1976 McGill received a notice of proposed removal (termination), a letter of suspension and two letters of warning, all on the same day. The reason given for these actions was McGill's alleged excessive absenteeism following about nine days of hospitalization at the VA Hospital in Durham, N.C. USPS then revised its position by reducing the discipline to five days of suspension. McGill pursued this suspension through the grievance procedures in the collective bargaining agreement, and the discipline was reduced to an "official counselling." Two white employees who had disciplinary records significantly worse than McGill's had received no disciplinary action at all, not even an "official counselling."

The Court finds that McGill has been discriminated against because of his race in

being denied promotion opportunities. The master should hereafter decide what jobs McGill was denied because of his race and provide appropriate monetary relief. McGill's back pay, of course, should end the date he retired. If necessary, his retirement benefits should be recalculated to take into account any lost earnings.

121. *Milton Yongue*—Milton Yongue was employed by the Postal Service as a temporary clerk in 1966 and gained full-time status a year later. He holds a Bachelor of Arts degree from Johnson C. Smith University in economics with a minor in mathematics.

Yongue applied in 1973 for a position as Postal Systems Auditor. The job went to a white employee, Gertha Richards, who had been detailed into that position for several months. Yongue had never received any higher level details in the position. Yongue's education experience as Accounting Technician in the Finance Department would have prepared him for an examiner or auditor job, since the duties are similar.

In about 1974 Yongue applied for a position as Postal Service Examiner. The job went to Charles Morgan, a white employee. Morgan had previously been detailed to that position. Yongue had specifically asked his supervisor (Mr. Sims) to provide him a share of details, but none was given to him. Yongue also asked Sims about getting further training, since the training he was receiving was limited to filing money order stubs. When Yongue's verbal efforts proved fruitless, he requested a detail in writing, but he still received none of the details or training provided whites.

In October 1974 Yongue sought a position as Accounting Assistant. The job went instead to a white employee, Margaret Malley, who had been detailed in the position for six months or more. Yongue had never been detailed into that or any other job.

Yongue is entitled to back pay to compensate him for discriminatorily denied promotions. He is also entitled to front pay at level 15 and to receive a promotion to a job in Charlotte at level 15 or above.

122. *Peggy Talbert*—Peggy Talbert began working for USPS in November 1966 as a clerk, a job she continued to hold through the time of trial. She graduated from N.C. Central University with a BS degree in 1965.

Talbert took the supervisory exam in either 1973 or 1974. She was unsuccessful. Consequently, she was unable to compete for supervisory promotions while the roster from that exam was in effect, until 1976. Since she was precluded from applying for any vacancies, the Court can make no determination of what positions, if any, she would have received. That determination will have to be made during the Stage II proceedings.

When USPS began its in-house postal management training program in Charlotte, Talbert signed up, received several weeks training and in about 1974 was detailed as officer-in-charge (OIC) of the Post Office at Stanfield, N.C., a small town outside of Charlotte, for 120 working days. After Talbert had been detailed to Stanfield, the OIC job in Stanfield was advertised to be filled permanently. She applied for the position, but it was given to a white employee (Bob Sails) who had no previous experience as an OIC. Talbert was denied the job even though, after her detail in Stanfield was completed, the auditor who reviewed her work said she had performed excellently.

The Court finds that Talbert has been discriminated against because of her race in being denied opportunities for promotion and detailing. She will be allowed to demonstrate to the master the details and promotions she was denied as a result of her failing the supervisory examinations. She is entitled to appropriate relief to compensate her for the discriminatory denial of the OIC job in Stanfield, N.C. Talbert should also receive back pay and front pay and be promoted as the master deems appropriate.

123. *Oren McCullough*—Oren McCullough was employed by the Post Office in 1948 as a letter carrier and continued in that job through the time of trial. McCullough was not certain of the specific years

when he took the supervisory exams, although he stated he first took one in about 1968. However, he attempted to pass the tests each time they were given and was never successful.

In view of the finding that the tests were discriminatory and violated Title VII, McCullough has demonstrated that he is a victim of a racially discriminatory practice. His entitlement to relief in terms of a retroactive promotion and back pay, if any, must be determined in additional proceedings.

In about 1972 or 1973, several white employees with less seniority than McCullough were detailed to work at a foreman's desk to give them training for that position. These whites, like McCullough, were not on the supervisory roster. McCullough complained about this practice to his immediate supervisor and to the person over the entire carrier force. USPS has advanced no reason, either at the time of the details or at trial, to show that some factor other than race accounted for this discriminatory treatment.

The court finds that McCullough had been discriminated against on the basis of his race in being denied opportunity for details and promotions. He is entitled to back pay for details lost in 1972 or 1973. The master should also consider what other details or promotions McCullough was denied during the statute of limitations period and award appropriate monetary and injunctive relief.

124. *Clarence Morgan*—Clarence Morgan was employed by the Postal Service in 1962 as a substitute clerk, and later became a permanent clerk. In 1969 he was one of 15 people assigned to a level 6 position as Postal Source Data (PSDS) Technician. Following that assignment, Morgan trained a number of whites assigned to the PSDS technician job including Charles Morgan, Robert Wallace, Richard Warfel, Laurel Ben Holland and Larry Inman. Thereafter each of these five whites were promoted to a position as Senior PSDS Technician, level 7. Clarence Morgan sought each of these promotions.

Following his being denied promotion to the Senior PSDS Technician position, Clarence Morgan attempted to file an administrative EEO complaint, challenging those promotions as racially discriminatory. The merits of the charge were never explored, since the Postal Service claimed that Clarence Morgan's complaint was not timely. The Postal Service has offered no evidence to show that anything other than race led to the promotions of each of these white employees over Clarence Morgan, nor has it offered any evidence showing any lack of qualifications on Morgan's part.

Clarence Morgan took the written exams for initial level supervisor in 1968 and 1970. He was ruled ineligible for promotion and detail to supervisory jobs on the basis of his test scores.

Clarence Morgan was also a victim of USPS's discriminatory disciplinary policy. Morgan was at the time of trial on suspension, allegedly for failure to perform his duties. However, the notice of suspension states that Clarence Morgan was counseled on dates prior to the dates that he is alleged to have failed to perform his duties. Moreover, he was disciplined on the eve of trial for an act which allegedly occurred eight or nine months earlier. In view of (a) USPS's failure to provide any evidence to justify these discrepancies, (b) the defendants' inability to demonstrate that Clarence Morgan's claims are not true, or to show that Clarence Morgan was treated on an equal basis with whites, and (c) in view of the prima facie showing of racially discriminatory disciplinary actions against blacks, the Court finds that Clarence Morgan's suspension was discriminatory.

The Court finds that Clarence Morgan has been discriminated against because of his race in being denied promotions and receiving unfair discipline. Clarence Morgan is entitled to receive back pay, front pay and promotions assuming he would have received a Senior PSDS Technician job and the subsequent promotions that were accorded the whites who received those jobs. Morgan should also receive back pay for any earnings lost as a result of discrimi-

natory discipline. The master should determine the exact amount of his loss. Morgan should also receive relief from any subsequent disciplinary actions in which his discriminatory suspensions were taken into account.

125. *John T. Harrison*—John Harrison was employed by the Postal Service in 1973 as a mail handler. He has several years of college background and is about 45 hours short of receiving a degree.

In 1977 Harrison sought a promotion to the position of Postmaster at Crouse, N.C. a small post office in Lincoln County. In 1978 he sought a position as Foreman of Mails.

When Harrison applied for the Crouse Postmaster position, USPS informed him that he was qualified but not selected. USPS did not allow him an opportunity to interview for the job. The position went instead to a white employee. The Postal Service has offered no evidence which shows any reason other than race for Harrison's denial of that position.

When Harrison applied for the Foreman of Mails position, he was also not given an interview. This foreman job went to a white employee, David Willis, who had no previous experience supervising the mail handler craft. Harrison was on the supervisory roster at that time and was qualified for the job. The Postal Service has presented no evidence which shows any reason other than race for the refusal to award a foreman position to Harrison.

In May, 1977, Harrison was required to go to the night shift although there were less senior white part-time mail-handlers who normally would have been required to take the less desirable shift. Harrison filed an EEO complaint about this discriminatory action. The next day, Dale Terry told Harrison that if Harrison dropped his EEO complaint he would be given a permanent mail handler job. Harrison did drop his EEO complaint and achieved permanent status on June 4, 1977. Harrison lost one day's pay as a result of the undesired shift change.

Harrison is entitled to reimbursement for the one day lost pay discussed immediately above. He is also entitled to back pay, front pay and promotions based on the discriminatory denial of the Crouse Postmaster job and an opportunity to demonstrate to the master that he has been denied other promotions.

126. *Wade Mosley*—Wade Mosley has been employed by USPS since 1959. In 1975 he sought a job as rural carrier. Mosley was at that time a clerk. When he sought the job, he was told that, because of a collective bargaining agreement, one could be a rural carrier only if he was already employed as a rural carrier substitute. This agreement was reached by USPS and the union some time in 1975. Prior to 1975 at least two whites who were not rural carrier substitutes had been allowed to transfer into rural carrier positions.

Rural carriers at the Charlotte Post Office have always been white. Until 1975 rural carrier substitutes were selected by the rural carriers themselves and not through any formal selection procedures. The usual practice was that the rural carriers would select their friends to be substitutes. This practice had the effect of maintaining that craft as all-white.

Mosley was also a victim of the Post Office's racially discriminatory disciplinary practices. Mosley was suspended on several occasions. In 1975 Mosley was notified that he was being discharged because of excessive absenteeism. Mosley filed an EEO complaint as well as a grievance, alleging racial discrimination. Several white employees who had significantly worse attendance records had not been disciplined. USPS agreed to discontinue its discharge proceedings if Mosley would withdraw his EEO complaint. No relief was given him for the earlier suspensions, also taken against him for absenteeism. This racially disparate treatment, taken along with the statistical showing of discrimination in discipline and the lack of any other explanation by USPS, leads to the conclusion that Mosley was a victim of discrimination with respect to discipline.

The Court finds that Mosley has been discriminated against because of his race in being denied promotion to rural carrier and in being unfairly disciplined. He is entitled to be compensated for earnings lost as a result of discriminatory discipline. Mosley shall also be given an opportunity to show what, if any, specific rural carrier jobs he has been denied because of his race and to receive appropriate relief.

### T. *Summary*

127. This is not a close case. The discrimination visited on plaintiff Chisholm is similar to that applied to other blacks working for USPS in Mecklenburg County. The evidence, in all the particulars discussed above, shows pervasive and systematic discrimination, vestiges of which remain. A judgment will hereafter be entered to provide relief appropriate to the evidence.

### CONCLUSIONS OF LAW

■ 1. Plaintiff Chisholm filed a complaint of discrimination pursuant to the then-applicable U. S. Civil Service Commission regulations and pursued his complaint through the entire range of procedures available. He has thus exhausted his administrative remedies which are a prerequisite to filing an action in federal court. See, *Brown v. GSA*, 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976):

> Initially, the complainant must seek relief in the agency that has allegedly discriminated against him.

Although Chisholm was found to be a victim of discrimination, USPS and the Civil Service Commission both refused to grant him "make whole" relief or to provide the requested class relief. Chisholm filed this action within 30 days of receipt of notice of final action taken by the Civil Service Commission upon Chisholm's appeal, and the Court has jurisdiction of this action, § 717(c) of Title VII, 42 U.S.C. § 2000e–16(c).

■ 2. A Title VII case against the government is appropriately a *de novo* proceeding. *Chandler v. Roudebush*, 425 U.S. 840, 861, 96 S.Ct. 1949, 1959, 48 L.Ed.2d 416 (1976), and where the Rule 23 class action prerequisites have been met, as here, a class action is appropriate. *Swain v. Hoffman*, 547 F.2d 921 (5th Cir. 1977); *Williams v. TVA*, 552 F.2d 691 (6th Cir. 1977).

■ 3. At the time Chisholm's formal complaint was filed, USPS and the Civil Service Commission took the position that class actions pursuant to Title VII were never appropriate against the Federal government pursuant to § 717 unless all class members had exhausted their administrative remedies. Chisholm's class complaints involving promotion and detailing were never investigated at the administrative level. Nor did USPS investigate practices reasonably related to the specific issues with respect to which Chisholm sought relief.

The Civil Service Commission regulations which were relied on to refuse to accept or process class action complaints of racial discrimination were declared illegal and contrary to Title VII in *Barrett v. U. S. Civil Service Commission*, 69 F.R.D. 544, 552 (D.D.C.1975).

The Civil Service Commission procedures created a conundrum for individuals seeking to represent a class in litigation in federal court, since, on the one hand, class-type administrative complaints were not accepted or investigated, but, on the other hand, plaintiffs were met with the argument that they had failed to exhaust their administrative remedies, with respect to any issue that went beyond the individual's discrete claim. The result, as here, was to allow a federal agency to avoid coming to grips with the systemic problem of discrimination.

4. It is clear that Chisholm properly sought to raise in the administrative proceedings the issues which are raised in this litigation, i. e., practices which relate to and affect the promotion of blacks to positions of higher levels of responsibility and salary. The fact that Chisholm may not have identified during the administrative procedures each specific issue, e. g., that of discipline, that bears on the promotion process is not fatal, particularly since Chisholm was not

represented by counsel and was dealing with an extremely complex and technical set of regulations and laws. Chisholm's original complaint, subsequent actions and administrative appeals indicated his interest in remedying the whole range of policies which made blacks second class USPS employees. Moreover, Chisholm and the intervening plaintiffs have suffered discrimination in promotion and in detailing, and with respect to the written tests and discipline, and have been victims of the classwide discrimination proved herein.

USPS asserts that the issue of discrimination in the administration and use of the results of written tests for promotion to certain supervisory jobs, for qualification for some details, and in the other ways the test results were used was not sufficiently raised in plaintiff Chisholm's complaint. Chisholm's administrative complaint file (PX 1) demonstrates that this is simply not so. Chisholm alleged in his complaint that the Postal Service did not promote blacks to supervisory positions or provide blacks details. He went on to identify several specific devices used by the Postal Service in the promotion process, including manipulation of the requirement of specialized experience and discrimination in the assignment of details. There is no limitation suggested in the complaint, however, that those particular devices represent an exhaustive list of means by which the Postal Service was able to deny blacks promotions and details to higher level positions.

*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970) and *EEOC v. General Electric Co.*, 532 F.2d 359 (4th Cir. 1976) represent the leading cases in this area. The thrust of both *Sanchez* and *General Electric* is that an issue has been sufficiently raised in the administrative process if the issue sought to be litigated is like or related to that alleged in the complaint such that the new issue is likely to be developed in connection with a reasonable investigation of the initial charge. *EEOC v. General Electric Co., supra*, 532 F.2d at 366.

In both *Sanchez* and *General Electric*, the issues which the Courts determined were properly litigated were far less directly related to those raised in the applicable charges than here. For example, in *General Electric*, the Court allowed EEOC to litigate a charge of sex discrimination where only race had been alleged. In *Sanchez*, the Court allowed the litigation of an issue of discharge where only an issue of harassment had been raised and further allowed the plaintiff to pursue a claim of discrimination on the basis of national origin where only sex bias had been raised in the EEOC charge.

Other cases following *Sanchez* have allowed litigation to proceed based on issues not directly raised in administrative complaints. Such cases have allowed the litigation of complaints of discrimination in hiring, promotion and assignment where the initial charge alleged only discriminatory discharge, for example. Schlei and Grossman, Employment Discrimination Law, p. 994 (collecting cases). The *General Electric* and *Sanchez* standards have been adopted with respect to charges of discrimination against federal agencies. *President v. Vance*, 627 F.2d 353 (D.C.Cir.1980).

In this case defendants' suggestion that a specific practice (testing) which discriminates in promotion is not encompassed in a charge of failure to promote blacks in general lacks merit. A reasonable investigation of a charge of failure to promote would have involved USPS testing practices. Indeed, defendants implicitly recognize this point since they have in their responses consistently attributed whatever discrimination might have occurred to the discriminatory effect of the tests and the locally imposed cut-off scores.

The Court believes it would be unfair to impose on a layman the burden (especially in 1972) of delineating in his administrative complaint distinctions between "disparate impact" and "disparate treatment." Chisholm complained about the fact that blacks had been denied promotions and had been discriminated against with respect to matters relating to promotions (e. g. details). The defendants refused to consider any of his class claims, but the entire promotion

picture was a proper subject of investigation in response to his complaint and is properly in this case. There is simply no reason to impose on plaintiffs here an unrealistic specificity which would not have been required of a private charging party. See *President v. Vance, supra.*

 5. It is further well established Title VII law in the private sector that there is no requirement that individual class members exhaust their administrative remedies. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414, fn. 8, 95 S.Ct. 2362, 2370, fn. 8, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976). The Courts of Appeals have adopted a similar rule in cases against the government. *Swain v. Hoffman,* 547 F.2d 921, 924 (5th Cir. 1977); *Williams v. TVA,* 552 F.2d 691, 692 (6th Cir. 1977).

 6. This Court has previously concluded that this action is one appropriate for certification under Rule 23(b)(2), F.R. Civ.P. In order to satisfy the requirements of Rule 23(b)(2), plaintiffs are required to show compliance with Rule 23(a), i. e., that the class is so numerous that joinder of all members is impracticable, that there are questions of law or fact common to the class, that the claims of the plaintiffs are typical of the claims of the class and that the plaintiffs will fairly and adequately represent the interests of the class.

The Court has on two occasions entered conditional class action orders certifying this case as a class action. The latest order, filed July 17, 1979, shortly before trial, defined the class as follows:

> ... all black persons who have been employed by the defendants at the Charlotte, Mecklenburg County, North Carolina facilities of the United States Postal Service (or the United States Post Office) at any time from March 24, 1970 to the date of this Order who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants in ways which deprive them of employment opportunities and otherwise affect their status as employees or

with respect to promotion or pay because of their race or color.

After reviewing the evidence as set forth above, the Court concludes again that this action is entirely appropriate for class treatment.

With respect to numerosity, the evidence demonstrates there have been around 400 or more blacks who were employed by USPS at any one time during the periods in question who are members of the class. While no clear guidelines exist as to what numbers will satisfy the numerosity requirement, a class of this size surely does.

The common questions of law and fact in this case are whether the USPS has discriminated against black employees in the denial of promotions and promotion opportunities by means of detailing, written tests, discriminatorily applied selection procedures, and illegal and discriminatory discipline, among other things. The evidence at trial demonstrated, by means of statistics, proof of specific individual cases and review of unfairly applied USPS personnel practices, that black employees have been victims of these discriminatory practices and that such practices had classwide scope and effect. Class members, many of whom have become understandably discouraged by their lack of success in fighting this system, have relied on the outcome of this case for their legal remedy.

With regard to typicality, this Court's inquiry must be guided by *Hill v. Western Electric Co.,* 596 F.2d 99 (4th Cir. 1979). The Fourth Circuit in *Hill,* interpreting *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), held that class representatives must "possess the same interest[s] and suffer the same injury" as the class members they seek to represent, 596 F.2d at 101, quoting *Rodriguez.* The *Hill* court made it clear that employees complaining of discrimination in assignment and promotion could not represent those who asserted discrimination in hiring. This Court modified the class definition in July, 1979 in response to the *Hill* decision, and this case no longer involves applicants.

The Fourth Circuit's opinion in *Hill*, however, also makes it clear that the typicality requirement is satisfied by plaintiffs who are seeking to challenge promotion practices within the same facility.

If *Rodriguez* limited *Barnett [v. W.T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975)] in application, it did not leave it a derelict. Under *Barnett* a named plaintiff may represent a class of persons whose injuries and interests are of a kind with the representative's. A person who has been injured by unlawful, discriminatory promotion practices in one department of a single facility may represent others who have been injured by the same discriminatory promotion practices in other departments of the same facility. In such a case, the representatives of the class all have the same interests in being free from job discrimination, and they have suffered injury in precisely the same way in the denial of promotion. *Rodriguez* did not require the fractionization of similar claims by a class of employees in a single facility, nor does it destroy the utility of the class action device by requiring separate suits on an episodic basis.

This case meets the *Hill* test in that it involves claims relating to one finite area, the Charlotte Post Office, and the other few USPS stations in Mecklenburg County. The upper level positions which plaintiffs complain that blacks have been denied have been shown to be those that white employees in the positions—clerks, mailhandlers, and carriers—have promoted to. The mere fact that USPS has a number of stations and branches, along with the General Mail Facility, throughout Mecklenburg County, does not lead to a different conclusion. The evidence demonstrated that employees of USPS in Mecklenburg County freely moved from location to location. There is considerable movement, by promotion and detail, from one station and job to another. Most jobs level 7 and above have been filled by employees who began their service in one of the crafts. Job vacancies are advertised throughout the county. The upper level jobs in USPS have been filled from an "in-house" labor pool drawn from the local in-house labor market utilizing a central personnel office. Compare, *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1975), *cert. den.*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286.

Finally, by their conduct in this case and by presenting overwhelming evidence of discrimination, plaintiffs and their counsel have justified this Court's previous finding that they would adequately represent the class.

7. In addition to satisfying the requirements of Rule 23(a), plaintiffs are required to satisfy one of the prerequisites of Rule 23(b). This action has previously been certified under Rule 23(b)(2), and the Court concludes that a final certification under that provision is appropriate. Rule 23(b)(2) is applicable where

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Rule 23(b)(2) was added to the federal rules in 1966 with specific reference to actions such as this one. Numerous cases have recognized that where an employer makes personnel decisions in which race is a factor, certification under Rule 23(b)(2) is appropriate. See, *Barnett v. W.T. Grant Co., supra*, 518 F.2d at 547:

Barnett brought his class action under subsection (b)(2) of Rule 23 . . . . Viewed broadly, Barnett's suit is an "across the board" attack on all discriminatory actions by defendants on the grounds of race, and when so viewed it fits comfortably within the requirements of Rule 23(b)(2).

The Fourth Circuit's view in *Barnett* is consistent with the understanding of the Advisory Committee:

Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds

which have general application to the class.

Advisory Committee Note, 39 F.R.D. 98, 102. Class actions are appropriate in cases such as this because the "Damoclean threat" of racial discrimination hangs over the head of each class member. *Hall v. Werthan Bag Corp.*, 251 F.Supp. 184, 186 (M.D.Tenn.1966).

7a. Plaintiff Chisholm is a member of the class of blacks who has suffered as a result of discrimination at USPS. The evidence leads the Court to conclude (a) that blacks at USPS have historically been limited and restricted to lower level jobs in spite of regulations and Executive Orders prohibiting discrimination, (b) that such discrimination continued after March 24, 1972, (c) that the pervasive discrimination infested the whole range of personnel practices including policies and practices relating to detailing, testing, discipline and promotion, and (d) that Chisholm and the class he represents have been adversely affected by defendants' discrimination and are entitled to appropriate relief.

8. Based on the evidence in this case and Rule 23, the Court concludes it is appropriate to redefine the class in this case as follows:

> ... all black persons who have been employed by the defendants at the Charlotte and Mecklenburg County, North Carolina facilities of the United States Postal Service (or the United States Post Office) at any time from March 24, 1970 to the date of this Order who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants with respect to promotions (including all components of the promotion process), details, the use of written tests, discipline, or pay, or who have been otherwise deprived of employment opportunities related to said factors because of their race or color.

9. Chisholm filed his administrative complaint on March 24, 1972. The 1972 amendments to Title VII, extending jurisdiction to federal employees, became effective coincidentally on the same day. Chisholm's complaint is encompassed within Title VII, inasmuch as it was pending on the effective date of the 1972 amendments. *Koger v. Ball*, 497 F.2d 702, 704 (4th Cir. 1974). Further, plaintiffs and class members are entitled to relief, in the form of back pay, for discrimination occurring within two years of the date of filing of the complaint. § 706(g) of Title VII, 42 U.S.C. § 2000(e)–5(g). *Carreathers v. Alexander*, 587 F.2d 1046, 1050–51 (10th Cir. 1978); *Moore v. City of San Jose*, 615 F.2d 1265, 1272 (9th Cir. 1980); *Chewning v. Schlesinger*, 471 F.Supp. 767, 7720775 (D.D.C.1979). Section 717 did not create a new right for federal employees; it had long been illegal for the federal government to discriminate against its employees on the basis of race. *Chewning, supra,* 471 F.Supp. at 775, fn. 16. Section 717 explicitly creates a cause of action under Title VII or Executive Order 11478, 34 F.R. 12985 (1969), a rule against discrimination which pre-dated the back pay period.

10. While *Brown v. GSA, supra,* states that Title VII is the exclusive remedy for racial discrimination, *Brown* did not address possible Fifth Amendment claims and further is not applicable to those periods before Title VII became effective. Plaintiffs are entitled, pursuant to the Fifth Amendment, to relief in the manner of back pay and other injunctive relief because of the racially discriminatory conduct of USPS established in this case. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). See also *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), and *Hanson v. Hoffman*, 628 F.2d 42 (D.C.Cir. 1980). The three-year limitations period found in N.C.G.S. § 1–52(1) is the appropriate limitations period for employment discrimination claims where there is no specific federal statute of limitations. *Pittman v. Anaconda Wire and Cable Co.*, 408 F.Supp. 286, 293 (E.D.N.C.1976). Relief pursuant to the Fifth Amendment should thus go back to June 27, 1970.

11. Regardless of whether the Court utilizes the statistics asserted by plaintiffs or defendants, a *prima facie* case

of discrimination in promotion is presented. In 1970 and 1971, four blacks were promoted to jobs levels 7–9 out of at least thirty-seven promotions. These figures include two blacks promoted in December 1971; the number of whites promoted that month, if any, is not clear. From March 24, 1972 to June 30, 1973, using defendants' figures (GX 36) and time frame, only 9% (2 of 22) of the promotions to jobs at levels 7–9 were black. From June 30, 1973 to December 31, 1975, about 17% (8 of 46) of promotions to jobs at levels 7–15 went to blacks. If plaintiffs' figures are adopted, the promotion picture shows more discrimination against blacks.

The statistics with respect to the higher level positions are even more compelling. Using defendants' figures, from March 24, 1972 to December 31, 1975, only 5 of 50 upper level promotions (above level 9 to March 5, 1973 and above level 15 thereafter) went to blacks. The post-1975 figures show improvements; however, such improvements, in light of all the evidence, appear to be due to the pressure of litigation rather than a real change in USPS practices.

It is undisputed that the proper pool for these initial level jobs above the craft levels is the craft work force levels 6 and below which pool is composed of those persons in the lower level positions within the Charlotte Post Office. The in-house figures are more reliable than the general work force statistics, since the case involves primarily promotions and not initial hiring. See, *EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 185 (4th Cir. 1979). USPS has made no effort to demonstrate that there exist special qualifications for these higher level positions not possessed by members of the USPS Charlotte work force. During the pertinent period, blacks comprised approximately 30 percent of the USPS work force. The disparity between the work force composition and the number of promotions awarded to blacks in the jobs levels 15 and below is sufficient to create a *prima facie* case of discrimination.

Use of even defendants' figures, when analyzed under the statistical approach in *Castenada v. Partida*, 430 U.S. 482, 496, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977); and *EEOC v. United Virginia Bank/Seaboard National*, 615 F.2d 147 (4th Cir. 1980), present a compelling case of discrimination. From 1970 to the end of 1975, the promotions to initial level supervisor jobs (job level 7–9 prior to March 5, 1973 and jobs level 7–15 after that date) were as follows:

|  | Whites Promoted | Blacks Promoted |
|---|---|---|
| 1970 (See finding of fact 79 (e) | 25 | 2 |
| 1971 (including two blacks promoted in December) (see finding of fact 79 (f) | 8 | 2 |
| 1-1-72 to 3-24-72 (not including those re-ranked or re-assigned; see PX 5) | 9 | 0 |
| 3-24-72 to 6-30-73 (See GX 36) | 20 | 2 |
| 6-30-73 to 7-31-75 (See GX 36) | 38 | 8 |
|  | 100 | 14 |

Thus of the 114 promotions during the 1970–1975 period, only 14 went to blacks. This statistical disparity is compelling evidence of discrimination, in that it shows 4.13 standard deviations from the expected number of promotions for blacks. A standard deviation is calculated as being the square root of the product of the size of the sample (114) times the percentage of blacks in the sample (.30) times the percentage of whites in the sample (.70). The standard deviation under these figures is 4.893. The actual number of promotions blacks would receive under a non-discriminatory system is 34.2, computed as the product of the sample (114) times the black representation in the applicable work force (.30). The difference between the expected value, 34.2, and the actual value, 14, is 20.2. When divided by the standard deviation, 4.893, we find that the actual number of promotions deviates from the predicted number by a figure of 4.128 standard deviations. The Supreme Court has indicated that figures falling outside two or three standard deviations from the expected values constitute a statistically significant difference and can alone constitute a *prima facie* case of racial discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 1382 (4th Cir. 1972). Here, the statistics when combined with the other evidence present a compelling case of discrimination.

11a. Defendants take the position that, notwithstanding any discrimination that existed prior to March 24, 1972, it is free to continue to promote higher level supervisors from a labor pool composed of initial level supervisors which is almost wholly white as a result of defendants' historical discrimination. Defendants do not seriously dispute the finding of discrimination prior to March 24, 1972, which has resulted, *inter alia*, in a situation where the pool of supervisors in the initial level supervisory positions as of March 24, 1972 was almost exclusively white. Defendants simply contend such prior history is not relevant and should be ignored by the Court as it has been by USPS.

The Court concludes, however, that USPS is not free to utilize a system which will further freeze the promotion aspirations of black victims of discrimination without a showing of business necessity. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 240 (5th Cir. 1974); *Afro-American Patrolman's League v. Duck*, 503 F.2d 294, 300–301 (6th Cir. 1974). See also, *Harper v. Kloster*, 486 F.2d 1134, 1137 (4th Cir. 1973). It is clear that the use of the pool of initial level supervisors for promotion to higher levels, to the total exclusion of blacks in level 5 and level 6 jobs, is a practice which perpetuates the effects of prior discrimination. The practice effectively postpones for an indefinite period the ability of blacks who have been victims of discrimination to move into higher and higher levels of supervision. It is a practice which has a disproportionate effect on blacks and is thus violative of Title VII. *International Brotherhood of Teamsters v. United States, supra.*

USPS had no license to discriminate prior to March 24, 1972. As pointed out elsewhere, it had long been under the constraints of various Executive Orders and regulations which forbade discrimination. Title VII merely created a judicial remedy in 1972. USPS cannot now escape the consequences of its long history of discrimination, all of which was prohibited by law, by adopting allegedly neutral policies which are certain to postpone or prevent blacks from reaching their rightful place. The legislative history of Title VII indicates that Congress desired to give federal employees an opportunity to obtain full and complete relief from the discrimination of federal agencies. There is no evidence which demonstrates that black employees in levels 5 and 6 could not effectively perform higher level management jobs if given the opportunity to first be detailed or to receive on-the-job training.

The Court concludes that the practice of limiting upper level management positions to those employees, almost exclusively

white, in the next lower supervisory levels constitutes a perpetuation of prior discrimination, which has a disparate impact on black employees. When viewed against the backdrop of illegal discrimination which led to this result, the practice violates Title VII. *Griggs v. Duke Power Co., supra.* Defendants' practices can only be justified on a showing, the burden of proof of which rests on the defendants, that the practice is required by business necessity. I find that defendants have made no such showing. See *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971).

Finally, even assuming that the Court is wrong and that pre-Act discrimination and the perpetuation of such discrimination is not an appropriate consideration, the evidence set forth above demonstrates that defendants continued to discriminate well *after* the effective date of Title VII in the selection of initial level supervisors. Since defendants continued to choose upper level supervisors from a pool discriminatorily chosen after the effective date of Title VII, the method of selecting upper level supervisors violated the Act.

12. The statistical showing has been buttressed by evidence of individuals who have been discriminatorily denied promotions and details and who have been disciplined in a disparate fashion when compared with their white counterparts. The findings set forth above contain numerous examples of disparate treatment detrimental to blacks. *International Brotherhood of Teamsters v. United States, supra.*

Further, the evidence demonstrated that USPS maintains a virtually standardless procedure for filling vacancies and details. Detailing has been left up to the individual supervisor's discretion without any guidance as to how that decision will be made and without any method for meaningful review by superiors to ensure that race does not become a factor, consciously or unconsciously. Under those circumstances, where the supervisory force is largely white, "Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familiar or social association between the two groups." *Rowe v. General Motors Corp.* 457 F.2d 348, 359 (5th Cir. 1972).

The same is true with the promotion process itself. Although USPS created an allegedly neutral procedure for filling permanent upper level vacancies, the evidence proved those procedures to be an empty formalism which suffers from the same infirmities as does the detailing process.

The actual practice varies from promotion to promotion. In some cases there is no evidence that an application was even required. The Promotion Advisory Boards are given no instructions or guidance as to how they are to rate or evaluate the relative merits of the candidates. The applicant that the majority of the Board rates highest does not necessarily end up being recommended as the Board's first choice. When the recommendations go to the Postmaster for decision, he makes no independent review of the Board's process to ensure that discrimination has not been a factor. The Postmaster is ultimately free to choose any of the three recommended (or someone else), without stating a reason.

All of these practices lead to a system where the biases of a largely white supervisory force may play a role in the selection process. The statistical showing, along with these practices and the showing of specific instances where they have resulted in discrimination against individuals because of race, presents compelling evidence of classwide discrimination in promotion and detailing.

Arrayed against this evidence, USPS has offered no evidence to demonstrate that the various promotions were based on factors other than race, which is of course the burden that it must meet once a prima facie case of discrimination is shown. In only one case were the Board's worksheets introduced, and in that instance Herman Rushing was rated by two or three Board members as the better qualified, but a white was chosen.

USPS has evidently rested its case on a claim that longer service alone explains the disparity in the promotion rates between

blacks and whites. That explanation falls short for several reasons. First, the evidence was offered by a personnel assistant who reviewed the records in preparation for litigation. There was no effort by USPS to demonstrate that the members of the Promotion Advisory Boards or the selecting officials used any objective factor, seniority or otherwise. Second, the USPS evidence went only to isolated cases and failed to explain the opposing disparity where less senior whites were promoted over more senior blacks. While seniority may be a factor in acquiring the skills necessary to perform the higher level positions, seniority does not provide an automatic promotion to "best qualified" jobs. There has been no showing of the actual skills and knowledge of those selected compared to those blacks denied positions. This is not a case like *Hill v. Western Electric Co.*, 596 F.2d 99, 106 (4th Cir. 1979) where only a small percentage of blacks in the work force had any significant amount of experience with the employer. The evidence in this trial demonstrated that blacks have long been represented in large numbers in the USPS work force. Where the defendant had cited a white's longer service, the black employee has had a significant number of years of service. In those circumstances, experience assumes less and less importance. Moreover, blacks are better educated than whites, and USPS personnel rules make it clear that education is valued at the Post Office.

Finally, where experience has been gained through disparate treatment evidenced by discrimination in detailing, blacks should not be made to suffer because of the USPS's historical discriminatory practices.

13. The procedures for filling details have been, until the very recent past, even more amorphous and undefined and hence subject to abuse than promotions. There were numerous specific instances of discrimination in allowing detailing where there has been an administrative determination of discrimination. These determinations are not disputed by USPS, and the Court can accept them without further findings.

This discrimination in detailing cannot be isolated from the promotion process, since the opportunity to perform a particular job for some extended period of time inevitably gives the detailee a leg up over the person competing for the position with no immediate experience in the job. The discrimination demonstrated by the statistics is rendered even more important by the length of the favorable details provided whites.

14. Title VII proscribes the use of employment tests and selection devices that are discriminatory unless the employer meets the burden of establishing a manifest relationship between the test and the employment in question. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The employer's burden arises after the plaintiff has established a prima facie case by establishing that the tests "select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co., supra*, 422 U.S. at 425, 95 S.Ct. at 2375.

The process for establishing job relatedness by means of a validity study is discussed in *Albemarle Paper Co., supra*. That issue is not before the Court, however, since USPS has offered no evidence to counter plaintiffs' evidence of racial impact and has made no claim that the tests have been validated. Consequently, the only issue for determination is whether the evidence demonstrates that the USPS tests have statistically significant racial impact sufficient to make out a violation of Title VII.

The Court concludes that sufficient disparate impact has been demonstrated with respect to each of the tests involved—1968, 1970 and 1974—to establish a prima facie case of discrimination and further concludes that Title VII has been violated, in the absence of any validity studies. Compare *Bridgeport Guardian Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333, 1335 (2nd Cir. 1973), *cert. den.*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *U. S. v. City of Chicago*, 549 F.2d 415, 428–429 (7th

Cir. 1977), *cert. den.*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

With respect to the 1968 examination, the number of applicants is not available and the Court is therefore unable to determine precisely the relative percentages of successful black and white applicants. Other figures are available which furnish a basis for comparison, however. The number of black applicants on the succeeding tests ranged from a low of 22.5 per cent on the 1970 examination to a high of 38 per cent on the re-opened 1970 examination. Even if the lowest figure of 22.5 per cent black applicants is considered, the test, along with the super-imposed zone of consideration for promotion, totally excluded all qualified blacks from consideration for promotion, details and the other benefits gained frcm passage of the tests. Where the precise figures are not available, sources of data other than the actual pass-fail figures may be used. *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); *Vulcan Society v. Civil Service Commission*, 490 F.2d 387, 392 (2d Cir. 1973). The Court holds that the number of black applicants on the other examinations and the total exclusion of blacks from the zone of consideration are sufficiently compelling to justify a conclusion that the test exerted a disparate impact on black applicants, requiring the defendants to justify the use of the selection device.

Although the 1968 examination was administered before the March 24, 1970 limitation period, USPS continued to use the register established by that examination until 1971. Consequently, its continued use during the limitations period constitutes an act of continuing discrimination, and any class member denied promotions after March 24, 1970 because of the discriminatory operation of the 1968 examination is entitled to have his claim considered.

With regard to the 1970 and 1974 examinations (including the re-opened version of the 1970 examination), the figures are available to show the relative passing rates of black and white applicants. The Court concludes, on the basis of plaintiffs' expert testimony, that the different passing rates are statistically and legally significant, that the chance that the results would have occurred by chance is almost non-existent, and that these tests also violate Title VII.

Furthermore, USPS is subject to the requirements of the Uniform Guidelines of Employee Selection, 29 C.F.R. Part 1607. Those guidelines are jointly issued regulations of the Department of Labor, Equal Employment Opportunity Commission, Civil Service Commission and Department of Justice. They are applicable to a wide range of employers in the public and private sector, including USPS, because of its being subject to § 717. The Guidelines impose a test known as Four-Fifths Rule; the Court is entitled to infer adverse impact requiring validation if the passage rate for blacks is less than 80 per cent (⅘) of that for whites. The rate for each of these examinations is significantly less than 80 per cent. They are:

```
1970:    18.2   (black = 41 per cent;
         44.4   (white)

1970:    (re-opened):   14.9   (black) = 24.6 per cent;
                        60.5   (white)

1974:    25.3   (black) = 43.6 per cent.
         58.0   (white)
```

Since the regulations are those of the agencies charged with enforcement of Title VII, the Guidelines are entitled to deference by this Court. *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 431, 95 S.Ct. at 2378. The Court concludes that the comparisons based on the Four-Fifths Rule likewise justify an inference that the examinations in question violate Title VII.

The fact that statistics demonstrating the promotions provided blacks from 1974–1977 for jobs absolutely requiring passage of the tests do not demonstrate statistically significant discrimination does not end the inquiry. First, there was disparate impact in promotions in 1972–1973 when only one of ten jobs for which test passage was required went to blacks. Second, the evidence shows that blacks were denied details and many other benefits (See Paragraph 38 of the Findings of Fact) for which passage of the test made a difference. Since blacks lost significant employment opportunities because of the impact of the unvalidated examinations, plaintiffs and the class are entitled to appropriate relief.

Plaintiffs and class members who took any of the examinations and who were unsuccessful are presumptively victims of discrimination. Each such person will be entitled, during the Stage II proceedings of this action, to make a claim for lost wages and benefits and for affirmative relief in the form of promotions. Each such plaintiff and class member will be entitled to such relief unless USPS demonstrates that the class member would not have in any event received the promotion or detail in question.

15. USPS conceded that it had discriminated in the past but contends that it has no liability for discrimination prior to March 24, 1972, the effective date of the 1972 amendments to Title VII. This argument is not legally sound, and the Court will take cognizance of acts occurring prior to March 24, 1972 in several respects.

First, plaintiffs and class members are entitled to recover backpay for discriminatory acts occurring for a period of two years prior to the filing of the charge of discrimination, where that discrimination is part of the pattern and practice of discrimination which the Court has found. § 706(g), 42 U.S.C. § 2000e–5(g). *Chewning v. Schlesinger, supra; Carreathers v. Alexander, supra; Moore v. City of San Jose, supra.*

Where blacks have been denied promotions, details and training both before and after the effective date of Title VII, it is inappropriate to penalize the discriminatees by further promoting and detailing whites on the basis of discriminatorily acquired experience. Continued reliance on experience gained because of pre-Act discrimination after the effective date of Title VII serves to perpetuate the effects of past discrimination which is illegal unless justified by business necessity. *International Brotherhood of Teamsters v. United States, supra; Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Thompson v. Boyle,* 499 F.Supp. 1147 (D.D.C.1979). See also, *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977).

Further, although no back pay will be awarded for discriminatory acts occurring prior to March 24, 1970, the significance of earlier discrimination cannot be ignored. Where USPS has an admitted history of discriminating against blacks prior to March 24, 1970 (which is amply supported by the evidence), it cannot escape the consequences of that discrimination. The defendants cannot continue to rely on the effects of that discrimination into the present, where discriminatory detailing and promotion in the past have denied equal opportunity to blacks. USPS is not in the position of a private employer which had no obligation not to discriminate prior to the effective date of Title VII. Cf. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 353–354, 97 S.Ct. 1843, 1863–1864, 52 L.Ed.2d 396 (1977). USPS has long been subject to a proscription against discrimination, and each class member's entitlement to relief can take into account pre-Act discrimination. *Chewning v. Schlesinger, supra,* 471 F.Supp. at 775, fn. 16. See also *Moore v. City of San Jose, supra* at 1273:

The legislative history of the Equal Employment Opportunity Act of 1972, which extended Title VII to local governments, indicates a congressional intent to supplement the existing rights and remedies of public employees... Therefore, (it cannot be presumed) that Congress intended that the courts should ignore the unlaw-

fulness of a public employer's prior conduct and thereby sanction the withholding of remedial relief for unlawful acts occurring before (1972).

16. The evidence with respect to discrimination in discipline is also compelling. The statistics show blacks getting approximately two-thirds of the discipline while comprising less than one-third of the work force. USPS has promulgated no objective standards or criteria to govern the administration of discipline, with the result that the same conduct can result in differing forms of discipline at the hands of different supervisors or, indeed, even at the hands of the same supervisor. Plaintiffs offered evidence, in addition to the statistics, of specific instances in which blacks had been disciplined for offenses while whites with more significant adverse records had not been disciplined. USPS has offered no evidence to contradict the plaintiffs' showing nor has it made any efforts to explain those results on any basis other than race. Consequently, the Court concludes that the defendant's disciplinary practices have discriminated against blacks because of their race and that they are entitled, upon a proper individual showing, to relief, including the removal of disciplinary records and back pay for time lost.

16a. The evidence also indicates that defendants have often refused to treat allegations of discrimination in a serious manner. Chisholm's complaints of classwide discrimination were simply ignored. Other examples of discrimination raised in the administrative process have been settled by offering specific promotions or details without dealing with the root causes. Not all settlement agreements have been lived up to by USPS, and plaintiffs have suffered because of the lack of an advocate to represent them in EEO matters. This deficiency will be addressed in the relief provided herein.

17. Defendants have discriminated against plaintiffs and the class they represent both before March 24, 1970, from March 24, 1970 to March 24, 1972, and from March 24, 1972 to the date of trial on the basis of race in each of the following particulars:

(a) promotions, including the various selection procedures utilized in the promotion process;

(b) written examinations for supervisory positions, the results of which were utilized for distributing benefits with respect to various promotions and details;

(c) details;

(d) discipline;

(e) management training; and

(f) dealings with blacks who attempted to gain relief from discrimination through the administrative process.

18. The Court has broad discretion to remedy the effects of racial discrimination. One of the primary remedies is the award of back pay to victims of racial discrimination. 42 U.S.C. § 2000e–5(g); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Once a Court has determined that a class has sustained economic loss from a discriminatory practice, as here, a presumption in favor of back pay arises, and any denial must be well supported. *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 421, 95 S.Ct. at 2373. There are no reasons to deny back pay in this case.

The goal of the back pay remedy is, so far as possible, to make the victim whole. Consequently, each class member who brings himself within the entitlement to back pay will be entitled to receive compensation for lost wages received as a result of discrimination in promotion. Ordinarily, a discriminatee will be entitled to be compared with the white who was instead selected, including any subsequent promotions, in order to establish what would be the discriminatee's "rightful place." Back pay is also appropriate for losses caused by discriminatory detailing and discipline.

In addition, each discriminatee who establishes his entitlement to relief in subsequent proceedings will be entitled to recover front pay, if appropriate. That is, the discriminatee will be entitled to recover in the future the rate of pay of the position or

positions he was denied until he is placed into a job of equal or higher pay grade. *Patterson v. American Tobacco Co., supra,* 535 F.2d at 269.

Where promotions have been denied, plaintiffs and the class are entitled to appropriate injunctive relief and preferential treatment for future vacancies. *Franks v. Bowman Transportation, supra.* No "bumping" of incumbents will be allowed. *Patterson v. American Tobacco Co., supra.*

19. A number of individuals testified at trial concerning allegations of discrimination against them. With respect to plaintiff Chisholm, the administrative findings of discrimination against him has not been challenged. It is thus the law of this case that Chisholm was discriminatorily denied an interview for the Finance Examiner position. The burden, under present regulations, is thus on USPS to demonstrate, by clear and convincing evidence, that Chisholm would not have received the promotion if he had been interviewed. 29 C.F.R. § 1613.271(a)(1). The Court has carefully analyzed the evidence, including Chisholm's testimony, and concludes that if Chisholm had been interviewed and had otherwise not been a victim of discrimination a fair promotion board would have granted him the Finance Examiner promotion. Defendants put on no evidence to demonstrate what the pertinent promotion board considered when Robert Wallace was given the job. The evidence is strong that Wallace had been pre-selected for the job even before the board was convened. Chisholm, whose skills and articulateness are evident from his administrative file, his testimony at trial, his education and his work history, could, in the Court's opinion, have convinced a fair-minded promotion board that he was the best man for the job. Finally, even if the Court is wrong in this regard, Chisholm was found to be qualified by USPS for the level 21 job, Manager of Finance, in 1974, and by terms of the relief provided in the administrative process should have been given that promotion. He is entitled to proper equitable relief.

With respect to the other individual cases, defendants assert there has been no showing of discrimination. The Court has, however, evaluated all of the evidence and has weighed credibility issues where necessary, and determines that the individuals have demonstrated individual discrimination by USPS.

Where, as here, there is a showing of class-wide discrimination with respect to promotions and factors leading to promotions, there arises a presumption that each member of the class has been a victim of discrimination. In order to demonstrate an individual's entitlement to relief, one is simply required to show that he is a member of the class, that he applied for a job, and then provide (at the relevant stage) any other information to establish the amount of loss. *Sledge v. J. P. Stevens & Co., Inc.,* 585 F.2d 625, 637–638 (4th Cir. 1978), cert. den. 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241.

Each of the individuals who testified here has shown his qualifications for the promotions sought or otherwise demonstrated an example of discrimination. Having made that showing, USPS was obligated, in order to defeat a particular individual's case, to prove, by a preponderance of the evidence, that some factor other than discrimination accounted for the personnel decision. *Sledge v. J. P. Stevens & Co., Inc., supra;* 585 F.2d at 637. Further, defendants were required to demonstrate by objective comparative evidence the qualifications actually considered at the time of the decision. *East v. Romine Inc.,* 518 F.2d 332, 340 (5th Cir. 1975). It is not enough to demonstrate that some other factors *might* have accounted for the decision. For example, the testimony of Anne Davis, comparing the relative service and experience of the successful whites with the blacks who claimed discrimination, was merely a retrospective review of the personnel records. There was almost no testimony from the members of the relevant Promotion Advisory Boards as to what factors were considered. Where the Boards' deliberations were reviewed (as in Rushing's case) the evidence shows a more qualified black was denied the promotion.

The assertion of USPS that seniority and experience were the controlling factors is contrary to the testimony presented which indicated a whole range of factors were considered by the boards. Moreover, the evidence is clear that whites were specifically and discriminatorily groomed (through long details) for many of the promotions involved.

Evidence prepared specifically for litigation to explain the basis of promotion decisions and presented by one not involved in the very promotion decisions at issue has little probative weight, and USPS has failed to carry its burden. See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 433, fn. 32, 95 S.Ct. 2362, 2379, fn. 32, 45 L.Ed.2d 280 (1975).

The foregoing analysis is a variation from that set out in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), which discusses the burdens in an individual case of discrimination. The burden imposed by *Sledge* on defendants is greater than *McDonnell-Douglas* inasmuch as the classwide showing here shifts the burden to the defendant.

The Court concludes, however, that even using the standard established in *McDonnell-Douglas* and applied in later cases, the individual discriminatees have proven their cases.

Under applicable law, plaintiffs must show a *prima facie* case by presenting evidence of vacancy, qualifications and interest. Given that showing, the defendants must articulate a legitimate reason for the actions complained of, and plaintiffs have a chance to demonstrate defendants' proffered articulation is pretextual. The burden of proof remains with plaintiff throughout and the Court's duty is to evaluate all the evidence to see if plaintiffs have shown discrimination by a preponderance of the evidence. See *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees v. Sweeny*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Wright v. National Archives*, 609 F.2d 702 (4th Cir. 1979).

Even under this more difficult individual case analysis, the Court concludes, after weighing all the evidence and issues of demeanor and credibility, that the individual plaintiffs have demonstrated that they were victims of discrimination as they claim. Defendants have not shown any evidence of what considerations were used to deny details and promotions to blacks or to justify disparate discipline. Their assertions concerning experience are both speculative and fail to take into account the fact that whites have gained such experience as a result of discrimination. The Court incorporates herein the discussions of each individual claim set forth in the findings of the fact which demonstrate that defendants' articulations in each case cannot be accepted in light of the many instances of discriminatory and standardless conduct impacting on blacks in general and the individual claimants in particular.

The Court thus determines that the following individuals are entitled to the specific relief set forth in the Findings of Fact for each.

Napoleon Chisholm

Herman Rushing

Alfred A. Hart, Jr.

William McCombs

William Holman

James Little

John Pettice

James Lee

Norman Mitchell

Roy Dixon, Jr.

Tom Lee McGill

Milton Yongue, Sr.

Peggy F. Talbert

Oren McCullough

Clarence Morgan

John Harrison

Wade Mosley

20. A master will be appointed to recommend the exact individual relief appropriate in this case. *UTU v. N. & W. Ry. Co.* 532 F.2d 336 (4th Cir. 1975). For those individuals who have already been found to be victims of discrimination, the master will

determine the necessary and proper relief for the discrimination demonstrated. Plaintiffs and class members will have a chance to prove claims of discrimination consistent with the class definition, and relief shall be granted in accord with the principles set forth in *Sledge v. J. P. Stevens*, 585 F.2d 625, 637–38 (4th Cir. 1977); *White v. Carolina Paperboard Co.*, 564 F.2d 1073 (4th Cir. 1977); and other pertinent cases. Detailed instructions to the master will hereafter be entered to guide him in this task.

■ 21. As a matter of equity, this Court would be inclined to award appropriate pre-judgment interest to all back pay awards; however, it is precluded from doing so since pre-judgment interest is not specifically allowed in Title VII. *de Weever v. United States*, 618 F.2d 685 (10th Cir. 1980); *Fisher v. Adams*, 572 F.2d 406, 411 (1st Cir. 1978). Post-judgment interest is allowable and should be awarded on all back pay. *White v. Bloomberg*, 501 F.2d 1379 (4th Cir. 1974). The Court believes that post-judgment interest should be awarded at the "adjusted prime rate" used by the IRS in cases of income tax refunds or penalties. *EEOC v. Pacific Press Publishing Assn.*, 482 F.Supp. 1291, 1319–1320 (N.D.Cal.1979); *Olympic Medical Corp.*, 104 LRRM 1325 (1980). Such interest should be calculated from the date of the Judgment compounded monthly.

22. Plaintiffs are also entitled to appropriate injunctive relief and reporting provisions to insure the discriminatory practices found herein do not re-occur. *United States of America v. County of Fairfax*, 629 F.2d 932 (4th Cir. 1980).

23. Plaintiffs as prevailing parties shall recover their legal costs and expert witness fees. *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971).

## JUDGMENT

Based on the Findings of Fact and Conclusions of Law filed herein on October 3, 1980, the Court enters the following Judgment. This Judgment is limited to the facilities of the United States Postal Service ("USPS") located in Mecklenburg County, North Carolina, although USPS is specifically enjoined from utilizing policies developed on a national or regional basis which, in any way, conflict with this Judgment without first obtaining the permission of this Court.

IT IS HEREBY ORDERED, ADJUDGED and DECREED:

1. USPS, its officers, agents, employees and those acting in concert with them or at their direction (hereinafter referred to as "defendants") are hereby enjoined from discriminating against plaintiffs and the class represented by plaintiffs with respect to promotions (including all components of the promotion process), details, the use of written tests, discipline, or pay, in any fashion, intentionally or unintentionally, because of their race or color.

2. The defendants are enjoined against taking any retaliation or reprisal against any of the named plaintiffs or intervenors or against any persons who have testified or later testify on behalf of plaintiffs in the trial of this action or who have assisted or hereafter assist plaintiffs and their counsel in this proceeding.

3. This action is certified as a class action, under Rule 23(b)(2), F.R.Civ.P. The class is defined as follows:

All black persons who have been employed by the defendants at the Charlotte and Mecklenburg County, North Carolina facilities of the United States Postal Service (or the United States Post Office) at any time from March 24, 1970 to the date of this Order who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants with respect to promotions (including all components of the promotion process), details, the use of written tests, discipline, or pay or who have been otherwise deprived of employment opportunities related to said factors because of their race or color.

The Court will hereafter enter a separate Order requiring that notice of this case and a copy of this Judgment be given to all class members.

5. The defendants are hereby directed to post a copy of this Judgment at each different USPS facility in Mecklenburg County on all bulletin boards commonly used for employee notices; said notice will remain posted for a period of sixty days following the date of posting. Defendants will certify to the Court compliance with this paragraph within fifteen (15) days of the date of the filing of this Judgment.

6. The defendants are enjoined to pay back pay to each plaintiff and each class member who establishes his entitlement to recover back pay for any discrimination suffered since March 24, 1970. The issue of the individual entitlement to back pay will be referred to a master for hearings, findings, and recommendations, and a separate order will be entered setting forth detailed instructions for the master. Back pay will be provided to plaintiffs and class members for any losses suffered during the limitations period as a result of racial discrimination with respect to promotion, detailing or discipline.

7. The defendants are further enjoined to provide compensatory front pay to all plaintiffs and class members who have been discriminatorily denied promotions because of race and who have not attained their rightful place as of the date this Judgment is entered. Front pay shall be computed as the difference between a discriminatee's current pay rate and the rate he would have received but for discrimination until the individual is put in his rightful place where his pay rate is equal to or exceeds that which he would have received but for discrimination. Once a discriminatee's rightful place is determined, his appropriate wage rate should be immediately raised to the rate he would be receiving but for discrimination and such rate should continue until the individual is offered the job in Charlotte which he was wrongfully denied.

8. Defendants shall pay post-judgment interest on all back pay and front pay awards made in this case. Such interest shall be computed and paid from the date of the filing of this Judgment. Post-judgment interest shall be awarded at the adjusted prime rate used by the Internal Revenue Service and adopted by the National Labor Relations Board and shall be computed and compounded on a monthly basis.

9. Defendants are directed to provide to the following individuals, all of whom have proved cases of discrimination, the specific relief established for each one in the Findings of Fact entered herein: Napoleon Chisholm, Herman Rushing, Alfred A. Hart, Jr., William McCombs, William H. Holman, James M. Little, John A. Pettice, James F. Lee, Norman A. Mitchell, Roy Dixon, Jr., Tom McGill, Milton J. Yongue, Sr., Peggy F. Talbert, Oren McCullough, Clarence Morgan, John T. Harrison and Wade Mosley. Except as set forth below, the exact parameters of the promotions and details to which said individuals are entitled and the amount of back pay they should receive shall be determined by the master. Defendants are directed to provide the following specific relief as soon as pertinent vacancies occur:

(a) Napoleon Chisholm is to be promoted to the next vacancy in Charlotte level 21 or above for which he is qualified;

(b) John Pettice is to be promoted to the next vacancy in Charlotte level 18 or above for which he is qualified;

(c) Herman Rushing is to be promoted to the next vacancy in Charlotte level 17 or above for which he is qualified;

(d) William McCombs, Milton Yongue, and Roy Dixon, Jr. are to be promoted to the next three vacancies in Charlotte level 15 or above for which each is qualified; and

(e) James F. Lee is to be promoted to the next vacancy in Charlotte in the Senior Postal Service Data Technician job.

The above listed individuals will be presumed qualified for the pertinent vacancies which hereafter occur unless USPS can show by clear and convincing evidence that they are not qualified or cannot assume the position with a reasonable amount of training.

10. All plaintiffs and class members including those listed in Paragraph 9 above,

all of whom will be entitled to present any additional claims not presented at trial, will be entitled to present claims before the master for discrimination with respect to promotions, detailing and discipline for actions which occurred within the limitations period. The master shall provide such injunctive relief as is appropriate under applicable case law to plaintiffs and class members who are successful in their claims. Such relief, in addition to the monetary compensation discussed above, can include promotion, detail, removal of records of unfair discipline and reinstatement. Plaintiffs and class members who prove a case of discrimination in promotion shall be entitled to receive promotions for jobs discriminatorily denied in Charlotte.

11. The defendants are enjoined to take affirmative efforts to achieve the recruitment, appointment and promotion of qualified black persons in sufficient numbers so as to reach the work force percentages within the various job classifications by the dates set forth below. For the purposes of this decree, the long term goal of defendants shall be to insure that blacks are represented in non-bargaining unit jobs, level 7 and above, at a ratio not less than that of the ratio of blacks in the total work force in Mecklenburg County. The defendants are enjoined to set another goal but not as a rigid quota: (1) a sufficient number of blacks at the Mecklenburg County facilities of USPS such that by January 1, 1982 and thereafter, the percentage of blacks in jobs levels 7–9 and in jobs levels 10–17 shall equal or exceed the percentage of blacks then existing in the work force at USPS; (2) a sufficient number of blacks at said facilities such that by January 1, 1983 and thereafter the percentage of blacks in jobs levels 18–20 shall equal or exceed the percentage of blacks then existing in the work force at USPS; and (3) a sufficient number of blacks at said facilities such that by January 1, 1984 and thereafter the percentage of blacks in the jobs level 21 and above shall equal or exceed the percentage of blacks then existing in the work force at USPS. The above goal is to be used as a framework by defendants. To the extent possible and consistent with this Judgment and future orders of this Court, defendants are directed to promote class members to the upper level positions. Defendants are further directed to promote and recruit blacks for other jobs where blacks are now underrepresented such as rural mail carriers and secretaries.

12. By March 1, 1981, defendants are directed to submit reports to plaintiffs' counsel setting forth the following information:

(A) An analysis of the work force existing at the USPS in Mecklenburg County, as of January 1, 1981, setting forth the number of blacks and the number of whites in each job level maintained by USPS in Mecklenburg County as of said date.

(B) A list of all promotions, reassignments, transfers and details lasting more than 15 days made from August 11, 1979 to January 1, 1981 to non-bargaining unit jobs level 7 and above and specifically setting forth with respect to each such movement the following:

a) the name, race and sex of each individual receiving such a promotion, reassignment, transfer or detail;

b) the name of the job which was filled by each promotion, reassignment, transfer or detail;

c) the level of the job filled by each promotion, reassignment, transfer or detail;

d) the date each promotion, reassignment, transfer or detail was filled;

e) the names of all blacks who applied for or were considered for each such promotion.

(C) With respect to all suspensions and terminations of employees working for USPS in Mecklenburg County from August 11, 1979 to January 1, 1981, the defendants will provide the following information:

a) the name and race of the employee suspended or terminated;

b) the date of the suspension or termination;

c) the reason for the suspension or termination; and

d) the exact discipline administered.

13. On March 1, 1982 and on March 1 of the next three years (to March 1, 1985), defendants are directed to submit reports to plaintiffs' counsel setting forth the following information:

(A) An analysis of the work force existing at the USPS in Mecklenburg County, as of the previous January 1 setting forth the number of blacks and the number of whites in each job level maintained by USPS in Mecklenburg County as of said date.

(B) A list of all promotions, reassignments, transfers and details lasting more than 15 days made during the previous calendar year to non-bargaining unit jobs level 7 and above and specifically setting forth with respect to each such movement the following:

　　a) the name, race, and sex of each individual receiving such a promotion, reassignment, transfer or details;

　　b) the name of the job which was filled by each promotion, reassignment, transfer or detail;

　　c) the level of the job filled by each promotion, reassignment, transfer or detail;

　　d) the date each promotion, reassignment, transfer or detail was filled; and

　　e) the name of all blacks who applied for or were considered for each such promotion.

(C) With respect to all suspensions and terminations of employees working for USPS in Mecklenburg County during the previous calendar year the defendants will provide the following information:

　　a) the name and race of the employee suspended or terminated;

　　b) the date of the suspension or termination;

　　c) the reason for the suspension or termination; and

　　d) the exact discipline administered.

14. Defendants shall designate an individual to be responsible for preparing and submitting the above reports and for carrying out this Judgment. The name of this individual should be provided to counsel for the plaintiffs within thirty (30) days of the entry of this Judgment.

15. Defendants are enjoined to formulate objective criteria governing the procedures for administration of discipline and filling of details and permanent promotions. Defendants are further enjoined to subject each of these procedures to the validity studies identified and described in the Uniform Guidelines on Employee Selection Procedures, §§ 5, 14 and 15, regardless of any disparate impact upon blacks. The results of such studies shall be provided to plaintiffs' counsel and the Court.

16. The defendants are enjoined to establish a new job of EEO Employee Complaints Representative at the USPS facilities in Mecklenburg County. This new job will be a level 21 position and shall be filled by a non-discriminatory advertisement, competitive application and a promotion advisory board. The job of the EEO Employee Complaints Representative will be to represent and advise employees of USPS in the administrative EEO process. The EEO Employee Complaints Representative shall be provided appropriate support and secretarial assistance. Employees who so desire will be represented in the EEO administrative process by the EEO Employee Complaints Representative. Employees who prefer shall be allowed to utilize the options of representation available to them under current USPS and EEOC regulations.

17. Defendant is enjoined from utilizing any written tests or other selection devices in connection with promotion to any non-bargaining unit jobs level 7 and above unless said tests are validated in accordance with the Uniform Guidelines on Employee Selection.

18. Defendant is enjoined from assigning or transferring any excessed USPS employees from outside Mecklenburg County into any jobs level 9 and above within said county so long as the Court retains jurisdiction of this action.

19. Plaintiffs are the prevailing parties in this action. Defendants shall pay counsel for plaintiffs reasonable partial interim at-

torneys' fees, costs and expenses, including expert witness fees and consultation fees, paralegal time and unusual clerical time for all work heretofore performed in this litigation, in the amount of $235,000, all as set out in the accompanying Memorandum of Decision as to Fees ("Order Allowing Interim Fees").

20. Plaintiffs' counsel shall also receive reasonable attorneys' fees, costs and expenses including paralegal time and other proper expenses for all future work done on behalf of plaintiffs and class members including all proceedings before the master and for work done in the implementation of this Judgment, including fees and expenses for monitoring and examining the various reports required, in answering questions of any class members and in investigating any alleged violations of this decree. Plaintiffs' counsel shall send monthly statements to counsel for defendants which shall be paid within fifteen days after receipt. If defendants contest any amounts claimed, the Court will determine what fees are appropriate.

21. The Court will retain jurisdiction of this case for five years from the entry of this Judgment. The status of the action will be reviewed at that time to determine the defendant's progress towards eliminating the effects of its past discrimination.

## ORDER ALLOWING INTERIM FEES

Plaintiff's counsel filed on September 10, 1980, a motion for allowance of interim fees and reimbursement of expenses. The motion is clearly written; it is supported by detailed back-up in the form of affidavits, itemized expenses and theories of recovery. The memorandum in support of the award is thorough and detailed and reflects a full and correct evaluation of the factors which must be considered in setting fees, pursuant to *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978).

The plaintiff is obviously the prevailing party and his attorneys are obviously entitled to substantial fees now for their seven years of labor.

Rather than repeat or re-state the facts which plaintiff's counsel has so clearly stated, I simply find as correct the facts set forth in that memorandum, with the following reservations:

(a) I make no present determination as to the "multiplier," if appropriate, by which the court might increase an otherwise normal fee, and will leave that element for consideration when a final award is made.

(b) The charge for the fees of James Outtz, Ph.D, does not appear to be supported by any particular affidavit or other description.

(c) Although the explanation may be obvious, I need some detail on the expense item of $1,337.44 listed as "Travel to Washington, D. C. (for settlement conference)."

(d) Counsel for defendants have not yet commented on the $32,133.69 requested as compensation for the services of Dr. Carl Hoffman, plaintiff's statistical expert.

(e) I am not prepared without further information to go to $20.00 an hour for charges for the time of paralegals and law clerks.

Because of those qualifying circumstances, the partial award herein ordered is kept substantially within the total which plaintiff's counsel are obviously entitled to for services of the attorneys and their staff; the partial award herein made for costs and expenses will be confined to $15,000.00 instead of $23,255.40, and the partial award herein made for the services of the statistical expert, Dr. Hoffman, will be $25,000.00 instead of the $32,133.69 requested.

In view of these considerations, and taking into account all of the information on file, I therefore find as a fact that plaintiff's counsel are entitled to an interim partial award of attorneys' fees and expenses as follows:

1. Attorneys' fees: _____ $175,000.00
2. Paralegals and law clerks: ___ 20,000.00
3. Costs and expenses: _____ 40,000.00 (including $25,000.00 of the charges of Dr. Hoffman).

Defendants are therefore directed and ordered to pay counsel for plaintiff the sum of $235,000.00 to cover the items listed above.

Final determination will be made after more information is available and when there is more time to give full consideration to the question of appropriate fees for the entire services and expenses of counsel.